# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| J.F. NUT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CAUSE ACTION |
| | ) | NO. 1:17-CV-405-SS |
| SAN SABA PECAN EXPORTS CORPORATION AND SAN SABA PECAN, LP, | ) | |
| | ) | |
| Defendant | ) | |

ORAL DEPOSITION OF

MR. DONALD K. LINDQUIST, III

MAY 1, 2018

VOLUME 1 OF 1

ORAL DEPOSITION OF MR. DONALD K. LINDQUIST, III, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on May 1, 2018, from 10:15 a.m. to 4:17 p.m., before Carol A. Curtis, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Thompson & Knight, LLP, 1722 Routh Street, Suite 1500, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions attached hereto or stated on the record.

# A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr. Michael D. Tuttle
ESPINOZA LAW FIRM, PLLC
2211 Danbury Street
San Antonio, Texas 78217
Telephone: (210) 229-1300
Facsimile: (210) 229-1302
michael@espinozafirm.com

FOR THE DEFENDANT:

Mr. Gregory D. Binns
THOMPSON & KNIGHT, LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
gregory.binns@tklaw.com

ALSO PRESENT: Mr. James K. Shahan

# I N D E X

Appearances . . . . . . . . . . . . . . . . . . . . . 2
Stipulations . . . . . . . . . . . . . . . . . . . . 6
MR. DONALD K. LINDQUIST, III
Direct Examination by Mr. Tuttle . . . 6
Signature Page . . . . . . . . . . . . . . . . . . . 178
Reporter's Certificate . . . . . . . . . . . . . . . 179

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | E-mail dated December 10, 2015 (Bates Nos. San Saba 00000668 through San Saba 00000669) (Previously marked) | 147 |
| 13 | E-mail dated February 17, 2016 (Bates Nos. San Saba 00000100 through San Saba 00000101) (Previously marked) | 147 |
| 135 | First Amended Notice of Intent to Take Deposition of Don Lindquist | 35 |
| 136 | Arrowhead Bank account statement dated January 29, 2016, to February 29, 2016 (Bates Nos. San Saba 00000476 through San Saba 00000477) | 102 |
| 137 | Wire transfer instructions dated February 17, 2016 (Bates No. San Saba 00000482) | 109 |
| 138 | Purchase order dated January 28, 2016 (Bates No. 000021) | 110 |
| 139 | Microbiological limits (Bates Nos. 000019 through 000020) | 110 |
| 140 | J.F. Nut Company invoice (Bates No. 000018) | 113 |
| 141 | Freight bill (Bates No. 000022) | 115 |
| 142 | Pedimento (Bates No. 000023) | 116 |
| 143 | Certificate of origin (Bates No. 000025) | 116 |

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 144 | Finished product shipment format (Bates No. 00017) | 117 |
| 145 | San Saba Pecan, LP, check request dated January 19, 2016, and attachments (Bates Nos. San Saba 00000451 through San Saba 00000459) | 120 |
| 146 | E-mail dated April 21, 2016, and attached spreadsheet (Bates Nos. San Saba 00001713 through San Saba 00001714) | 139 |
| 147 | Federal Bureau of Investigation public service announcement dated January 22, 2015 | 157 |
| 148 | Federal Bureau of Investigation public service announcement dated August 27, 2015 | 158 |
| 149 | E-mail dated March 28, 2016 (Bates Nos. San Saba 00000262 through San Saba 00000263) | 166 |
| 150 | Interoffice memo (Bates No. San Saba 00000588) | 167 |

A G R E E M E N T S

THE REPORTER: Today's date is May 1st, 2018. The time is approximately 10:15 a.m. We are located in Dallas, Texas.

This is the oral deposition of Mr. Don Lindquist, as Authorized Representative for San Saba Pecan, LP, in the matter of J.F. Nut Company vs. San Saba Pecan Exports Corporation and San Saba Pecan, LP, in the United States District Court for the Western District of Texas, Austin Division, Cause No. 1:17-CV-405-SS. My name is Carol Curtis, certified shorthand reporter, representing Kim Tindall & Associates, Inc., 16414 San Pedro, Suite 900, San Antonio, Texas

Will all counsel present please state their appearances and whom they represent and any stipulations, and then I will swear the witness.

MR. BINNS: I'm Greg Binns with Thompson & Knight for San Saba Pecan, LP, and San Saba Pecan Exports Corporation.

MR. TUTTLE: This is Mike Tuttle for the Plaintiff, J.F. Nut Company.

MR. DONALD K. LINDQUIST, III,

having been first duly sworn, testified as follows:

MR. TUTTLE: And just for the record, pursuant to the Rule 615 that relates to excluding witnesses, the

agreement that we stated on the record at the last deposition. And so I'm -- I'm objecting to him being present. You can obviously do what you want, but I'm objecting to him being present.

