# EXHIBIT D

Page 74

Q. Did you ever ask Keith to do a review prior to this incident occurring, a review of the accounting policies and procedures?
A. No.
Q. Did you ever hire a consultant or anyone from the outside to come in and do an analysis or review or audit of the accounting policies and procedures of San Saba?
A. No.
Q. As a CEO of the company, did you subscribe to any journals, industry magazines, things of that nature?
A. Yes.
Q. What journals and magazines?
A. Pecan South.
Q. Any others?
A. None that I can recall.
Q. Tell me a little bit about Pecan South and the type of content that's contained within.
A. Primarily the content located inside is about growing conditions, market information, equipment for sale, new pest controls, anything new to the market. It's geared more towards the growing side.
Q. Do you recall reading or seeing any articles in Pecan South that relate to the accounting aspects of your job?

Page 75

A. No, sir.
Q. How much time did you spend prior to this incident occurring doing your own self-study or research online about accounting policies and procedures?
A. Very little.
Q. When you say "very little," can you describe for the jury what the extent of that self-study or research on your own consisted of?
A. Sure. I -- I can remember, you know, going into bookstores, and I bought books on accounting just to understand the basics, and that's about it.
Q. Did you ever have your wife go into the office and have her evaluate or review any of the accounting policies and procedures of San Saba?
A. No.
Q. Prior to this incident occurring, did you ever have conversations with your wife about the accounting policies and procedures of San Saba?
A. No.
Q. During the last deposition of Ms. Mann, there was some talk about San Saba's document retention policy and procedure. Do you recall that in Ms. Mann's deposition?
A. Yes, I recall some of it.
Q. The documents that were produced by San Saba in

Page 76

connection with that are Bates stamped San Saba 000576 through 582.
Do you recall that document retention policy?
A. I would have to look at it, to be honest with you.
Q. I'm not going to attach it as an exhibit, but for the record, at least the documents that I'm looking at are San Saba 00000576 through 582.
Do you recognize those documents?
A. Yes.
Q. And is that San Saba's document control and records retention policy and procedure?
A. Yes, for their food safety.
Q. And -- and as you've stated, this relates specifically to food safety, correct?
A. Correct.
Q. And I believe in Ms. Mann's deposition, I specifically asked if San Saba had any type of accounting -- written accounting policies and procedures, and I believe her answer was no.
Do you recall her answer to that?
A. I don't recall her answer, but I don't know that we have a -- a large amount of written policies.
Q. Well, and that's kind of what I want to understand. I mean, I'll -- I'll represent to you that

Page 77

I've been told, at least through your attorney, that San Saba does not have any written policies and procedures that relate to the accounting aspect of the business. Is that accurate?
A. I would say so, yes.
Q. Okay. And so as we sit here, there's not one document that you can point the jury to that would reflect a written accounting policy and procedure for San Saba; is that correct?
A. Not that I'm aware of right now, no.
Q. Okay. Now, it is true, however, that San Saba has some forms like for when it's going to request a wire transfer and things of that nature, correct?
A. Correct.
Q. But in terms of a written policy as to how to do things, how things operate, work flow, things of that nature, there's nothing in writing that San Saba maintains; is that correct?
A. That's correct --
Q. And --
A. -- to my knowledge.
Q. And -- and that's -- that was true back when the incident gave -- that gave rise to the lawsuit, and -- and is that still true today, or is it --
A. I -- I believe so, yes.

Page 78

Q. Okay. And so just to be clear, since that was a compound question, that was true at the time this incident happened, correct?
A. Correct.
Q. That there were no written policies and procedures for the accounting aspect, correct?
A. Correct.
Q. And -- and that's still true today, correct?
A. We have, you know, procedures. I don't know that they're written, yes.
Q. Okay. And so I want to talk about your role as a CEO at the time this incident happened. At the time this incident happened, as the CEO of the company, the company being San Saba, did Keith report to you?
A. Yes.
Q. And what is your understanding of the role of a CEO in general, if you can provide the jury with your understanding of what the role of a CEO is?
A. Sure. My understanding is a C -- did you say CEO or CF --
Q. C -- CEO.
A. CEO. CEO is to manage, you know, all aspects of the business, work hand in hand with managers and employees alike to make sure that business is getting done. I oversee the buying, the selling, and the