MR. BINNS: That's fine.

DIRECT EXAMINATION

BY MR. TUTTLE:

Q. Please state your name for the record.

A. Donald Kenneth Lindquist, III.

Q. Will you please -- do you have a driver's license on you --

A. I do, yeah.

Q. -- by any chance?

A. Yeah. (Witness tenders document.)

Q. Thank you. For the record, I'm looking at a Texas driver's license, Texas driver's license [redacted]27; Class C; date of birth, [redacted]977; under the name Donald Kenneth Lindquist, III; with an address of [redacted] San Saba, Texas 76877. Thank you, sir.

Is all the information that's contained on your driver's license correct as of today?

A. It is not. My address is actually different now.

Q. What's -- what's your latest address?

A. It's [redacted] Georgetown, Texas

Q. Do you know what percentage?

A. No, sir.

Q. Do you know if he -- if he owns it through some other entity or if he owns it in his individual capacity?

A. I'm not sure.

Q. Have you ever seen the owner or the -- well, let's -- let me ask you this. San Saba Pecan, LP, do you understand what that means as an LP?

A. I just know it stands for limited partnership.

Q. Do you know who the limited partner is?

A. I -- my understanding it's the Chase family and the trust.

Q. And what's the name of the trust?

A. That, I don't know.

Q. Do you know who the general partner is?

A. No.

Q. Are you familiar with a company by the name of Head Nut, LLC?

A. I've seen mail that said Head Nut on it, but I don't know anything about it.

Q. Does San Saba do business with other entities that Richard Chase or the Chase family owns?

MR. BINNS: Let me interrupt you one second. I'm sorry. You're -- we're getting to the point of where you're talking about San Saba.

A. This is the form that the bank provided so that we can wire money.
Q. In fact, and that form is filled out, correct?
A. Correct.
Q. I want to show you a document that I will mark as Exhibit 138.
(Exhibit No. 138 marked)
Q. (BY MR. TUTTLE) Do you recognize that document?
A. Yes.
Q. What is that document?
A. This is a purchase order.
Q. And what is the purpose of the purchase order?
A. Just to reduce to writing what we have agreed on as far as price and product and make sure that they understand that they must meet our specification.
Q. And typically -- and I kind of want to go through all -- all the documents that would be part of -- of a particular transaction. Is -- when you say the specifications, is that the document that I will mark here as Exhibit 139?
(Exhibit No. 139 marked)
A. That's correct.
Q. (BY MR. TUTTLE) And so when a purchase order would be sent to a vendor -- and let's make sure I have the terminology correct. For example, J.F. Nut, what

would you classify J.F. Nut, as a supplier, a vendor?
A. I would call them a supplier.
Q. A supplier. Okay. And so if you were going to send a purchase order to a supplier, would that be a document like what we're looking at here in -- in Exhibit 138?
A. It can be, yes.
Q. Are there other versions of that document that are out there, like different formats?
A. I don't know if there's any other formats, but we can -- we can agree to something in an e-mail. And sometimes this doesn't get sent, but most of the time, it does.
Q. Now, as it relates to the -- the J.F. Nut case, this case in particular, are you aware of any transactions that are part of this lawsuit that did not have a purchase order as part of it?
A. It would always have to have a purchase order. I just don't know if this is actually written, but they would have to have a purchase order, to my knowledge.
Q. What do you mean by whether it was actually written?
A. So sometimes if Jorge says, Hey, I have a load that I want to send to you, do you want to pay this, or what can you pay or whatever, I say, Well, let me -- let

me look at my position, and I'll say, Yeah, I can buy it. And I'll say, Pam, can you get him a PO. And she may just send in an e-mail, your PO number is this, this, and this, so that he can deliver it.
Q. Correct, but at some point in the process, a PO would be generated, correct?
A. Correct, uh-huh.
Q. And -- and my question is, in regards to the transactions that this lawsuit involves, are you aware of any of the transactions that did not include a PO?
A. I'm not aware of any, no.
Q. Okay. And so every transaction that's at issue here, your -- it's your testimony that there's a PO involved, correct?
A. There would be a PO number involved, yes.
Q. Well, when I say a PO, I'm talking about a written PO, correct?
A. There should be, yes.
Q. All right. And -- and, for example, the Exhibit 138, that's an example of one of the POs, correct?
A. Correct.
Q. All right. And 139, is that something that is always sent with a PO, or is that sent every once in a while, or how oft -- how often does that get sent?
A. This is -- this is sent pretty -- it's pretty

standard, yeah.

Q. Now, when -- the document at the top says microbial -- hold on. I'm sorry.

A. Microbiological.

Q. Microbiological limits; is that correct?

A. Yes, sir.

Q. And for the ladies and gentlemen of the jury, what does that mean?

A. It basically means that, you know, if we're going to get something from you, it can't surpass this limit.

Q. Okay. And so every shipment that gets delivered to San Saba from a supplier, for example, J.F. Nut, then the expectations would be that the shipments of pecans would meet those microbiological limits as contained in 139, correct?