Page 79

shelling, and rely on my managers.
Q. And when you say the -- the CEO's duty or the CEO's job is to manage all aspects of the business, that also includes the accounting aspects, correct?
A. Yes.
Q. But it's also true, as you sit here today, that at least at the time that you became the CEO, you had no experience managing the accounting aspects of any business for that matter; is that correct?
A. Correct.
Q. And it's also true that no one -- no decision maker above you asked you or required you to go obtain any kind of additional training, correct?
A. Correct.
Q. And on your own, other than going to the bookstore and -- and looking or purchasing a book that relates to accounting, you didn't do any independent research with regard to that, correct?
A. Correct.
Q. You didn't take any classes or go to any seminars on that, correct?
A. Correct.
Q. And earlier you were talking about Ms. Mann's position, and I think you talked about how she works with growers and also that she performs some accounting

Page 80

functions; is that correct?
A. Correct.
Q. With regard to those accounting functions, you were not in a position to provide her with any kind of training or -- or advice or anything like that as to how to do that part of the job, correct?
A. That's correct.
Q. And from the standpoint of the CEO, would you agree with me that one of the duties of the CEO is to identify risks to the organization and try to minimize those or prevent those?
A. Yes.
Q. And what did you do to try to identify risks to the organization?
MR. BINNS: Objection. Calls for a narrative answer and overbroad.
A. With respect to, you know, buying, I -- you know, basically my job was to make sure that we bought on the right side of the market. With respect to selling, to make sure that we worked hand in hand with our apart -- our accounting department to make sure that we were selling at a profit. With production, making sure that we were meeting budget as far as what we were projected to produce that month and sell that month. With respect to accounting, I -- my -- I relied on managers to do that

Page 81

because they were -- they were highly educated in that area.
Q. (BY MR. TUTTLE) However, with regard to the accounting, however, you would agree with me that due to your lack of experience and education in that area, you weren't in a position to be able to identify any risks to the organization that related to that accounting aspect; is that correct?
MR. BINNS: Objection. Argumentative.
A. I can -- I can identify a risk if I see it. You know, I -- but I don't see a lot of risk in our accounting department.
Q. (BY MR. TUTTLE) And with regard to things like Internet security, e-mail security, things of that nature, what experience or training did you have with that?
MR. BINNS: Objection. Vague and ambiguous question.
A. With security with Internet, I didn't have any formal training.
Q. (BY MR. TUTTLE) Had you done any self-study or anything like that?
A. No.
Q. And with regard to the -- the things that you were asking the -- I think a moment ago when you testified that you relied on their experience because they were -- I

Page 134

A. That's correct.
Q. And so it's your testimony today that you -- you can't -- you don't know?
A. That's correct.
Q. Okay. Have you ever sat down with Keith prior to today to -- to learn what documentation would be required?
A. No, sir.
Q. Okay. And so you rely completely on Keith, then, to perform his job up to whatever standards are out there, correct?
A. Yes. This is a very rudimentary part of our job. We do it every day.
MR. TUTTLE: Okay. Let's take a quick -- a quick break.
MR. BINNS: Okay.
(Lunch recess from 1:54 p.m. to 2:52 p.m.)
Q. (BY MR. TUTTLE) All right. So I want to kind of transition a little bit to talk about the actual terms and conditions of each of these transactions. And in particular, I want to know, first of all, whether it's your contention that any oral statements or anything like that that may have been made in the course of dealing with Mr. Jorge Flores, if there are any oral statements that you're contending form part of the terms and conditions

Page 135

of -- of these transactions with San Saba.
A. No.
Q. And so to the extent that there were terms and conditions to this agreement or to these agreements, they would be found in the -- in the documentation that's been provided by San Saba; is that correct?
A. Correct.
Q. And I want to talk about in particular what that documentation is. And so one of the things that we've talked about is the e-mails between the parties, at least initially as it pertains to the price, quantities, things of that nature.
Is there anything in those e-mails that you would be pointing to the jury other than the price, quantity, you know, telling people, Hey, we're going to send this purchase order, that you would point to as containing the terms and conditions of the agreement?
A. No.
Q. Now, before we took a break for lunch, we had reviewed the purchase order, correct?
A. Yes, sir.
Q. Now, the purchase order itself, what I'm looking at from my standpoint, appears to be a copy of a purchase order. Would you agree with that?
A. Yes, sir.