A. That's correct.

Q. Are there different versions that would be relevant here to any of the transactions that took place, or is that pretty much the standard version?

A. This is standard.

Q. Okay.

(Exhibit No. 140 marked)

Q. (BY MR. TUTTLE) I'm going to show you a document that's marked Exhibit 140. Do you recognize that

Q. And -- and that particular is, I believe, 138, is that correct, the exhibit number?
A. Yes, sir.
Q. And so other than the information that's contained on the face of that document, are there kind of terms and conditions on the back side or -- or somewhere else that we can't see that's in that agreement?
A. No, sir.
Q. Okay. And so I want to list these things as to what -- where this information may be found. So the -- the purchase order, and as an example, just as an example, 138, Exhibit 138, correct?
A. Yes, sir.
Q. What other document is -- would -- would San Saba contend would comprise the terms and conditions of San Saba's agreement with J.F. Nut?
A. Anything under the amount.
Q. Such as?
A. Just written confirmation back and forth.
Q. And the written confirmation back and forth, is that with regards to price and to quantity?
A. Yes, sir.
Q. Anything else?
A. And could be a text.
Q. Is there any particular text that would say

anything other than price or quantity that you would be pointing to the jury?
A. No, sir.
MR. BINNS: Objection. Calls for speculation.
A. No, sir.
Q. (BY MR. TUTTLE) And so there were texts, correct, that went back and forth that discuss pricing, quantity; is that correct?
A. Yes, sir.
Q. What else?
A. We discuss timing of loads. He -- he asked when money was coming. He would ask if I needed any more loads, basically if we were in the market to buy anything.
Q. What else?
A. He would ask when are we going to -- basically when are we going to pay, you know, and -- and did I like the loads, did we receive loads. That's basically it.
Q. With regard to that documentation, it's -- just to be very clear what San Saba is contending what makes up the terms and conditions of the agreement, and I just want to review, you talked about a purchase order, correct?
A. Correct.
Q. You've talked about e-mails and text messages, correct?
A. Correct.

Q. Other than the purchase order and the e-mail and text messages, what else would San Saba point to to tell the jury this is what formed our agreement?

A. I believe that's it.

Q. Okay. And I want to narrow that down a little bit further. With regard to the e-mails and the text messages that went back and forth, the -- the terms and conditions that went back and forth that are relevant in the e-mails and from San Saba's standpoint are the e-mails that relate to price, to quantity. Would that be correct?

A. Correct.

Q. Now, you also mentioned that there were -- there were discussion of the timing of the loads and when payment was going to be made, but -- but does that actually comprise the agreement, or is that just kind of an inquiry as part of the agreement as it's unfolding?

A. That's just an inquiry as it's unfolding.

Q. Okay. But in terms of the agreement itself between J.F. Nut Company, the Plaintiff in this case, and San Saba Pecan, you would be stating that if we were going to look at the terms and conditions, it would be the purchase order itself and the e-mails that relate -- and texts that relate to price and quantity, correct?

A. Correct.

Q. There's nothing else that you're going to come

A. Correct. There's nothing formal or informal that would require her to change anything.

Q. Okay. And it's also your -- your testimony that there were no procedures that were in place or policies that were in place by San Saba that were designed to prevent a hacker from sending an unauthorized e-mail to the company asking to change wiring instructions, correct?

A. I mean, I don't know how we would protect somebody else from being hacked, but, no, we -- no.

Q. Okay. And it's your testimony that you don't know how you would protect someone from being hacked, correct?

A. Correct.

Q. Okay. Now, I want to kind of move back just for a moment to Exhibit 146. In Exhibit 146 there's one, two, three, four, five, six, seven wire transfers that are listed in the spreadsheet, correct?

A. Yes, sir.

Q. And out of the seven, six of them are the ones, as you've previously testified, that Jorge Flores claims that he hasn't received payment for, correct?

A. Correct.

Q. Now, is it San Saba's position that J.F. Nut Company had not provided the pecans that triggered payment for -- on each of those invoices that they submitted to

San Saba?

A. Say that again. I'm sorry.

Q. In other words, there's -- there's six invoices where San Saba made a payment, correct?

A. Correct, yes.

Q. Now, is there anything about any of those six invoices where San Saba is taking the position that, well, J.F. Nut Company didn't fulfill its obligations under the agreements for each transaction?

A. No, these -- these pecans were received and paid for.

Q. Okay.

MR. TUTTLE: And objection. Nonresponsive.