Page 136

Q. And -- and that particular is, I believe, 138, is that correct, the exhibit number?
A. Yes, sir.
Q. And so other than the information that's contained on the face of that document, are there kind of terms and conditions on the back side or -- or somewhere else that we can't see that's in that agreement?
A. No, sir.
Q. Okay. And so I want to list these things as to what -- where this information may be found. So the -- the purchase order, and as an example, just as an example, 138, Exhibit 138, correct?
A. Yes, sir.
Q. What other document is -- would -- would San Saba contend would comprise the terms and conditions of San Saba's agreement with J.F. Nut?
A. Anything under the amount.
Q. Such as?
A. Just written confirmation back and forth.
Q. And the written confirmation back and forth, is that with regards to price and to quantity?
A. Yes, sir.
Q. Anything else?
A. And could be a text.
Q. Is there any particular text that would say

Page 137

anything other than price or quantity that you would be pointing to the jury?
A. No, sir.
MR. BINNS: Objection. Calls for speculation.
A. No, sir.
Q. (BY MR. TUTTLE) And so there were texts, correct, that went back and forth that discuss pricing, quantity; is that correct?
A. Yes, sir.
Q. What else?
A. We discuss timing of loads. He -- he asked when money was coming. He would ask if I needed any more loads, basically if we were in the market to buy anything.
Q. What else?
A. He would ask when are we going to -- basically when are we going to pay, you know, and -- and did I like the loads, did we receive loads. That's basically it.
Q. With regard to that documentation, it's -- just to be very clear what San Saba is contending what makes up the terms and conditions of the agreement, and I just want to review, you talked about a purchase order, correct?
A. Correct.
Q. You've talked about e-mails and text messages, correct?
A. Correct.

Page 138

Q. Other than the purchase order and the e-mail and text messages, what else would San Saba point to to tell the jury this is what formed our agreement?
A. I believe that's it.
Q. Okay. And I want to narrow that down a little bit further. With regard to the e-mails and the text messages that went back and forth, the -- the terms and conditions that went back and forth that are relevant in the e-mails and from San Saba's standpoint are the e-mails that relate to price, to quantity. Would that be correct?
A. Correct.
Q. Now, you also mentioned that there were -- there were discussion of the timing of the loads and when payment was going to be made, but -- but does that actually comprise the agreement, or is that just kind of an inquiry as part of the agreement as it's unfolding?
A. That's just an inquiry as it's unfolding.
Q. Okay. But in terms of the agreement itself between J.F. Nut Company, the Plaintiff in this case, and San Saba Pecan, you would be stating that if we were going to look at the terms and conditions, it would be the purchase order itself and the e-mails that relate -- and texts that relate to price and quantity, correct?
A. Correct.
Q. There's nothing else that you're going to come

Page 139

later on whenever we get in front of a jury that you would be saying, This is what we are relying on?
MR. BINNS: Objection. Asked and answered.
A. Correct. We -- we rely on text messages, e-mails to facilitate getting these loads taken care of.
Q. (BY MR. TUTTLE) Right. And -- and I'm not disputing that, but with -- but there's a lot of e-mails and communications that relate to the price, the quantity. And so what I'm trying to find out is, is there anything within those e-mails as to price and quantity other than that, that relate to price and quantity that you would be telling the jury, Hey, this -- this was part of our agreement?
MR. BINNS: Objection. Vague and ambiguous question.
A. No, sir.
Q. (BY MR. TUTTLE) And at some point after the issues arose in this case, my understanding is that an e-mail was sent to you -- to Jorge on April 24th. And that e-mail, I'm attaching an exhibit sticker as Page 146.
(Exhibit No. 146 marked)
Q. (BY MR. TUTTLE) Do you recognize that e-mail?
A. Yes, sir.
Q. Did you write that e-mail?
A. Yes, sir.

Page 140

Q. Did you send that e-mail to Jorge?
A. Yes, sir.
Q. And attached to that e-mail is a spreadsheet. Do you see that on the third page?
A. Yes, sir.
Q. And that spreadsheet is something that San Saba generated; is that correct?
A. Yes.
Q. And isn't it true that that spreadsheet is a summary of the invoices or the payments, I guess I should say, and invoices that are at issue in this case; is that correct?
MR. BINNS: Objection. Assumes facts not in evidence, misstates the content of the document. It's argumentative.
A. Yes, sir.
Q. (BY MR. TUTTLE) And in other words, that -- that document was prepared as San Saba and J.F. Nut had gotten together and tried to investigate what had occurred, correct?
A. Correct.
Q. And on that spreadsheet in the, I believe it's the first column, the first column says PO number. Do you see that?
A. Yes, sir.