Q. (BY MR. TUTTLE) So, for example, if I may -- if I may see it one more time real quick.

A. I'm sorry. (Witness tenders document.)

Q. If we're taking a look at the first invoice, which is A1067, do you see that?

A. I do.

Q. And if we actually looked at that invoice, it is true that San Saba received the pecans that were subject to that invoice, correct?

A. Correct.

Q. And it's also true that those pecans cleared the COAs, correct?

A. Correct.
Q. At that point, then, payment was to be issued based on that Invoice A1067, correct?
A. Payment was made in accordance to the e-mails.
Q. Right, but that's -- that's not my -- sure, that's not my question, but from the standpoint of there was nothing that was going to hold up payment at the -- at the time that payment was, in fact, made, correct?
A. Correct.
Q. Now, it's -- you understand that it's Jorge Flores' contention that he didn't receive the money, correct?
A. Correct.
Q. But I also want to make sure that it's not San Saba's contention that they weren't entitled to be paid on that invoice. That's not -- that's not San Saba's contention, correct?
A. Correct.
Q. Okay. And then the same thing with the second payment, which reflects an Invoice 010101000 for PO Number 1083 in the amount of $218,700. Do you see that there?
A. Yes, sir.
Q. And so the same question for that invoice, there was nothing that J.F. Nut company had failed to do as a

Q. The last two on there, if you can read those into the record.

A. Know the habits of your customers, including the details of, reasons behind, and amount of payment. The second one is, Carefully scrutinize all e-mail requests for transfer of funds to determine if the requests are out of the ordinary.

Q. Now, when someone is changing payment instructions to a third party, would you agree that that is something that would be out of the ordinary?

A. No.

Q. And why not?

A. It happens all the time in our industry.

Q. In this particular case, if Jorge Flores is asking that payment be made to Jude Okoh, instead of J.F. Nut Company, is it your testimony that that wouldn't raise any red flag whatsoever?

A. That is correct.

Q. Is it also your testimony that it wouldn't raise a red flag whatsoever if they're changing the bank itself?

A. That's correct.

Q. Is it also your testimony that there would be no red flag if they're changing the address of the beneficiary?

A. That's correct. It happens all the time.

F-1067

# PURCHASE ORDER

**San Saba Pecan, LP**
*2803 W Wallace*
*San Saba, Texas 76877*
*(325) 372-5727*

Date 1/28/16

P.O. NO. № 001882

VENDOR JF Nut Company
Jorge Flores

SHIP TO San Saba Pecan
2803 W. Wallace
San Saba, TX
325-372-5727

| SHIPPING METHOD | SHIPPING TERMS | DELIVERY DATE |
|---|---|---|
| | | |

| QTY | ITEM # | Description and Reason for Purchase (or item being repaired) | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 48,373 lbs | (1612 cs @ 30 lbs) | Fancy Small Pcs | $5.40/lb | |
| | | | | |
| | | Payment to be made upon receipt of SSP Clear COA | | |
| | | Must Meet Attached Spec's | | |
| | | PO number must be on all paperwork (BOL & Invoice) | | |
| | | | | |
| | | | SUBTOTAL | |
| | | | SALES TAX | |
| | | | TOTAL | |

1. Please send two copies of your invoice.
2. Enter this order in accordance with the prices, terms, delivery method, and specifications listed above.
3. Please notify us immediately if you are unable to ship as specified.
4. Send all correspondence to:
Keith Shahan
2803 W Wallace
San Saba, TX 76877
325-372-5727 Phone
325-372-5171 Fax

EXHIBIT
138
Lindquist
PENGAD 800-631-6989

[signature]

Date

# Microbiological Limits

TOTAL PLATE COUNT: <10,000/ gram Maximum

MOLD: <300/ gram Maximum

YEAST: <300/ gram Maximum

COLIFORMS: <50/ gram Maximum

E. COLI: ≤0.3/ gram

SALMONELLA: Negative / 25 grams

AFLATOXIN: <15 PPB

COAGULASE STAPHYLOCOCCI: <10 grams

LISTERIA: Negative / 25 grams

MOISTURE: < 5%

FREE FATTY ACIDS: < 0.5%

PEROXIDE VALUE: < 5% meq/kg

ACID VALUE: < 0.5%

EXHIBIT
PENGAD 800-631-6989
139
Lindquist

The above are standard counts, and will be deemed as acceptable unless the customer specifies or requests otherwise.



Contents of this document and any parts thereof are confidential and trade secret, the sole property of San Saba Pecan, LP, and are not to be copied or duplicated in any form without written permission from San Saba Pecan, LP.

| Document Revision Date | Summary of Revisions |
|---|---|
| 3.19.2015 | Document revised; moisture, FFA, Peroxide and Acid Values added. |
| | |
| | |
| | |



Contents of this document and any parts thereof are confidential and trade secret, the sole property of San Saba Pecan, LP, and are not to be copied or duplicated in any form without written permission from San Saba Pecan, LP.