Page 141

Q. And the PO number reflects each of the POs that San Saba and J.F. Nut had looked into and determined that payment went somewhere other than directly to J.F. Nut; is that correct?
A. Correct.
Q. And then the next column shows the date received. And the date received in each of those, does that reflect the date the PO was received or the date the wire went out, or do you know?
A. I'm not certain about this date, to be honest with you.
Q. The next column talks about invoice number; is that correct?
A. Yes, sir.
Q. And so when the first column says PO Number 1882 and then there's a corresponding invoice number that says A1067, that is J.F. Nut's invoice number, correct?
A. Correct.
Q. And then the third column, I guess one, two, three, four, maybe the fourth column where it says amount of invoice, that's the amount of the invoice that was received from J.F. Nut, correct?
A. Correct.
Q. And then the next column says wire fee, which was the cost to send the wire; is that correct?

Page 146

A. Correct.
Q. Okay. And, in fact, the -- it reflects the beneficiary, the payee for that particular wire that corresponds to PO 1884 and Invoice A1090, as being J.F. Nut Company, correct?
A. Correct.
Q. Okay. Now, in terms of setting up a client within J.F. Nut's accounting systems and things of that nature, you don't have any particular knowledge of that in your individual capacity, do you?
A. J.F. Nut's?
Q. I'm sorry. San Saba. I apologize.
A. My understanding, when we have a -- a vendor or a -- if you want to call it supplier, whatever the case may be, they are set up within Great Plains. They are issued a -- a vendor number and the name of the company, the contact, and that's done at Great Plains.
Q. And -- and is it also your understanding that wire information or payment information as to where a wire would go is not maintained within that computer system?
A. That's correct.
Q. Okay. And so where is that information maintained from a file standpoint?
A. That file is located on Pam's desktop.
Q. Okay. And I'm going to show you a document that

Page 147

was Exhibit 13 to Pamela's deposition. Actually I -- I take that back. Let me go back to Exhibit 5 of Pamela's deposition. And, well, be -- before we talk about Exhibit 5, the only place or -- or the procedure that Pam follows, is it your understanding that she was trained to do that, or is it just because that's what the bank told her to do as it relates to providing information for a wire transfer?
A. It's my understanding that the bank provided the documentation for us to facilitate a wire, and she's done that for many, many years.
Q. Okay. And was that the procedure before you came -- you became CEO?
A. Yes, sir.
Q. Was that the procedure before you came -- became executive director?
A. Yes, sir.
Q. And nothing changed once you became CEO, correct?
A. No, sir.
Q. And -- and so I'm going to show you Exhibit 5. Do you recognize Exhibit 5 to be the e-mail where Jorge Flores provided wiring instructions for payments to be made after loads were ready to be paid by San Saba?
A. Yes, sir.

Page 148

Q. And who was that e-mail directed to?
A. To Pam.
Q. And Pam would have been the proper person to have received that, correct?
A. Correct.
Q. And you never provided Pam with any kind of training as to how she's supposed to document that, other than knowing that that's what you just testified, that the bank had requested the information to be on a certain form, correct?
A. That's correct. I never provided Pam any training for this. This is what she did.
Q. And the e-mail itself and the form that it was received was acceptable to San Saba; is that correct?
A. Correct.
Q. Is it San Saba's contention that that e-mail that provides the wiring instructions for J.F. Nut was deficient in any way?
A. I don't believe so.
Q. And is it also the case that other than the actual wiring instructions that go to the bank like we had looked at earlier, I believe in Exhibit Number -- where are the exhibits, oh -- in Exhibit Number 137, that there's no special form or anything like that that San Saba maintains for the wiring instructions for suppliers?

Page 149

MR. BINNS: Objection. Misstates prior testimony.
A. From this e-mail, she would put the information on this form and save it to her desktop.
Q. (BY MR. TUTTLE) Correct. But my question is, does San Saba send a supplier a form asking them to fill it out and to sign off authorizing San Saba to pay under a specific set of instructions?
A. No, sir.
Q. Okay. And so the only thing that San Saba bases its decision to utilize the wiring instructions is what's re -- in this particular case, what was received in -- in that e-mail, which is Exhibit Number 5 to Pamela Mann's deposition; is that correct?
A. Correct.
Q. And isn't it also true that San Saba did not have a written policy or a written procedure that must be followed prior to changing a supplier's payment instructions?
A. That's correct.
Q. And prior to this incident, it's also true that there never had been any discussions about trying to create a policy or procedure that would relate to changing a supplier's payment instructions?
A. That's correct.