# Transcript of the Testimony of

# **James Shahan**

**Date:**

May 01, 2018

**Case:**

J.F. NUT COMPANY vs SAN SABA PECAN EXPORTS, et al

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

J.F. NUT COMPANY, )
)
Plaintiff, )
)
VS. ) CAUSE ACTION
) NO. 1:17-CV-405-SS
SAN SABA PECAN EXPORTS )
CORPORATION AND SAN SABA )
PECAN, LP, )
)
Defendant )

ORAL DEPOSITION OF

MR. JAMES K. SHAHAN

MAY 1, 2018

VOLUME 1 OF 1

ORAL DEPOSITION OF MR. JAMES K. SHAHAN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on May 1, 2018, from 4:22 p.m. to 8:10 p.m., before Carol A. Curtis, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Thompson & Knight, LLP, 1722 Routh Street, Suite 1500, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions attached hereto or stated on the record.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Michael D. Tuttle
ESPINOZA LAW FIRM, PLLC
2211 Danbury Street
San Antonio, Texas 78217
Telephone: (210) 229-1300
Facsimile: (210) 229-1302
michael@espinozafirm.com

FOR THE DEFENDANT:
Mr. Gregory D. Binns
THOMPSON & KNIGHT, LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
gregory.binns@tklaw.com

ALSO PRESENT: Mr. Donald K. Lindquist, III

Page 3

INDEX

Appearances . . . . . . . . . . . . . . . . . . . . . . 2
Stipulations . . . . . . . . . . . . . . . . . . . . . 7
MR. JAMES K. SHAHAN
Direct Examination by Mr. Tuttle . . . 7
Cross-Examination by Mr. Binns . . . . 116
Redirect Examination by Mr. Tuttle . . 120
Recross-Examination by Mr. Binns . . . 134
Redirect Examination by Mr. Tuttle . . 140
Recross-Examination by Mr. Binns . . . 144
Signature Page . . . . . . . . . . . . . . . . . . . 150
Reporter's Certificate . . . . . . . . . . . . . . . 151

Page 4

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | Wire transfer instructions dated February 17, 2016 (Bates No. San Saba 00000482) (Previously marked) | 34 |
| 136 | Arrowhead Bank account statement dated January 29, 2016, to February 29, 2016 (Bates Nos. San Saba 00000476 through San Saba 00000477) (Previously marked) | 82 |
| 140 | J.F. Nut Company invoice (Bates No. 000018) (Previously marked) | 80 |
| 141 | Freight bill (Bates No. 000022) (Previously marked) | 80 |
| 142 | Pedimento (Bates No. 000023) (Previously marked) | 80 |
| 143 | Certificate of origin (Bates No. 000025) (Previously marked) | 80 |
| 144 | Finished product shipment format (Bates No. 00017) (Previously marked) | 80 |
| 145 | San Saba Pecan, LP, check request dated January 19, 2016, and attachments (Bates Nos. San Saba 00000451 through San Saba 00000459) (Previously marked) | 69 |
| 146 | E-mail dated April 21, 2016, and attached spreadsheet (Bates Nos. San Saba 00001713 through San Saba 00001714) (Previously marked) | 61 |
| 147 | Federal Bureau of Investigation public service announcement dated January 22, 2015 (Previously marked) | 55 |

Page 5

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 148 | Federal Bureau of Investigation public service announcement dated August 27, 2015 (Previously marked) | 55 |
| 149 | E-mail dated March 28, 2016 (Bates Nos. San Saba 00000262 through San Saba 00000263) (Previously marked) | 55 |
| 151 | San Saba, LP, check request dated February 17, 2016, and attachments (Bates Nos. San Saba 00000417 through San Saba 00000424) | 85 |
| 152 | San Saba, LP, check request dated February 25, 2016, and attachments (Bates Nos. San Saba 00000409 through San Saba 00000416) | 86 |
| 153 | San Saba, LP, check request dated February 25, 2016, and attachments (Bates Nos. San Saba 00000400 through San Saba 00000408) | 86 |
| 154 | San Saba, LP, check request dated February 25, 2016, and attachments (Bates Nos. San Saba 00000391 through San Saba 00000399) | 87 |
| 155 | San Saba, LP, check request dated March 15, 2016, and attachments (Bates Nos. San Saba 00000371 through San Saba 00000380) | 87 |
| 156 | San Saba, LP, check request dated February 22, 2016, and attachments (Bates Nos. San Saba 00000425 through San Saba 00000432) | 88 |
| 157 | Wire transfer instructions date February 18, 2016 (Bates No. San Saba 00000483) | 111 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 158 | Wire transfer instructions date February 26, 2016 (Bates No. San Saba 00000484) | 111 |
| 159 | Wire transfer instructions date February 29, 2016 (Bates No. San Saba 00000488) | 112 |
| 160 | Wire transfer instructions date March 4, 2016 (Bates No. San Saba 00000491) | 113 |
| 161 | Supplier information packet (Bates Nos. San Saba 00000910 through San Saba 00000913, San Saba 00000726, and San Saba 00000902 through San Saba 00000903) | 130 |



AGREEMENTS

THE REPORTER: Today's date is May 1st, 2018. The time is approximately 4:22 p.m. We are located in Dallas, Texas.

This is the oral deposition of Mr. James Shahan, in the matter of J.F. Nut Company vs. San Saba Pecan Exports Corporation and San Saba Pecan, LP, in the United States District Court for the Western District of Texas, Austin Division, Cause No. 1:17-CV-405-SS. My name is Carol Curtis, certified shorthand reporter, representing Kim Tindall & Associates, Inc., 16414 San Pedro, Suite 900, San Antonio, Texas.

Will all counsel present please state their appearances and whom they represent and any stipulations, and then I will swear the witness.

MR. BINNS: Greg Binns for San Saba Pecan, LP, and San Saba Pecan Exports Corporation.

MR. TUTTLE: Mike Tuttle for the Plaintiff, J.F. Nut Company.

MR. JAMES K. SHAHAN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TUTTLE:

Q. Will you please state your name for the record?
A. Full name is James Keith Shahan. I go by Keith.



Q. Are you the I, the II, the III?
A. I'm the one and only.
Q. Do you have a son who's also a CPA?
A. I have a son who's a CPA. I have two sons who are CPAs.
Q. Well, lucky you.
A. They're twins.
Q. Really?
A. Yeah.
Q. Well, congratulations.
A. One practices publicly. The other is in industry.
Q. What are their names?
A. Kevin Lee and Brian Keith.
Q. The only reason I ask, because when I was looking up -- when I was Googling your name, I kept on coming across other Shahans who are CPAs in San Saba?
A. Yeah. Well, there's only one in San Saba. The other one is up here in Dallas. I also have a sister that's a CPA.
Q. Numbers run in the family. Mr. Shahan, what -- do you have a driver's license on you?
A. Yeah.
Q. May I see it, please?
A. (Witness tenders document.)



Q. Thank you. For the record, I'm looking at a Texas driver's license Number 05680136 with a -- an address of 2509 West Dry Street in San Saba, Texas 76877, with a date of birth of 04/08/1950.
Is all the information that's on your driver's license true and correct?
A. That is my physical address, yes, but that's not my mailing address.
Q. Physical is fine. Although I promise I'm not going to go stalk you.
A. Well, just don't mail anything there.
Q. How many years have you been living at that address?
A. Since 1984.
Q. And who do you live there with?
A. My wife.
Q. And what's her name?
A. Debra.
Q. How do you spell Debra?
A. D-e-b-r-a.
Q. Shahan?
A. Yes.
Q. Other than your twin sons, do you have any other children?
A. Yes.

Page 10

Q. How many?
A. Three others.
Q. What are their names?
A. Nathan Clay Shahan, Jason James Shahan, Steven Scott Shahan.
Q. Is that Scott with two Ts?
A. Uh-huh.
Q. And what cities did -- or what city does Nathan reside in?
A. Nathan resides in Heath.
Q. Texas?
A. Yes, which is Rockwall.
Q. And what about --
A. Jason.
Q. -- Jason?
A. Jason lives in Granbury, and Steven has just moved back to San Saba.
Q. I'm going to go over a couple of things before we get started. Have you ever given your deposition before?
A. Yes.
Q. How many times?
A. Two or three.
Q. When was the last time?
A. Let me think. The last deposition I gave, wow.

Page 11

Q. Was it a long time ago?
A. It's been awhile, yes.
Q. Okay. That's fine. More than ten years ago?
A. Probably, yes.
Q. Fair enough. Well, I'm going to go over kind of the -- the rules. I kind of got into that late with Don, but you understand that we have a court reporter here today?
A. Yes.
Q. You understand that she can only take verbal responses?
A. Yes.
Q. I may prompt you at times, say -- I may say, Is that a yes, if you say uh-huh or whatever. Do you understand that?
A. Yes.
Q. Do you understand that you're under oath today?
A. Yes.
Q. Do you understand that we'll be using your testimony for all -- for all purposes in this proceeding from here on in?
A. Yes.
Q. And will you agree that if for some reason you -- if for some reason I ask a question that you don't understand or is confusing, that you'll tell me so I can

Page 12

rephrase it?
A. Yes.
Q. Thank you. All right. Let's talk about where you resided before the 2509 West Dry Street.
A. Before 2509 West Dry Street --
Q. Yes, sir.
A. -- I was at 201 North Hope Street in San Saba.
Q. And how long were you there?
A. I was there from 1976 to 1984.
Q. What year did you marry your wife?
A. 1970.
Q. And where did you live before that?
A. Before the Hope Street address, I lived at Number 7 Castleberry in Lampasas, Texas.
Q. How long were you there?
A. From 1973 to 1976.
Q. Have you always lived in Texas?
A. Yes.
Q. Where did you graduate high school?
A. San Saba High School.
Q. What year?
A. 1968.
Q. Did you have any formal education after that?
A. Yes.
Q. From when to when?

Page 13

A. From 1968 to 1972, I attended Angelo State University in San Angelo, Texas.
Q. Did you earn any degrees there?
A. Yes.
Q. In what?
A. I have a degree. I have a bachelor's degree in accounting with a bachelor's -- a Bachelor of Business Administration degree with a major in accounting.
Q. Did you have any schooling after that?
A. No.
Q. My understanding, you're a licensed CPA?
A. That's correct.
Q. When did you take the exam?
A. When did I take it, or when did I pass it?
Q. A fair -- fair --
A. Those are two different dates.
Q. A fair -- fair question. When did you obtain your license?
A. I started taking the exam in 1972, and I finally got my license in 1975.
Q. Persistence pays off. Everyone that I've ever talked to about that says that's a lot harder than the bar exam.
A. I don't know. I've never taken the bar, but I know the CPA exam is pretty tough.

Page 14

Q. Through college, did you work at all?
A. Yes.
Q. What type of jobs?
A. Well, the first two years, I worked during the summers back in San Saba in road construction. And the second year into college, we got married, and so I had a part-time job while we lived in San Angelo at a company that manufactured signs.
Q. Once you graduated in 1972, where did you start working?
A. I went to work for a public accounting firm in Austin, Texas.
Q. What was it called?
A. The name of the firm was McWhirter, that's M-c-W-h-i-r-t-e-r, McWhirter & Edwards.
Q. And what was your position?
A. Staff accountant.
Q. And from what year to what year were you there?
A. I was there from August of '72 until the first part of November of '73.
Q. Where did you go after the that?
A. 1973, I moved to Lampasas and went to work for a sole practitioner CPA there in Lampasas.
Q. What was his name?
A. His name was J.C. Ewing, just like Dallas' J.C. Ewing.

Page 15

Q. And what was your position?
A. I was the only employee, so I guess I was staff, senior, whatever -- whatever he wanted me to be.
Q. And how long were you there?
A. I was there from '73 until '76.
Q. And where did you go from there?
A. May of '76, I moved back to San Saba and took the position as the manager officer of the then San Saba Building & Loan Association, which subsequently became Heart of Texas Savings.
Q. Is that what it is today?
A. It's no longer around.
Q. Savings and loan scandal?
A. It went out of business in '89, '88 actually.
Q. And were you -- you were there from '76 to when?
A. '88.
Q. And in 1988, what did you do?
A. In 1988, the savings and loan failed, and it became part of what was then known as Olney Savings & Loan.
Q. How do you spell that?
A. O-l-n-e-y, just like the town in Texas. I stayed with them until about the middle part of 1989 and went to work for another savings and loan called Texas

Page 16

Trust Savings -- Savings Bank.
Q. Texas Trust Savings Bank?
A. Texas Trust Savings Bank.
Q. Okay. Going to the -- jumping back up to the San Saba Building & Loan, what was your position there?
A. I was the managing off -- managing officer was the title I held.
Q. What was the name of your position at Olney?
A. At Olney, I guess -- I don't know that I had a -- I don't know that I had a position. Probably the nearest thing would have been a CFO type title.
Q. And what about at Texas Trust?
A. Texas Trust, I was the treasurer and then subsequently CFO.
Q. What year did you become CFO?
A. Let's see. I went to work there in '89. Probably sometime mid to late 1990.
Q. And when did you leave Texas Trust?
A. I left Texas Trust in 1995. Actually Texas Trust no longer -- they ceased to exist as well in December of 1994. And what --
Q. Where -- go ahead.
A. And what was left of the company was merged into a sister company that was all owned by the Centex Corporation, and I stayed with them until 1995.

Page 17

Q. Centex Corporation?
A. Uh-huh, C-e-n-t-e-x.
Q. They're the nuclear place?
A. No, they were Fox & Jacobs Homes. They -- they merged into Pulte Homes.
Q. Gotcha. So you were at Centex from 1995 until when?
A. Well, Cen -- Centex -- no, Centex owned Texas Trust Savings Bank.
Q. Okay.
A. So I was with Texas Trust Savings Bank from '89 until '95 in effect because they took their federal charter and handed it back to the Office of Federal Supervision in December of 1994, and they ceased to exist. And then what assets were left over were merged into one of the Centex subsidiaries in '90 -- and then I left in '95.
Q. And where did you go in '95?
A. I went back to San Saba. I was working here in Dallas. I went back to San Saba in 1995, opened up my own practice, was self-employed for about six months, and then went to work for, at that time, Morven Partners, M-o-r-v-e-n, Partners, which had just acquired San Saba Pecan, Inc.
Q. Just to make sure I have this straight, you went

Page 18

back to San Saba to open up your own practice in about '95, correct?
A. Yes.
Q. And you were self-employed for about six months before jumping on with a company called Morgan [sic]?
A. Mor -- Morven, M-o-r-v-e-n. Morven, M-o-r-v-e-n, Partners, which had just acquired San Saba Pecan, Inc.
Q. And what was your position when you first came on?
A. When I first came on there, I was the -- well, they had -- they had four divisions within the company, and I was the CFO of the pecan division.
Q. And since 1995, '96, have you been an employee of San Saba Pecan in the different variations it became over time?
A. Yes.
Q. And let's talk about the different variations or the transitions. You said that Morven Partners had acquired San Saba Pecan in the '95 time frame, '95 or '96?
A. '95. They bought it in March of 1995.
Q. Okay. Do you remember what month in '95 that you went to work at --
A. Sept --
Q. -- San Saba?

Page 19

A. September.
THE REPORTER: And, sir, if I could get you to hold on one second and let him finish his question.
Q. (BY MR. TUTTLE) That's another thing I forgot to ask you to do. Just if you can please wait for me to finish asking the question before answering --
A. Oh.
Q. -- even if you know what I'm going to say.
A. Sorry.
Q. Sometimes people throw stuff at me when I don't do that. And what changes has -- has the company gone through since your arrival in '96?
A. In the way of ownership changes?
Q. Yes, sir.
A. Okay. Morven Partners sold San Saba Pecan to the Chase family in February of 2003.
Q. When you say the Chase family, do you know the name of the specific entity or --
A. Well, in two thousand and -- in 2003, the San Saba Pecan, LP, was formed. Actually it was formed in January of '03, but the closing occurred in February of '03. And at that point in time, the ownership interest in the partnership was basically all in one person, and that was Richard Chase. And then Richard subsequently sold the partnership interests out to other individuals to the

Page 20

point that there were -- I think there were 12 partners at that time.
Q. Was Buddy Adams --
A. He was one of the partners.
Q. Do you know what his ownership interest was?
A. At that time, I think it was 15 percent.
Q. And from February '03 until December of 2015, what other changes in terms of structure, you know, LP, Inc., LLC, business structure take place?
A. Well, the business structure of being a limited partnership is unchanged. The partners that are involved in the company did change.
Q. And as of the December 2015 time frame, what is your understanding of the structure and the partnerships?
A. In December of 2015, there were six partners.
Q. Who were they?
A. Chase Farms at 60 percent. There were three exempt trusts. The exempt trusts were what they call the grandchildren trusts. They were all grandchildren of Matt Chase. Each one of them owned ten percent. Richard Chase owned nine percent. Head Nut, LLC, owned one percent. And Head Nut, LLC, is the general partner. Head Nut, LLC, is a limited liability company owned one hundred percent by Richard Chase.
Q. Do you know if Head Nut, LLC, still exists?

Page 21

A. Yes, it does.
Q. At the time of the incident giving rise to this suit, and I'll -- I'll define that as from December 2015 to March or April of 2016, were you the CFO of San Saba Pecan, LP?
A. Yes.
Q. When did you first assume the role of CFO?
A. For San Saba, Pecan, LP, I assumed it the day that it was closed into the Chase ownership in two thousand and -- February of 2003.
Q. And from February 2003 until December of 2015, was Pamela Mann an employee during that entire period?
A. Yes, she was.
Q. She -- she was already an employee when you were hired, correct?
A. Yes.
Q. Did she report to you in terms of line of authority?
A. Time frame?
Q. The time of the events giving rise to the lawsuit.
A. Yes.
Q. For all her duties and responsibilities or just some of them?
A. Just some of them.

Page 22

Q. And what are the duties and responsibilities that she had that she would have to report to you and be accountable to you?
A. Mainly regarding the payment for supply, I mean, for pecans received either on an in-shell basis or a finished goods basis.
Q. What does it mean a finished goods basis?
A. With the pecan meats out of the shell.
Q. And for purposes of this lawsuit, that's the manner that J.F. Nut Company was supplying the pecans, correct?
A. That is correct.
Q. And I want to talk about your -- your role as a CFO just for a moment. As CFO, what are your duties and responsibilities?
A. Main responsibilities are -- are to oversee the books and records, especially from the accounting standpoint, and to manage the funds or lack thereof.
Q. What year did Don Lindquist start working for the company?
A. I believe 2012.
Q. Now, at the time Don was hired, was Buddy Adams the CEO?
A. Yes.
Q. What position was Don hired for?

Page 23

A. Don was hired, and the title that he was given was executive director.
Q. At the time, was Don in a position that was higher than you, or was he an equal on the org chart, per se?
A. I don't recall what the org chart looked like, but I think Buddy intended for us to treat him as an equal, and we did. "We" being the other existing officers.
Q. And the other officers were Sonny Paddie?
A. Yes.
Q. And who was the other one?
A. Jimmy Ellis.
Q. And Paddie is spelled P-a-d-d-i-e?
A. That's correct.
Q. Did any of the accounting and business -- well, let me say did any of the accounting responsibilities fall on Don when he was still an executive director?
A. No.
MR. TUTTLE: I need to take a quick restroom break.
A. Sure.
(Recess from 4:48 p.m. to 4:53 p.m.)
MR. TUTTLE: What was the last question?
(Requested portion was read)

Page 24

Q. (BY MR. TUTTLE) At the time this incident took place and, again, being the time -- the relevant time from this lawsuit talking about December of 2015 through March and April of 2016, what were your responsibilities as CFO?
A. Basically the same answer as I gave you awhile ago, you know, oversee the accounting function and oversee the treasury function.
Q. That's right. One of the duties and responsibilities that you would have had as a CFO would have been -- or at least under your watch would have been setting up suppliers in the system, correct?
A. Yes.
Q. Suppliers such as J.F. Nut, correct?
A. Yes.
Q. And that's what he was referred to in the context of your business, a supplier?
A. Supplier. And then in the accounting vernacular, it would be a vendor.
Q. And I think a couple of folks have testified that the accounting system that was used was called what?
A. We had just converted our existing accounting system software from a supplier called Sage, S-a-g-e, to the Great Plains platform, which was a Microsoft product or is a Microsoft product.
Q. Is that the platform that's still used to this

Page 25

day?
A. It is.
Q. Was that changed at your direction?
A. No.
Q. Who made the decision to change it?
A. The decision to change was basically, if I recall correctly, it was -- it was a project undertaken and directed by Richard and G.L., Richard Chase and G.L. Straley, because other companies within the Mack Energy umbrella were -- were using it.
And there were people who had quite a bit of expertise at being able to set the software up and -- and make it do things that we could not do in the -- in the accounting platform under the Sage product.
Q. The current structure of San Saba Pecan, LP, at the time of this incident was that you had Head Nut as the limited partner; is that correct?
A. No, that's not correct.
Q. Or as the general partner?
A. Yes.
Q. And it was a one percent general partner?
A. Yes.
Q. And the limited partner was Richard Chase individually; is that correct?
A. He's one of them.

Q. And then -- and who was the other one again?
A. Chase Farms was another limited partner and then the three grandchildren's trusts were the other limited partners.
Q. In total, how many -- or what percentage did the grandchildren trusts own?
A. Each grandchildren trust owned ten percent, so in total, the three grandchildren's trusts owned 30 percent.
Q. And then 30 percent plus Richard's 60 percent?
A. No, no.
Q. No? What -- what was the split?
A. 30 percent for the three grandchildren's trusts, 60 percent for Chase Farms, nine percent for Richard Chase, one percent for Head Nut, LLC.
Q. Got it. And since you're the accountant, I'm going to assume all those add up to a hundred.
A. They do.
Q. It kind of sounds like it did.
A. They do.
Q. Do you consider Mack Energy an umbrella corporation for San Saba Pecan, LP?
MR. BINNS: Object to -- objection. Vague and ambiguous, calls for speculation.
A. I would call it a related company.



Q. (BY MR. TUTTLE) How was it related?
A. We -- we get support services from them as in the way of IT, for one thing. Currently, not at this time, but currently today we're getting HR services from them as well, and we pay them for those services.
Q. What is your understanding of San Saba Pecan Exports Corporation?
A. From the standpoint of my understanding, San Saba Pecan Exports Corporation is an IC-DISC corporation. In the tax code, it's capital I, capital C, dash, capital D-I-S-C. It stands for Interest Charge Domestic International Sales Corporation. And it is specifically set up by Congress to enable companies to get a tax break for exporting product overseas. And it was set up to -- what's the right word -- promote, to promote export sales through a tax break.
Q. And San Saba Pecan Exports Corporation was formed after the incident that gave rise to this lawsuit, correct?
A. That's correct.
Q. Do you have any knowledge one way or the other about whether San Saba Pecan, LP, has transferred, assigned any liabilities or debts of San Saba Pecan, LP, to San Saba Pecan Exports Corporation?
A. There's been nothing of that sort, no.



Q. And how is it that you know that?
A. I have knowledge of what happens in the -- in the San Saba Ex -- San Saba Pecan Exports Corporation.
MR. TUTTLE: So will it make everybody happy if we dismiss San Saba Pecan Exports Corporation?
MR. BINNS: And comply with your agreement you made eight days ago, yeah, that would be nice.
Q. (BY MR. TUTTLE) In setting up a vendor, is there anything within the Great Plains platform that allows someone from San Saba to input wire payment instructions?
A. In the normal course of setting up a vendor, it's usually name, address, payment terms. Great Plains is very flexible. There are places in there, if you choose to do so, that you could put wiring instructions as part of the vendor setup, but we do not.
Q. Why is that?
A. We don't go to the Sage platform for wire instructions. It's not our procedure.
Q. Now, one of the things that both Pamela and Don have testified is that there are no written policies and procedures for the accounting department; is that true?
A. There is no written manual in the way of policies and procedures for the accounting department.
Q. You say that there's no written manual, but are



there other documents that someone can turn to to try to figure out what a policy or procedure is for doing something within the accounting department?
A. At this date, no.
Q. And what about at the time of the events giving rise to this lawsuit?
A. At that date, no.
Q. During the deposition of Pamela Mann, I think when we were off the record, we were joking about, well, why do we have policies that are written for the food safety aspect of the business but not for anything else, and the joke was kind of, well, because it's not required.
Is that the reason why, because it's not required?
MR. BINNS: Objection. Misstates statements that were reportedly made off the record.
A. The food safety side of it gets a very extensive audit. And if you don't score high enough on the audit, then you don't get your certification that you need, the vendors that -- that our customers require in most -- not all of them, but some of them.
Q. (BY MR. TUTTLE) And so what is the reason why there are no written policies and procedures in the accounting department?
A. The policies and procedures basically have, I

guess, for lack of a better word, evolved. And there are procedures. We just have never reduced them to writing. So the procedures are basically understood by the people who are in the department. And most of the procedures were put in place by myself, but they were never reduced to writing.
Q. Other than setting up a vendor -- well, let's talk about that. Setting up a vendor, what is required for setting up a vendor in your system? What is the proced -- what are the procedures for that?
A. The procedure is you have to have a name. You assign them a vendor ID, which is usually a variation of their name. You have to have their address. Sometimes it can be more than one address, depending on where they want their check sent. You set the terms in there so that you'll know if they're net ten, net 20, net 30, due on demand, whatever that may be. And then once you get that in the system, then you can begin to enter invoices against that vendor ID.
Q. What do you mean by entering invoices against the vendor ID?
A. Well, you can't enter a -- you can't enter a payables invoice in the accounting system without a vendor to assign it to. Now, you can write a check and pay someone. If you don't do business with them on a regular



basis and it's just occasional, you can just write them a check and pay them and not set them up as a vendor, but in most cases, if you're going to do repeat business with them, you'll want to set them up as a vendor. And in order to enter an invoice that they may have presented for payment, you have to have a vendor ID, and you have to have him set up as a vendor.
Q. And who decides whether to actually enter them into the system or not? Is there -- is that a decision made on a case-by-case basis or -- and who -- who makes that decision?
A. It's usually case by case.
Q. And who makes that decision?
A. Sometimes it's myself. Sometimes it's Amanda Haynes. Sometimes it's Steve Galbaldon. Sometimes it's a person that ordered whatever it was that they ordered. Are we going to do business with them again, no. Then we don't set them up.
Q. And in the case at hand, was J.F. Nut set up in the system?
A. They were, yes.
Q. And who made the decision to set them up in the system?
A. I'm sure it was probably me.
Q. And you mentioned just a moment ago the name



Steve. What's the last name?
A. Gabaldon.
Q. Gabaldon? How do you spell that?
A. G-a-b-a-l-d-o-n.
Q. And he's the current CFO, correct?
A. That is correct.
Q. Was he working for the company at the time of the events giving rise to this lawsuit?
A. I don't think he was.
Q. You were still the CFO at that time?
A. I was still the CFO at that time. Even though he came on somewhat in a -- he originally came on in a -- in a consulting type position because he was the one that had the extensive knowledge about the Great Plains platform, but I -- I'm almost certain he was not an employee of the company at that time.
Q. And what was San Saba's procedure for documenting payment instructions from a vendor?
A. If it was by check, then the documentation was in the platform. If it was by wire transfer, then we requested wire transfer instructions.
Q. How would you request the wire transfer instructions?
A. Normally they would come in by e-mail.
Q. Did you have a specific policy for how to



request that and obtain that information?
A. Well, the policy was to ask for it. I mean, if they wanted to provide it by e-mail, that was fine. If they wanted to provide it by fax, that was fine. If they wanted to send us an invoice with instructions on the invoice, that was fine. I don't know that we really had a procedure, per se, other than we needed the information.
Q. So there was no procedure for how to get that information other than the fact that if it was going to be someone that was going to be paid by a wire is that you tried to obtain that information from them; is that correct?
A. At that time, that's correct.
Q. And since the incident giving rise to this lawsuit, how has that changed?
A. Since the lawsuit, we -- we sent out a wire transfer form, as you have in these exhibits right here, with the information that we had on hand for that vendor under a cover letter. The cover letter said it is imperative that you check these instructions, that you verify to us that they're correct, and if they are correct, we want your signature on the signature line that's provided on that sheet. Where I normally would sign it, we asked the vendor to sign it under that one wire out -- I mean, under that one mail out.

Page 34

Q. So, for example, in Pamela Mann's deposition Exhibit 15, I believe, you would send them that blank form -- well, I take it back. You would send them the form with their information on it --
A. Yes.
Q. -- and ask them to return on the signature line signed, correct?
A. Yes, we would ask them to sign the signature line and send it back to us by mail or by fax.
Q. Okay.
A. Do not scan it and e-mail it.
Q. Okay.
A. Then we put those on record, and we had their signature with the procedure at that point to be if you want your wire transfer instructions changed, then you have to send us written notification by fax or some means other than by e-mail and sign it. Then we in effect had a signature card, much like a bank, that we could compare their signature to on the changed wire instructions to the instructions that we had from them that said that this is -- these are our instructions.
Q. And so what you're saying is the purpose of having them sign it in part was so that you could verify and confirm the signature of any subsequent change of payment instructions?

Page 35

A. Correct.
Q. Did you institute any new policies that would require a secondary method of verification like a phone call, a text, a fax, other than just a mere e-mail or -- or a singular communication method?
A. No, we did not -- we did not require it. Now --
Q. Now, at what -- during what time frame?
A. We -- well, we -- we don't have a -- we did not require a secondary procedure in -- in conjunction with this -- with this procedure here, the new procedure, for verifying their wire instructions.
Q. And the new procedure, just to be clear, that's the procedure that was formulated after the events giving rise --
A. Correct.
Q. -- to the lawsuit?
A. Yes.
Q. And I -- and I will just remind you just respectfully if you can wait for me to finish the question, because otherwise she gets mad at me. She might get mad at us.
A. Or me.
Q. And you would agree with me that the purpose of this new policy or procedure that happened after the events giving rise to this suit was to prevent someone

Page 36

from trying to change the payment instructions without authorization?
A. It was to reduce the likelihood of someone changing those procedures without us being able to know that it was not them, that it was not the vendor.
Q. Okay. And -- and essentially, I mean, the allegation that's being made in this case by Jorge Flores is that someone sent an e-mail who really wasn't authorized to change the payment instructions. I mean, you -- that's -- that's your understanding, correct?
A. That's my understanding, yes.
Q. Okay. And so by instituting that new procedure that is going to minimize, or at least it's your hope that it will minimize the risk of someone changing the payment instructions without authorization, correct?
A. That was the intent, yes.
Q. Okay. And -- but prior to the event giving rise to that -- to this lawsuit, you didn't have that procedure in place, correct?
A. That's correct.
Q. Okay. And Pamela Mann was the person within the organization that was charged with maintaining, updating payment instruction information that it re -- that she received or that the company received from vendors?
A. That was one of her primary jobs, yes.

Page 37

Q. Did the -- was there anyone else who had that within their scope of duties and responsibilities, or was it only Pamela?
A. Well, to a certain extent, I oversaw that as the CFO. And I worked with her, but she maintained the templates in her computer. She corresponded with the -- in this case, with wire instructions, mainly growers or suppliers of finished goods. And she had a rapport of most of those vendors, such that when they called and wanted something, they would call and ask for Pam, or they would e-mail Pam.
Q. And I just want to be clear so I can kind of shut that down at least for purposes of this case. Is there anyone else that -- involved in any of these transactions where the payment instructions were changed that had the responsibility to oversee that, to change it, to check on it other than Pamela Mann and yourself?
A. And myself, yeah.
Q. Okay. So I don't need -- we don't need to depose Amanda if we're trying to find that information out?
A. No, I don't think she'll tell you anything different than what's already been put in the record.
Q. Okay. And so she doesn't have -- she didn't have any part, duty, responsibility in doing that,

Page 38

correct?
A. No.
Q. Okay. In other words, when I say she didn't, that's correct, right?
A. That is correct, yes.
Q. Okay.
A. Yes, no, she didn't.
Q. Clear as mud. During your time as the -- the CFO, did you ever send Pamela out for any kind of seminar or anything like that for training for her to -- on how to do her job?
A. No.
Q. Did you ever bring someone in house from the outside, a third party to come in and show her how to do her job?
A. No.
Q. The job that she was doing when you came on as -- as CFO, did that change in any appreciable way?
A. Her job duties changed quite a bit, yes, after -- after Buddy Adams left.
Q. And how did they change?
A. Well, first of all, she had been what we called his administrative assistant pretty much. But what Buddy did in addition to his CEO duties, just like Don does in addition to his CEO duties, is he does the buying. And so

Page 39

Pam, as his administrative assistant, somewhat by default became the interceder with all these buyers from the time that she worked for Buddy and still to this day today.
And Buddy would make a deal, whatever it was, usually he would have it written in his notebook, and he would give those details to Pam, and Pam would get it written down as she understood it from Buddy and read it back to Buddy and say, Now, this is the deal you made. Buddy said, That's it.
And then from that point forward, Pam pretty well took over, oversaw -- oversaw the receipt of the -- of the pecans, oversaw the fact that they were received as agreed and needed to be paid for. And that's how she pretty well worked into the situation of becoming the person in charge of the wire transfers.
Q. And from your time in -- in 2003 to the relevant time of the events that gave rise to this lawsuit, are you aware of any specific time where -- where someone sat down with her for several days and -- and taught her how to do her job or explained to her how to do her job?
A. Well, I think when I got there, she knew how to do her job.
Q. Okay.
A. And I -- I don't know that she needed anybody to really tell her how to do her job. I from time to time

Page 40

would give her pointers on things. Like, for instance, she might bring me a wire transfer that had an ABA number on there that only had eight digits. Well, all ABA numbers are nine digits. So I said, If you've only got eight digits on there, then we've got a problem to start out with.
So it was little things like that in the way of maybe if you want to call it training, but she had been doing the job before I ever got there in 1995. And so I don't know that she needed any training.
Q. Sure. And did -- was there ever a circumstance that you're aware of either before you arrived or -- or after you arrived where payment was made to the wrong person?
A. I can think of one instance in all the years that I've been there that we sent a wire transfer out that went to the wrong person.
Q. And tell me about that.
A. And it's been so long ago, I don't remember, but it was sent to the wrong person. And we realized it soon after we did it, and there's a way that you can go into the wire transfer system and re-call a wire. And if I recall correctly, I believe that's what we did in this instance was we had our bank re-call the wire.
Q. Do you know if you tried in this particular case

Page 41

as it relates to the wires that are at issue in this particular case? Did you ask your bank to try to re-call any of the wires?
A. At the time that we found out about them, I think it was way past the time frame that you can re-call a wire. There's a certain number of days, and I think it's a fairly short period of time that you have to re-call a wire transfer. I think it may be 24 to 48 hours at the most. And I think we were way past that deadline when this happened.
Although I think there may be an e-mail in some of this discovery about where we had asked the bank to do that, but we never got a response from them.
Q. Okay. And -- and in the circumstance when it was sent to the wrong person, as you're sitting here today, you testified that you tried to get the bank to re-call it, correct?
A. Specifically --
Q. Not -- not the J.F. Nut.
A. Okay.
Q. The -- the circumstance --
A. Yeah.
Q. -- the example that you were giving a minute ago.
A. Oh, yeah, yeah, we asked the bank to re-call the

wire.
Q. And they did?
A. They did.
Q. Okay.
A. But it was within the window.
Q. Sure. And -- and the reason you did that is because it went to the wrong person, correct?
A. I think it was the wrong payee, if I recall correctly. And like I say, it's only happened once in the 20-some-odd years that I've been there, and it was quite a ways back.
But I think we had the wrong payee and the wrong account number on there, and maybe even the wrong bank. I don't remember for sure, but I remember that we found out about it soon enough that we could re-call -- re-call the wire. And it was a domestic wire, which makes it much easier to re-call a domestic wire than it does an international wire.
Q. And it's also true that you tried to contact Arrowhead Bank and/or Frost to see if they could re-call the wires as well in -- in this particular case, correct?
A. I'm almost certain that there was a request made, yes.
Q. And when I'm talking about this particular case, I'm talking about the one that involves J.F. Nut Company,



correct?
A. Yes.
Q. And ultimately you're told -- you were told that -- well, were you told anything one way --
A. We weren't told anything. It just kind of -- it just kind of fell on deaf ears or went out into never-never land or something. I don't know, but we never got a response from them. And we assumed that meant that they couldn't.
Q. Did you have any conversations with the bank about -- about commercially reasonable security measures?
MR. BINNS: Objection. Vague and ambiguous question.
A. Which bank?
Q. (BY MR. TUTTLE) Any bank that -- that relates to wire transfers.
MR. BINNS: Same objection.
A. I had no conversations regarding anything using that term.
Q. (BY MR. TUTTLE) Let me ask a -- let me ask it a little bit different way. Have you had -- are you aware of what commercially -- I can't pronounce that. Sorry. Are you aware of what commercially reasonable security procedures are as it relates to wire transfers?
A. I --



MR. BINNS: Objection. Vague and ambiguous question.
A. I don't know what that term means.
Q. (BY MR. TUTTLE) Does your bank have any authentication protocol that they require San Saba to provide information before it will execute a wiring instruction?
A. Can you define to me what you mean by authentication protocol?
Q. Does the bank require anything other than receiving, for example, the -- a document like what's listed in Exhibit 15 from Pamela's --
A. Arrowhead -- Arrowhead Bank did not, no.
Q. Okay. When they received wire transfer instructions like what's contained in Plaintiff's Exhibit 15, would they pick up the phone and call to verify with Pamela or you or anyone else?
A. In most cases, we called them.
Q. And so in most cases, when a wire transfer instruction was transmitted, there would be a follow-up call from Pamela or someone else?
A. Yes. We would call them to make sure that they got the fax because we sent all our transfers -- we either carried it, hand carried it to the bank and delivered it by hand because the bank is only -- in San Saba, a



population of 3,000 people, we can be there in less than five minutes.
Normally we would fax them the wire instructions because that's how they wanted them sent to them, not by e-mail, but by fax. That was their choice. But a lot of times we would send a wire down there, and it wouldn't come through on the fax. And then somebody would be yelling saying, I didn't get my money. And we said, Well, we sent it, and then the bank said, We never got the fax.
So to prevent that from happening, we would call them and say, We sent you a fax for a wire transfer of X number of dollars. Did you receive the fax? And they would have to say yes or no. No, we would send it again. Yes, everything was fine.
Q. And -- but your picking up the phone and calling didn't have anything to do with the bank requiring that as part of its process of executing the instructions that you sent them?
A. Not at that time, but they require it now. If I don't call them, they call me.
Q. To get that confirmation, correct?
A. Yes.
Q. And going back to San Saba's procedures for changing the information for a wire transfer, what would someone have to do to call in, communicate with San Saba

to change the payment instructions and -- I'll let you answer that.
A. Well, as I said earlier, fax, e-mail, or send us an invoice with wire instructions on it. I mean, basically that's -- if we had knowledge that we had product that we had acquired and we owed for it, if someone wanted to change their instructions, we would take it by fax. We would take it by e-mail, or we would take it in any other reasonable form they could get it to us.
Q. And assuming they sent it through whatever reasonable form, would there be any follow-up confirmation that San Saba would do as part of its process and procedure of changing the payment instruction information?
A. Sometimes, yes.
Q. And under what circumstances would it require the follow-up to confirm?
A. Pam was cautious in most cases about wire instruction changes. And domestic wire transfer changes, she picked up the phone and called the -- she called the -- the supplier.
In this case, we weren't dealing with the supplier by telephone. All the conversations she had with that supplier was by e-mail, or in Don's case, maybe by text, but Don was the one that was texting him and not Pam.



Q. And the reason that Pam was cautious and the reason that Pam would pick up the phone and try to communicate when it was someone domestic would be to prevent someone from making an unauthorized change of that information, correct?
A. Or to confirm, yes, do you really want to change your wire instructions, much like what she replied to Jorge.
Q. Right, and -- but the purpose of that confirmation is to prevent someone from changing that without authorization?
A. Sure, yes.
Q. I mean, and that -- it's basically a protection, correct?
A. You could call it that, yes.
Q. Sure. And -- and it's your testimony that she would do that for domestic wire transfers, correct?
A. Yes.
Q. Now, it's also true that Don would communicate with Jorge via text, correct?
A. I understand that that's correct, yes.
Q. And is it your understanding in having looked at this that Pamela also knew that Jorge would communicate with Don via text before all this happened?
A. I'm sure she probably did, yes.



Q. And did you ever train her to say, well, if it's an international wire transfer where the payment instructions are being changed, then make sure that someone communicates with that person, whether it's via text or some other method, to confirm the change?
A. Well, I guess to answer that question, I would say we tried to use every precaution that we could if there was a change in wire instructions and try to communicate with the vendor, supplier that was asking for the wire instructions to be changed.
Q. But you would agree with me that no one tried to contact Jorge via text to confirm that, right?
A. To my knowledge, they didn't, but I'm -- I was not involved in the text or the e-mails, so, but, no, I don't think there was any indication to me that -- that they tried to confirm it with Jorge by text.
Q. Sure, but when you testified that they tried to use every precaution they could, it is true that someone could have tried to communicate with Jorge via text to -- to confirm the change in those payment instructions, correct?
A. They could have, yes.
Q. And there was no formal or written policy or procedure that would have required Pamela to try to find a secondary communication method to confirm the change in



payment instructions, correct?
A. That's true.
Q. Because if one of the things that the company is trying to prevent with its new policy, which is to prevent unauthorized changes of information, there's always the possibility that if someone has hijacked a method of communication, then by reconfirming with that same method of communication, well, nothing is really being confirmed, correct?
MR. BINNS: Objection. Calls for speculation.
A. The new method requires them to send us signed requests to change by any method other than e-mail. So it would have to come by fax. I'm not sure you can hack a fax, but at least we've been told you can't hack a fax, or put it in the mail.
Q. (BY MR. TUTTLE) Sure. But --
A. So that -- so we have a written -- so that we have a signed document that we can compare the signatures with.
Q. Sure. Now you do, but at the time --
A. Yeah, but at the time, we did not, no.
Q. Right.
A. So is that what you're asking about?
Q. Yes. And -- and so let me --
A. Okay.

Page 50

Q. Let me reask the question maybe a little bit clearer. At the time of the incident giving rise to this suit, you would agree with me that if -- the purpose of Pamela at that time trying to confirm a wire transfer was to prevent an unauthorized person from changing the instructions, correct?
A. Yes.
Q. And -- and if Pamela tries to confirm using the same method of communication where the change request is being made, well, then there's not -- I mean, there's no -- really no security in that method because you're using the same method of communication, correct?
A. That's --
MR. BINNS: Objection. Calls for speculation.
A. I would agree with that. That's the reason we went to this.
Q. (BY MR. TUTTLE) Correct. Now, as a CFO, you would agree with me that one of your duties and responsibilities is to protect the organization from threats, you know, in the financial area, the financial arena, correct?
A. That would be a -- a normal responsibility of a CFO, yes.
Q. And one of those responsibilities arguably would be to try to put in internal controls to avoid things

Page 51

like -- or -- or to minimize the risk of embezzlement, correct?
A. Sure, it would, yes.
Q. And it would also involve trying to take precautions to avoid other type of financial crimes that are known to exist, correct?
A. Sure, as part of the duties, yes.
Q. And as a CPA, were you required to on a regular basis obtain any continuing education on a yearly basis?
A. 40 hours a year.
Q. And where would you typically go to -- to get that 40 hours of continuing education?
A. I get a good bit of my continuing education through correspondence.
Q. And as part of that correspondence, prior to the events giving rise to this suit, had you been made privy to threats that are out there, such as things called business e-mail compromise and phishing and things of that nature?
A. In the correspondence that I get, I get a quarterly publication that has articles in it. You read the articles, and you answer questions, turn it in, and that's how you get credit. And there's articles in there that cover broad ranges of subjects, and some of them -- some of the quarterly subjects have been on fraud, yes.

Page 52

Q. And what's the name of that publication that you get quarterly?
A. It's called CPE Direct, and it's from the AICPA's publication division.
Q. And when -- some of that training or some of that continuing education, as you just testified, involved trying to protect or giving you training at least or advice as to protect your organization from fraud, correct?
A. Sure.
Q. Did that also entail Internet fraud, cyber fraud, things of that nature?
A. There were several different articles over the past several years that dealt with those broad range of subjects, yes.
Q. And did you ever have an opportunity to try to contact anyone from the outside and -- and try to do an evaluation of the way you all were conducting business to try to make sure that you are using best practices as it -- as it related to the -- the financial area and the accounting area of the company?
MR. BINNS: Objection. Vague and ambiguous.
A. No.
Q. (BY MR. TUTTLE) And -- and just for clarification standpoint, when I say the financial, slash,

Page 53

accounting aspects, I mean, if I say accounting department, does that include everything that falls under the scope of your responsibility, or -- or is that not broad enough?
A. No, it's broad enough, I think, yes.
Q. Okay.
A. At that time.
Q. At that time, right. And I understand that you're not CFO anymore, correct?
A. That's correct.
Q. But you stopped becoming CFO after the events that gave rise --
A. That's correct. That's correct.
Q. If you can wait until I finish the question.
A. I'm sorry.
Q. She's going to get mad at me.
A. At least I haven't started nodding my head.
Q. And after reading those articles that you just described, did you ever try to apply that to San Saba Pecan in any way and -- and trying to figure out whether you guys could improve the practices and procedures?
A. Nothing formal, no.
Q. Okay. And from an IT standpoint, is IT something that generally fell under your scope, or was that something that fell under someone else's?

A. It did not fall under my scope.
Q. Okay. Do you recall any training that San Saba received or requested, for that matter, from the IT department about trying to prevent cyber threats?
A. The only -- the only thing related to any of that, we would get e-mails time to time from the head of the IT department at Mack Energy saying, Be careful of what you open because it could have a virus in it. We've been -- and then there would be instances where they knew of a specific virus that was out there that they would send a -- I don't know what the name is when you send it to everybody in the company, but it would be a broad e-mail that they would send to everybody.
And it basically would say there's -- we know for a fact that this virus is going around, be very careful of opening any attachments to any e-mails. If you don't know who sent you the e-mail and you're not familiar with who it is, you're better off just deleting the e-mail. And if they really need to get in touch with you, they'll get back in touch with you again. So I don't know if you call that training. I would call it warnings.
Q. Sure. And -- and those warnings were done for the purpose of trying to protect the organization, correct?
A. Yes.



Q. Are you familiar with the term "business e-mail compromise"?
A. I don't know that I ever saw the term before. I could guess what it is.
Q. Did you ever try to do anything affirmative to go outside of -- of the organization and -- and try to do any research to try to identify any threats to the organization?
A. No.
Q. Are you aware that the FBI has a link on its home page to certain resources that businesses have or that they have for businesses that relate to different types of financial crimes?
A. No, because I really don't know that I've ever been to the FBI website.
Q. I'm going to show you what was marked previously as Exhibit 148 and also 149. What is the date on Exhibit 148?
A. August the 27th, 2015.
Q. And that's before the incident that gave rise to this lawsuit, correct?
A. I believe that's correct, yes.
Q. And I -- I stand corrected. I'm also showing you Exhibit 147. What's the date on that one?
A. January the 22nd, 2015.



Q. And I'll represent to you that both of those PSAs talk about a threat that the FBI has -- had identified as a scheme called business e-mail compromise.
And prior to the events giving rise to this lawsuit, had you ever had -- you had never heard of a business e-mail compromise, fraud scheme, or anything like that, had you?
A. No, I had not.
Q. But you also had not affirmatively tried to go out and try to do any kind of research to identify other threats that were out there, correct?
A. That's correct.
Q. And as part of your training and your continuing education courses and things of that nature, had you ever been informed of a different type of fraud that's closely related called CEO fraud?
A. No.
Q. And I think as we talked about a little bit before, where -- are you aware of a type of fraud, hacking called phishing?
A. Yes.
Q. What's your understand of what phishing is?
A. As I understand phishing, it is similar to what I talked about that the IT -- IT department warned us about in the fact that unauthorized people send e-mails



out to get your information. And then they use that information for their benefit in whatever way, form, or fashion they may choose to use it.
Q. And you were aware of that even before the incident that gave rise to this suit, correct?
A. The word "phishing" as P --
Q. P --
A. P, whatever it is.
Q. -- F --
A. Yeah, right. That -- that word --
Q. I mean, P-h something.
A. I've -- I've heard of that word for quite awhile, yes.
Q. Okay. And -- and the risk you're aware from phishing is that if you -- you know, you click on something and put your information, you're -- someone can basically take control of either your computer or your information, correct?
A. That's how I understand it, yes.
Q. Okay. And as the CFO of San Saba, did you institute any policies, procedures, or anything to try to minimize or -- or prevent the risk that's posed by phishing?
A. I did not, no.
Q. Are you aware of anybody else like Mr. Lindquist

or anyone else that was charged with trying to implement any type of policies and procedures to minimize or prevent the risk posed by phishing?
A. The only other -- the only other -- the only other thing like that that I can relate to would be something coming from the IT department.
Q. Okay.
A. And -- and like I say, I would call them, for want of a better word, warnings.
Q. Sure. And the IT department was not really in-house. That was something that was contracted with and was paid for kind of on a contract basis, correct?
A. The IT department, again, is part of Mack Energy, but all of our -- all of our servers, all of our accounting software is on their servers in Artesia, New Mexico. So everything that we do goes through their computers in Artesia through the Internet.
Q. Through the Mack Energy computers and servers?
A. Yes.
Q. Okay. And did you ever have a discussion with Don about the threat posed by phishing?
A. Not specifically, no.
Q. And the threats posed by phishing were discussed in your continuing education credits and hours, correct?
A. Those terms were used in some of the articles,



yes.
Q. And -- but as you sit here today, in response to those -- to you reading those articles and those issues being brought to your attention through your continuing education, you didn't do anything to try to contact Don or -- or someone else within San Saba to try to do something affirmatively to prevent against those risks?
A. No, I did not.
Q. And the person that would have been -- the person that a change in payment instructions had to go through was Pamela, correct?
A. It started with her, yes.
Q. And I'm talking about back at the time of --
A. Yes.
Q. -- this. Would you have to sign off on a change for payment instructions?
A. Most of the time, she would bring it to me --
Q. Okay.
A. -- and say, We've got a change in wire instructions.
Q. Do you know in this particular case as it relates to J.F. Nut and the -- the change in payment instructions, in this case, whether she brought those changes to you to sign off on?
A. She brought me the e-mail that basically read



that they had had trouble with their bank. Would you please send the money to my financial accountant, Jude Okoh.
Q. And did that raise any red flags in your mind?
A. No, because it's not the first time it had ever happened.
Q. Did you instruct her to try to get a confirmation through Don or through some other method of that change, some method other than e-mail of that change?
A. Nothing other than e-mail, no. And I think she did try to get a confirmation, but she did it through e-mail.
Q. And at the time, knowing about the risk of phishing where someone can take control over someone's computer, knowing that risk, did you think about -- before approving that change in payment, did you think about trying to ask her, being Pamela, to change or to get some other confirmation through a means other than e-mail before approving that?
A. Up to this point, we had never had a problem with an e-mail not -- I mean, with a wire transfer not getting to the person that it was supposed to go to. In most cases, they sent us instructions by e-mail, so I didn't think that it was necessary to do anything else. I had an e-mail, and it came from him.



Q. Okay. Earlier --
A. 5 and 13.
Q. -- Don and I were discussing an Exhibit 146. And Exhibit 146 is an e-mail where Don was sending confirmation of all the wires where there was a problem to Jorge. You recall that, correct?
A. Uh-huh. Yes.
Q. And Don highlighted or put an X -- put a little star with a black pen next to the wire which did, in fact, go to J.F. Nut Company. And so is it your understanding as a CFO that all of those other wires are the wires that are at issue in this particular case?
A. It's my understanding there's six wires total in -- in -- in particular.
Q. And does that spreadsheet that's attached to Exhibit 146 give a correct listing of all of those wires with the exception of the very last one that Don put an asterisk by?
A. To my knowledge, that's correct, yes.
Q. And to your knowledge, each of those wires were sent to a payee or a beneficiary other than J.F. Nut Company. Is that your understanding?
A. That's what it shows, yes.
Q. And -- and I understand that that's what it shows, but that's your understanding of what happened,

correct?
MR. BINNS: Objection. Calls for speculation.
A. Yes.
Q. (BY MR. TUTTLE) And each PO that came from San Saba corresponds with an invoice from J.F. Nut Company, correct?
A. That is correct, yes.
Q. And -- and that's your understanding of that -- the information that that spreadsheet is conveying, correct?
A. Yes.
Q. Okay. And that spreadsheet was put together after San Saba did its own internal investigation with the assistance of Jorge Flores as well, correct?
MR. BINNS: Objection. Assumes facts not in evidence.
A. I think so.
Q. (BY MR. TUTTLE) And because San Saba did, in fact, conduct its own investigation to try to figure out what happened, correct?
A. We did, yes.
Q. And you were part of that investigation, correct?
A. Yes.
Q. And you also had communication with other third



parties such as Arrowhead Bank and Maria Seaton at Frost Bank, correct?
A. Marisa.
Q. Marisa. What -- what did I say?
A. Maria.
Q. Oh. Marisa Seaton, correct?
A. Yes.
Q. And what is your understanding about their investigation? I'm talking about Arrowhead's and Marisa's investigation.
A. Well, initially we contacted Arrowhead, and then Arrowhead used Frost Bank as the intermediary for their international wire transfers, and so Frost Bank was large enough that they had a fraud department. And so the Marisa lady was in the fraud department, and Arrowhead said, You need to talk to her.
Well, initially she was talking to Pam, and so I was getting information secondhand from Pam. And Pam -- a lot of what she was telling Pam, Pam didn't understand what she was telling her. And so I finally sent Marisa an e-mail and said, Make me your contact person from now on, not that I want to cut Pam out completely, but I need to be corresponding directly with you.
And so we started communicating. It wasn't a lot of communications because I was not getting a lot of



information out of Marisa. It's almost like she didn't want to tell me anything. And that was kind of the idea that I was getting was that she either didn't have information, or she couldn't give me the information because I was not the party that should have it.
So it kind of got to the point that I felt like I was wasting my time trying to communicate with her very much, but she did tell me certain things. And I think they're in the e-mails, some of the e-mails that we provided in discovery, that she said it had been turned over to the FBI, that the FBI -- FBI had been notified. And so we kept trying to find out what's the FBI -- FBI telling you, and then we didn't get much.
Q. There's some e-mails that went back and forth where Marisa is talking about how the FBI met with the -- the hackers or the fraudsters. I can't remember the word that she used, and we'll look at the e-mail in a minute, and that they -- that the hacker or the fraudster was trying to dummy up and -- and things of that nature.
What -- what was your understanding of what that was about?
A. Oh, I think the -- the term you -- when you used the term "dummy up," we received some invoices from -- from one of these -- we received two invoices from one of these payees. I had no idea what they were. They -- they



were sent to me by e-mail. And when I got them, I looked at them, and I thought what is this. And then I looked at the amount that was on there, and I thought that amount is familiar. And so I got to thinking where did that amount come from, and it -- it -- it matches to the dollar. Each invoice, separate invoice, matched to the dollar each one of these separate wires.
So I think the term "dummy up" came in because we felt like somebody was trying to dummy up some documents to make it look like those wire transfers were legitimate wire transfers to this company.
Q. Is it your understanding that J.F. Nut had any participation, connection with the dummying, the quote, unquote, dummying up process?
A. I have no idea where those wire trans -- where those e-mails came from and how they got my e-mail address.
Q. Okay. But it's true that -- if you know, and we'll find them in a -- in just a second, but those invoices came from the Katat or K-a-t-a-t?
A. K, yeah, that's the S.A. de C.V. K-a-t-a-t, whatever, Services -- Services Y Construccion.
Q. Okay. And at least per the e-mail from Marisa, it sounds like the FBI had spoken to them, correct?
A. Now, that, I don't know.

Q. Okay.
A. I -- I don't know. She -- she just didn't give me much information at all.
Q. Okay. Did San Saba Pecan, LP, or any other related entity have any insurance that would cover the loss that we're talking about here?
A. San Saba Pecan, LP, did not because that was the -- one of the first things I did was pick up the phone and call the agent. And they researched our policies, and there was -- I think there was one small part of one policy that might have -- they thought might be relevant to the situation, but the limits of coverage was like $10,000.
Q. And do you know if there's any other related entity that has some sort of ownership interest in San Saba Pecan, LP, or other contractual obligation to insure San Saba Pecan, LP, that has a policy of insurance out there?
MR. BINNS: Objection. The question is vague and ambiguous.
A. I -- G.L. Straley said that there was one policy that Chase Farms had that might have some coverage, but I'm not sure that he was even sure. And I don't remember whether it related to this incident or another one that we're dealing with.



Q. And what's the other incident that you're dealing with?
A. I -- I can't remember. We're involved in too many lawsuits.
Q. Are you keeping Mr. Binns happy?
A. Him and some others, I think.
Q. Are you aware of any other lawsuits or claims that are of a similar nature where -- that -- that have similar claims to the one that J.F. Nut Company is making in this case?
A. None similar to this, no.
Q. Have you done anything to follow up with Mr. Straley to find out if that policy that he thought might have some sort of coverage might provide some sort of coverage for this case?
A. I've had one or two conversations, but they've been this -- they haven't been recent. In fact, I've just -- I really kind of forgot about it.
Q. Do you know if any of those carriers have been put on notice of this lawsuit?
A. Now, that, I don't know.
Q. Oh, let me ask you a couple of questions about these public service announcements. The August 27, 2015, public service announcement talks about suggestions for protection against a BEC scam. And one of the things that



it suggests is confirm requests for transfer of funds. When using phone verification as part of the two-factor authentication, use previously known numbers, not the numbers provided in the e-mail request.
I think earlier you testified that you would normally have Pamela for at least domestic transfers try to confirm over the phone or some other method, correct?
A. That's one method, yes, uh-huh.
Q. Over the phone is --
A. Yeah.
Q. -- being one method?
A. Yes, uh-huh.
Q. But that wasn't written down anywhere, correct?
A. No, it's not written down.
Q. And, in fact, and -- and as you sit here today, you know that with regard to the wire transfers in this case, there was no other attempt to confirm other than through the same method of communication where the -- the wire instruction change came from, correct?
A. That's correct.
Q. And I think did -- did you testify that you actually signed off on the change or approved the change?
A. I saw the change, yes. And since it was from Jorge, I agreed that it looked legitimate, and we should send the money to where he directed.



Q. Was there a document that you initial or sign off on, or did -- was it just a verbal, Hey, okay?
A. She put the new wire instructions in, and I signed off on the wire instruction form.
Q. Okay. And so you signed off on the wire instruction form knowing that this was a change, correct?
A. Yes.
Q. Okay. And with regard to each of the wires that are summarized in Exhibit 146 on the last page, there's nothing on any of the wire transfer instruction forms -- and I'll use this one as an example which was in Pamela Mann's Exhibit 15. There's nothing at all on that form that indicates that, even though Jude Okoh is the beneficiary, that it's really for the account of J.F. Nut, correct?
A. There's nothing on here that has J.F. Nut's name on it, no.
Q. And that would be the same for all of the wires which is -- with the exception of the last one, that are contained in the list on the last page of Exhibit 146, correct?
A. They would all be similar, so that would be correct.
Q. Okay. I want to talk to you about Exhibit 145. Exhibit 145 says up at the top San Saba Pecan, LP, check

request. Are you familiar with that?
A. Yes.
Q. The initials down at the bottom where it says requested by, it says MC. Who is MC?
A. Maribel Cuevas.
Q. And is she the person that would have filled out that form?
A. She filled out the top sheet, yes.
Q. And what is the purpose of that top sheet on Exhibit 145?
A. This is a sheet that we normally use or normally used at that time. In fact, this is my form. I brought this form with me when I came to San Saba Pecan in 1995. And this form was put on top of every invoice that we ever paid, and this form in effect was used, in this instance, because everything else behind it had been completed.
So I have the documents. I take it to Maribel. I said, Write it up and put it in the file. That way we can find who it is, what it is, and everything related to it --
Q. Okay.
A. -- when we go to looking for it.
Q. Now, I see on the bottom of the first page of Exhibit 145 that it -- there's a place where it says approval, and then it says request payment by. Who would



normally sign off or initial where it says approval?
A. If this is for a check request and not a wire transfer, my name would be there. I would sign the approval. And we never filled out the request payment by because the -- this was all based on what the terms were in the software.
Q. Okay. And so if it -- if this was a check that was going to be issued to the vendor, then you would sign here?
A. I would have signed it, yes.
Q. Now, the reason you don't sign here when it's a wire transfer is because your signature goes on a different document?
A. It goes on a different -- it goes on a different document, and this is all after the fact. With a check, this is all before the fact that the --
Q. Okay.
A. -- that the payment has been made. This is after the fact that the payment has been made.
Q. And so help me understand the documentation process that San Saba uses before a wire is actually -- or the wire instructions are actually sent to the bank. And so I'm going to -- I'm going to kind of go in reverse order.
You would agree with me that Plaintiff's



Exhibit 15 is an example of wire transfer instructions that are sent to the bank, correct?
A. That's correct.
Q. And your expectation is, is that when your bank receives the wire transfer instructions, that those instructions are going to be executed according to the information that's on the -- the form, correct?
A. That's correct.
Q. When you send that form to the bank, is that the only page that they get or --
A. It's the only page that the bank gets, yes.
Q. Okay. Now, this -- so this is the end result of the transaction, correct?
A. That's correct.
Q. Okay. Now, prior to you affixing your signature on this form, what documentation are you going to be expected to be presented with?
A. Well, I guess to put it in proper order, you started in reverse order. Let's start in --
Q. Sure.
A. Let's start in the front order. The front order is that this document represents the receipt of the product on the dock.
Q. And for the record, you're referring to Bates stamped document --



A. 453. 0 -- whatever those number of zero --
Q. 453.
A. 453.
Q. Okay.
A. This is the document that the dock manager completes. When that truck backs up to the dock and they unload the truck, this is the first document.
Q. And for the record, we're talking about, of course, Page 453 of Exhibit -- that's Bates stamped 4 --
A. 145.
Q. I'm sorry.
A. Exhibit 145.
Q. Okay. Okay.
A. Then normally when -- this goes to Pam first, but she puts it on my desk. And at the same time, she normally gives me this, which is the purchase order.
Q. And that's --
A. Which is 456.
Q. Okay.
A. So now I know what the deal is. I know how many pounds we were expecting, how many pounds did we get, what price we're going to pay. This has nothing to do with the price, but whenever the COA comes in and we know that the COA has cleared, I have what we received, what we expected to pay, and then I get an invoice.

Then I match the invoice from the vendor with the terms on the purchase order. I see that we got 1,350 cases, which is 40,200 pounds, times $5.45 a pound, equals $220.75 -- $220,725. Pam, has the COA come in? The COA has come in, and it's clear, ready to be paid. Wire instructions, sign it, it goes to the bank, and we pay it.

Q. And so when all this documentation is sitting on your desk, before you affix your signature to the wire instructions, you would expect to see a packet that contains all of the information that's contained within Exhibit 145?

A. Not all of it.

Q. Okay.

A. Because I really don't care about this.

Q. When you say "this," you're referring to page --

A. This is -- yeah, this is Page 454, which is I think is their bill of lading. I don't care what somebody else sent. All I care is what my man says. This is something that's used basically internally by the dock people. I don't care about that.

Q. Hold on.

A. That's number 455. 456, I've got to see. I'll take a verbal from Pam that the COA has come in and is clear. I don't have to see the e-mail from Steve. If she



tells me it's come in and he's sent it to her, see, which he did, he's telling her that the COA on three loads have been received. They're all clear. They meet specs. 457, I don't care whether that's there or not. If she tells me, I take her word for it.

This comes way after the fact because this is an internal inspection sheet. They run the product over the table to see if they're happy with it. I don't care whether I see this or not. They bring me a copy of it, but I don't care if I see it or not. And it's usually way after the fact when the product has been paid for. That's 458 and probably 459.

Q. All right. And so the documentation that's crucial for you -- and I'm going to try to clean it up just a little bit.

A. Okay.

Q. The documentation that is crucial for you to see before agreeing to put your name on wire transfer instructions, if it's going to be a wire, is going to be the invoice that's received from the vendor, correct?

A. Correct.

MR. BINNS: Objection. Argumentative.

Q. (BY MR. TUTTLE) It will be the document that's similar to Page 453, which shows what San Saba has actually received from the vendor, correct?



A. We call that a cold storage sheet.

Q. Okay. So Page 453 is called a cold --

A. Cold storage sheet. In other words, that product is getting ready to go into cold storage.

Q. And -- and you don't care about --

A. I don't care about that.

Q. Okay. One at a time. You -- you don't care about the bill of lading, correct?

A. That's correct.

Q. And you don't really care about the log sheet?

A. No.

Q. But you do care about the purchase order?

A. I do.

Q. And you want some sort of confirmation, whether it's in writing or verbal, that the COAs are cleared?

A. That's correct.

Q. And the external quality control product check, you don't need to see that?

A. No.

Q. Okay. And every time you're presented with a wire transfer instructions to sign, are you also going to receive the check request form, which is the top or first page of Exhibit 145?

A. We will -- we may do the wire before we do the top sheet, but the top sheet goes with all those other



documents so we can find them in the file.

Q. Okay.

A. And then that wire transfer sheet instructions should correspond to the information that's all stapled together in that file.

Q. So there could be a scenario where you would sign off on a wire transfer instruction sheet before having the check request form actually filled out by Maribel?

A. Maribel. That is correct, yes.

Q. But by the time it gets filed away, you expect that check request form to be part of the documentation?

A. Correct, yes.

Q. Now, would you require to actually see attached or together in a packet with the wire transfer instructions the invoice and the cold storage form and the PO?

A. I would want to see those three documents before I did the wire transfer.

Q. Now, you just testified, I would want to, but in this particular case, at least as it relates to J.F. Nut Company and those invoices, are you aware of any situation where that wasn't the case, where you didn't see those documents before signing off on it?

A. No, I'm not aware that that was not the case.

Page 78

Q. Okay.
A. Is that the right answer?
Q. So as -- so as far as you sitting here right now, it's your understanding before you signed off on each wire transfer instruction that went to the bank, you saw at least the invoice, the PO, and the cold storage form?
A. Yes.
Q. And so if we pulled those for the jury and the court, each one of those POs and invoices that's being referred to in the last page of Exhibit 146, that would be accurate for all of the transactions that are at issue here with the exception of the very last one, correct?
A. I think that's correct, yes.
Q. Okay. Now, as you sit here today, are you aware of any term or condition that J.F. Nut Company didn't live up to whereby they weren't entitled to receive payment for the pecans that they provided to San Saba?
A. No.
Q. And as far as -- and it's your testimony as you sit here today, at least as far as you're aware, that J.F. Nut Company did, in fact, do everything that they needed for San Saba to provide them payment?
A. Yes.
Q. It's also your testimony, as you sit here today, that you're aware of these circumstances that's summarized

Page 79

in Exhibit 146 on the very last page where these six wire transfers went to a beneficiary that's not named J.F. Nut Company, correct?
A. Correct.
Q. Okay. And as you sit here today, you're not aware of any information that -- or any evidence that J.F. Nut did, in fact, receive those payments that are summarized, the first six of them, on Page -- on Exhibit 146?
A. I don't know if J.F. Nut got them. I don't know if they didn't get them.
Q. Right. But you don't have any evidence that they did, in fact, get them, correct?
A. No.
Q. Okay. In fact, the only evidence that you have right now as you sit here today is that they didn't receive them, correct?
MR. BINNS: Objection. Misstates prior testimony.
A. I don't know that I have any evidence that they didn't get them.
Q. (BY MR. TUTTLE) Well, the evidence that you have, at least in summary form in Exhibit 146, is that they went to payees other than J.F. Nut Company, correct?
A. They went to payees --

Page 80

MR. BINNS: Objection. Misstates prior testimony.
A. -- other than J.F., yes, but I don't know where -- where it went after it went to those payees.
Q. (BY MR. TUTTLE) Sure. And that's fair, but as you sit here today, you don't have any evidence that J.F. Nut Company did, in fact, actually receive the monies that were wired in connection with the six wires that are summarized in Exhibit 146, correct?
A. There's -- there's no --
MR. BINNS: Objection. Asked and answered.
A. There's no evidence to that fact here.
Q. (BY MR. TUTTLE) Okay. These other exhibits that I was talking to Don about earlier, Exhibit 140, 141, 142, 143, and 144, I mean, you don't care about that documentation at all; is that correct?
A. This appears to be -- this is an invoice. I would -- I would be interested in seeing an invoice.
Q. I apologize. I stand corrected. 140 is an invoice, but the other ones?
A. And this appears to be an invoice for freight, but we -- we would not have paid freight to a Mexican freight company. And it appears to be a Mexican freight company, so I wouldn't -- I would have probably just blew this off. This has something to do with getting it across

Page 81

the border. I wouldn't have cared about that. That's 142. 141 is the freight invoice.
This has to do with NAFTA. I wouldn't have cared about. And this is a bill of lading, which is part of that other document, and I -- I didn't care about that either. And that's 144 and 143.
Q. Now, whether you cared about it or not, are those documents that you would typically have as part of the packet for a transaction, or is that something that the vendor typically keeps on his own?
A. I'm not sure. Because sometimes these papers come with the trucking company, and when they get to the dock, they may stay at the dock. And I don't know if they're required to get them across the border or whatever. Like I say, a lot of times, they -- they would never come to the office. The dock foreman would maybe keep them over there with his papers.
So now this one probably could -- the -- the 144, which is the bill of -- this is related to the bill of lading. This is their listing of what's supposed to be on the truck. It would usually come to the office, and the invoice would usually come to the office, but the invoice usually did not come with the truck. And then these documents over here, I usually never see those.
MR. TUTTLE: Let's take a quick break.

(Recess from 6:19 p.m. to 6:26 p.m.)
Q. (BY MR. TUTTLE) I'm going to show you what's been marked Exhibit 136. Do you recognize that?
A. Yes.
Q. Is that a bank statement for San Saba Pecan?
A. Well, it's one that's been -- what's the term -- re -- re -- redacted.
Q. Correct.
A. Yeah, re -- yeah, it's one that's been redacted.
Q. And it's been redacted to just reflect transactions that are related to this or included in a batch that's related to this case, correct?
A. That appears to be correct, yes.
Q. And the first page of this, of course, there are redactions, but we have a wire that occurred on -- on --
A. February the 1st.
Q. Let me finish, please.
A. Oh, I was trying --
Q. She -- she gets mad.
A. I was trying to help you out.
Q. I need all the help I can get right now, but -- but she'll get mad at me. And there's also another one on the 17th, correct?
A. Right.
Q. Of February?



A. Yes.
Q. And also on the 19th?
A. Yes.
Q. Of February?
A. Yes.
Q. And of February 26th?
A. Yes.
Q. And February 29th?
A. Yes.
Q. And on the second page, these are copies of checks, or what are these copies of?
A. They're called debit slips.
Q. Okay. And what is your understanding of the purpose of the debit slips?
A. Once the wire transfer sheet that I send to the bank which -- right there, yes.
Q. For example, like --
A. For example, 130 -- Exhibit 137. Once this goes to the bank, then the bank creates a debit slip to take it out of our account. So rather than being a check, this is what's internally generated by the bank to correspond to wire transfer form.
And I don't think this is the one that corresponds to that, but nevertheless, we would have sent a wire. They would have sent a wire for us on



February the 1st for $509,594.43 to -- I'm not sure. That just says wire. I think that's w-i-r-e.
Q. And what the bank generates on that day is the debit slip for the number of wires that San Saba is requesting for that day, correct?
A. I believe that is the way they do it, yes.
Q. And so if there's multiple wires for that day, then there's one debit slip, correct?
A. Yes.
Q. And so each of these debit slips may reflect one transaction that related possibly to J.F. Nut, or it could be J.F. Nut and other transactions, correct?
A. That's -- that's true.
Q. Okay.
A. For instance, you see that says four wires.
Q. And so the --
A. And I think what that says is three wires.
Q. And so the three wires and four wires don't necessarily correspond to all four of them being for J.F. Nut. They could be for J.F. Nut and other vendors, correct?
A. I believe that is right, yes.
Q. Okay. And the -- and the way we would figure out which wires in particular would be looking at the wire instructions for those particular days, correct?



A. That's correct. I had to swallow.
(Exhibit No. 151 marked)
Q. (BY MR. TUTTLE) I'm going to represent to you that this Exhibit 151, which consists of Bates stamped documents 417 through 424 was produced by San Saba and seems to have documentation that would be accumulated in connection with that wire transfer.
Does that look familiar to you?
A. Yes.
Q. And again, to the extent that Exhibit 151 has documents that you don't look like -- or that you don't look at, you would sign off on a wire instruction form if it had the documents that you testified to earlier, being the purchase order, the invoice, and the cold storage ticket, correct?
A. Yes.
Q. And are all those three documents in there?
A. Yes.
Q. Okay. And so that would have been enough for you to sign off on?
A. Yes.
Q. Okay. And is that one of the wires that is at issue here?
A. Yes.
Q. Is there anything that's contained with those

documents that are not correct or shouldn't be included as part of that packet, as far as you know?
A. It all looks to be correct to me.
(Exhibit No. 152 marked)
Q. (BY MR. TUTTLE) I'm going to show you another set of documents that I've marked as Exhibit 152, and they contain the documents that are Bates stamped 409 through 416.
Do you recognize the documents as part of that packet?
A. Yes.
MR. BINNS: On Exhibit 152, the highlighting is not on the original, correct?
MR. TUTTLE: I don't believe so.
Q. (BY MR. TUTTLE) Is -- is there anything that's missing in 152?
A. It doesn't appear to be.
MR. BINNS: You can ask him for that.
A. Not -- not from my standpoint. It all looks to be there.
(Exhibit No. 153 marked)
Q. (BY MR. TUTTLE) What about the documents that are contained in 153?
MR. BINNS: Again, the highlight is on Exhibit 153 and not on the original, correct?



MR. TUTTLE: Yes, I believe that's the case. These were all printed, so if there's any highlighting on there, that's mine.
A. The documents I look for are there.
Q. (BY MR. TUTTLE) Is there anything there that's not supposed to be there, as far as you know?
A. No.
Q. Okay.
A. That's 153.
(Exhibit No. 154 marked)
Q. (BY MR. TUTTLE) I'm going to show you documents as Exhibit 154. And are these all the documents that you would have required for payment?
A. Yes.
Q. May I see that last one?
A. (Witness tenders document.)
Q. Let me show you another set of documents that I'm going to label Exhibit 155.
(Exhibit No. 155 marked)
Q. (BY MR. TUTTLE) Does Exhibit 155 contain all the documents that you need in order to issue payment?
A. Yes.
Q. Let me see it.
A. (Witness tenders document.)
Q. I'm going to show you another set of documents



that I'm going to label Exhibit 156.
(Exhibit No. 156 marked)
Q. (BY MR. TUTTLE) Does this contain all the documents necessary for you to issue payment?
A. Yes.
Q. I want you to take a look at PO -- what -- what is the -- in that packet, 156, what is the PO that's at issue there?
A. The PO number is 1883.
Q. And what is the date that the check is being requested on?
MR. BINNS: Objection. Misstates the content of the documents.
Q. (BY MR. TUTTLE) From the documentation that you have.
MR. BINNS: Same objection. It assumes facts not in evidence also.
A. The check request form shows February the 22nd.
Q. (BY MR. TUTTLE) Does -- does that appear to be that invoice A1008 corresponds with 1883? Can you tell that by looking at that documentation?
A. Can I add the pounds?
Q. Sure.
A. Well, the invoice has 40,500 pounds. The receiving sheet has 40,500 pounds. The PO has



41,916 pounds, but it could be that he didn't ship all of the 41,916 pounds on the PO.
Q. What's the amount that San Saba intended or deposited or intended to deposit as a result of the documentation that's attached to Exhibit 156?
A. The -- the amount that we wired?
Q. Yes.
A. $218,700 was the amount of the invoice, and that's what's on the check request form.
Q. Taking a look at the summary here, is that the tran -- the second transaction that's listed in the summary?
A. I can't tell for sure.
Q. What would we need to look at or go to to try to figure that out?
A. Well, if I'm looking at the date received on the cold storage sheet, it's February the 10th. The date received on this spreadsheet does not have a date received prior to February the 15th.
Q. Now, is the amount that correlates on the -- on the summary in that spreadsheet, does the amount correlate?
A. The -- the dollar amount correlates with the invoice, but the invoice number does not correlate. I'm not sure if -- it appears that the invoice number is

Page 90

A1008, and A1008 is not on this spreadsheet.
Q. And the number that's on that spreadsheet, being the -- the number for the invoice, is that a typical number for an invoice that you would see from J.F. Nut?
A. The second one on this report is not, no.
Q. Okay. And do you think that that's a typo on that report or --
A. I'm not sure where that number came from. It looked -- it doesn't look like an invoice number, though. The PO number with it, though, is the same PO number.
Q. Correct.
A. 1883.
Q. So the 1883 PO, which you said, does the cold storage match with the PO?
A. No.
Q. It was off by a little bit?
A. Yes.
Q. And so what do you go by? Do you go by the cold storage?
A. Go by the cold storage because that's what we actually got.
Q. And so does the cold storage show more than what the PO is for or less?
A. It shows less.
Q. And so what is the amount that the cold

Page 91

storage, in other words, the dollar amount that the cold storage gives rise to?
A. Well, the cold storage will not have the price on it, but the cold storage agrees to the invoice as far as the number of pounds received.
Q. And --
A. Which would lead to the invoice of 218,700 being the amount.
Q. And does that correspond with the amount that's in the --
A. It does, yes.
Q. And just for clarification, to the second wire that's listed in the summary in Exhibit 146?
A. The dollar amount agrees, yes.
Q. And so if that invoice number was A1008, as indicated in that packet that was produced by San Saba, then that would be consistent with that second wire, correct?
A. Yes.
Q. And so as you sit here today, there's no question that you received -- when I say "you," I'm talking about San Saba -- that San Saba received sufficient -- sufficient numbers of pecans that passed through all its processes such that it would have triggered payment in the amount that's indicated in the

Page 92

second wire on Exhibit 146, correct?
A. I believe that's correct, yes.
Q. Okay. And so to the extent that that invoice shows some number, 01, whatever that is, then that's -- I mean, that could very well be just a typo in that column, correct?
A. Correct.
Q. Okay.
A. I -- I don't think that's a valid invoice number.
Q. Okay. But you're not denying that at least the documentation that you see there in Exhibit 156 that corresponds to the PO from San Saba, 1883, that -- that that information shows that San Saba received sufficient numbers of pecans to justify triggering a payment of $218,700, correct?
A. Yes, that's -- that's what's indicated by the documents.
Q. And so more than likely, then that -- that corresponds to the invoice Number A1008, correct?
A. On the face of the documents, I would agree with that, yes.
Q. Okay. Now, as we sit here today, is there something else that we would have to go to to -- for you to be one hundred percent certain, or do you feel more

Page 93

likely than not that that's what that second wire transfer is referring to, that information there that's contained within Exhibit 156?
A. It's more likely than not. The one thing that -- that I would have a question about that I would want to probably clarify is the date received. Because the date received on the cold storage sheet is on the 10th, and this shows to be received on the 19th. That's a week and a half or nine days, and they ran it over the tables on the 11th.
Q. And so what document do you think we would go to to try to figure that out? And -- and I'm saying that because these are the documents that San Saba produced to the Plaintiff. And what -- what other document could we go to to try to get that confirmed one way or the other?
A. Where would I start?
Q. Well, let me ask this in a different way. Is San Saba going to show up at trial and somehow say, Well, because the information that's contained in Exhibit Number 156 doesn't match exactly to the second entry here, that, no, it's our position that J.F. Nut did provide us with those pecans, and we didn't have an obligation to pay for the pecans that are reflected in the documentation in Exhibit 156?
A. No, I don't think we would contend that. I

think it's just -- it's just a matter of maybe some numbers being off, but I think that every -- everything here was received.
Q. Okay. And so more -- more likely than not, it's just the summary has a typo on that invoice and the received date; is that correct?
A. Or a typo on the PO number.
Q. Okay. But -- but the information that's contained in Exhibit 156 does, in fact, show a PO number of 1883, correct?
A. It does. That is the PO attached to the documents.
Q. And the date that the wire at least was -- or the check was requested for the wire to go out, that falls within the time frame and the time period where J.F. Nut Company was not listed as the beneficiary of the wire, correct?
A. That is correct.
Q. And, in fact, the second wire shows a beneficiary of Jude Okoh, correct?
A. That's correct.
Q. Now, before the payment instructions were changed, there were several wires that went through without a hitch to J.F. Nut Pecan, correct?
A. That is correct, yes.



Q. And, in fact, after it came to everyone's attention that there was a problem, J.F. Nut continued to do business with San -- with J.F. Nut, correct?
A. San Saba Pecan.
Q. San Saba Pecan continued to do business with J.F. Nut, correct?
A. That is correct, yes.
Q. And you would agree with me that the money that was paid -- let me say it a different way. Let -- before we get into that, who is Alonso Ponce Ortega?
A. I believe that that was one of the individuals that I obtained his name after those -- what was called the dummy invoices came in.
Q. And what did he do for you?
A. He didn't do anything for me. I -- I called him. I think he was the man that I called. I think there's an e-mail in there that detailed what I -- the gist of how far I got with trying to contact those people in Mexico.
But I believe that that was his name that -- that we called, and he said -- he directed us to another individual supposedly within the company who in that e-mail, if I recall correctly, he said that he was just an agent, that he would have to talk to the owner and get back to us, and he never did.



Q. And you're talking about an agent of the company where the wires actually went to, correct?
A. Yeah, the Service -- Services Y Construccion, S.A. d-e C.V. K-a-t-a-t. I believe that's where that name --
Q. Okay. And so you were doing your own independent investigation with regard to that, correct?
A. I -- yes, I was trying to get some information.
Q. Okay. And -- and from your standpoint, as you sit here today, you heard -- you heard the testimony of Don Lindquist about the documents that compose or comprise a transaction, correct?
A. Yes.
Q. And did you disagree with anything that he said, any of the testimony that he provided?
MR. BINNS: Objection. Calls for a narrative -- narrative answer.
A. No.
Q. (BY MR. TUTTLE) And you would agree with me that in this particular transaction what gave rise to an obligation to pay was the fact that J.F. Nut provided the pecans that met all your specifications, and they cleared the certificates of -- or they cleared the COAs, and that gave rise to an obligation to pay, correct?
MR. BINNS: Objection. Calls for a legal conclusion.



A. Yes.
Q. (BY MR. TUTTLE) And -- and as you sit here today, you're -- you're -- it's not at all San Saba's contention that J.F. Nut failed to do something that would have been a condition of them receiving payment, correct?
MR. BINNS: Objection. Calls for a legal conclusion.
A. Correct.
Q. (BY MR. TUTTLE) And had these wires happened within the 24 -- or had the -- the unauthorized change in payment instructions been detected prior to the 24 to 48 hours having lapsed, there would have been a chance, more than likely, that Arrowhead Bank or Frost Bank would have been able to re-call the wires or pull the money back, correct?
A. That --
MR. BINNS: Objection. Argumentative, assumes facts not in evidence, and calls for speculation.
A. It's a possibility, yes.
Q. (BY MR. TUTTLE) I mean, as far as you know, correct?
A. It's a --
MR. BINNS: Same objection.
A. -- possibility, yes.

Page 98

Q. (BY MR. TUTTLE) And you would have tried to do that, correct?
A. More than likely, yes.
Q. In other words, had it been able to be done, I mean, you would have instructed the bank to be able to do that, correct, to try to do that?
A. Well, I'm making a supposition, but I would -- it -- yes, we would have tried to.
Q. And did you, in fact, ask the bank to try to re-call the wire transfers?
A. I'm almost certain there is a wire tran -- a wire transfer, an e-mail from Don to both the lady at Arrowhead Bank and the lady -- and San Saba and the lady at Arrowhead Bank in LLano, who actually sends the wire transfers, requesting that, but it got nowhere.
Q. Okay. And -- and that's because at the end of the day, it was -- you would agree with me that J.F. Nut did not have any control over the wire transfer process between San Saba and Arrowhead Bank, correct?
A. That's correct.
Q. Nor did they have any control over the wire process as it related to Frost Bank's role in that, correct?
A. Correct.
Q. And -- and the money that came out of the

Page 99

account in payment came from San Saba's accounts, correct?
A. Correct.
Q. And they went into other accounts that were not under the name of J.F. Nut Company, correct?
A. Correct.
Q. And you would agree as a -- with your experience as a CPA and as a CFO, J.F. Nut wouldn't -- wouldn't have any authority whatsoever to be able to go into a bank and demand money that was neither sent from their account nor sent to their account?
MR. BINNS: Objection. Calls for speculation.
A. I guess to answer that, I would say I don't know whose account that was other than who the payee was.
Q. (BY MR. TUTTLE) Sure. And assuming just for the sake of -- of this discussion that we're having that J.F. Nut has no connection, doesn't know who these other payees were, you would agree with me that J.F. Nut wouldn't have any authority to go into a bank and make any demands that relate to San Saba's accounts, correct?
A. That's correct.
Q. Nor would they have any power to make any demands on -- on any of the beneficiaries' accounts if there's no connection between J.F. Nut and the beneficiary accounts?
MR. BINNS: Objection. Calls for speculation.

Page 100

A. In Mexico, I don't know.
Q. (BY MR. TUTTLE) Well, in America, what would you expect?
A. Well, in --
MR. BINNS: Same objection. Calls for speculation.
A. In America, they couldn't, I know.
Q. (BY MR. TUTTLE) You know for sure that they couldn't, correct?
A. That's right. I know for sure they couldn't in America.
Q. And so there would be no expectation whatsoever on your part that J.F. Nut would be able to go in and demand anything of Arrowhead Bank or Frost Bank, at least as it relates to these wires that did not go to J.F. Nut as a beneficiary, correct?
A. That's correct, yes.
Q. Okay. And the -- the money, as far as you know as a representative of -- I'm not talking about the corporate representative, but in other words, being an employee of -- of San Saba, the -- from your standpoint at least, you understood that the money -- the purpose of that money was going to go to pay down the money that was owed or to pay off the invoices that J.F. Nut had submitted to San Saba, correct?

Page 101

A. That's correct.
Q. For the pecans that San Saba did, in fact, receive, correct?
A. That's correct.
Q. And the -- you would agree with me that had someone hacked into San Saba's e-mail and directed J.F. Nut to -- to deliver the -- the pecans to Alaska instead of one of your warehouses or one of San Saba's warehouses and he actually complied with that and he said, Hey, I want payment, you wouldn't pay him, correct?
MR. BINNS: Objection. Calls for speculation.
A. Probably not.
Q. (BY MR. TUTTLE) Because you didn't receive the pecans, correct?
A. That's correct.
Q. Because, in other words, to trigger payment, you would -- it would -- you would expect to have the pecans in hand, correct?
A. Correct.
Q. And vice versa, if J.F. Nut hasn't received payment for those nuts, would you not agree that J.F. Nut is entitled to receive payment for those nuts?
MR. BINNS: Objection. Calls for a legal conclusion and speculation.
A. From his standpoint, yes.

Q. (BY MR. TUTTLE) And, of course, the -- the whole situation here, I mean, you would agree that it's unfortunate, right?
A. Very.
Q. And as you sit here today, do you believe that -- that Jorge Flores is -- has been dishonest or -- or lied about anything as far as you're aware?
A. Not to my knowledge.
Q. Have you overheard, you know, Don or someone else saying, Well, you know, Jorge is just lying about this because of A, B, C, X, Y, Z?
A. No.
Q. And you're not going to show up in trial and say, Well, Jorge is just a big liar. He -- he was at -- he was at the root of this scheme, and it was all something that he came up with?
A. I don't think I would accuse him of that, no.
Q. And -- but it's -- but yet San Saba, or, well, let's say -- but yet J.F. Nut -- you would agree with me that J.F. Nut has yet to receive payment for the pecans that it provided to San Saba?
MR. BINNS: Objection. Calls for speculation, assumes facts not in evidence.
A. That's what they're saying.
Q. (BY MR. TUTTLE) Okay. And assuming that's



true, is it your testimony in front of the -- the ladies and gentlemen of the jury and -- and the court that they're just out of luck, it's just too bad?
A. The money left my bank. I paid for pecans to somebody, and so my money is gone. So it appears to me that it's his problem to find his money.
Q. But you would also agree with me that the money that was sent, J.F. Nut is entitled to that money, correct?
MR. BINNS: Objection. Calls for legal conclus -- conclusion and speculation.
A. I think it's obvious we received the pecans.
Q. (BY MR. TUTTLE) Which made --
A. And we -- and we -- and we paid for the pecans.
Q. Well, I'm not going to dispute that you sent money to somebody, but you would -- at least as you sit here today, you would agree with me that J.F. Nut has not received the money for the pecans that it sent to San Saba, correct?
MR. BINNS: Objection. Asked and answered, calls for speculation, assumes facts not in evidence.
A. According to what he says.
Q. (BY MR. TUTTLE) Okay. And so -- and it's only because you can't find the money or the bank wasn't able to pull the wire back that you're putting this on --



completely on J.F. Nut Company because, well, the money is no longer able to be located, correct?
MR. BINNS: Objection. Argumentative, calls for a narrative answer, and assumes facts not in evidence.
A. It's not in my bank.
Q. (BY MR. TUTTLE) And is it -- and before the ladies and gentlemen of the jury and the court, would it be -- is it your testimony that there's absolutely nothing that San Saba could have done to have prevented this from happening?
A. I believe I would testify to that, yes.
Q. Okay. Even though a simple text from Don to confirm the -- the payment instructions, that could have been done, right?
MR. BINNS: Objection. Asked and answered.
A. Possibly.
Q. (BY MR. TUTTLE) I mean, pos -- I mean, possibly, I mean, it could have been done, correct?
A. It could have been done.
Q. Right.
A. Yes.
Q. And -- and that could have prevented all of this from occurring, correct?
MR. BINNS: Objection. Calls for speculation.
A. I would say maybe.



Q. (BY MR. TUTTLE) Okay. And but it -- but it wasn't even tried, correct?
A. Not to my knowledge.
Q. Okay. And, in fact, at some point in the process of -- even though at the time you were aware that phishing posed a particular risk to the organization, correct?
MR. BINNS: Objection. Calls for speculation, argumentative, and asked and answered.
A. Generally phishing poses a risk to the organization, any organization.
Q. (BY MR. TUTTLE) And yet you didn't put any protections any place to protect the organization from the risks posed by phishing, correct?
MR. BINNS: Objection. Objection. Asked and answered.
A. I didn't think that was my responsibility. That's IT department's responsibility, but the phishing didn't happen to our account. It happened to Jorge's account.
Q. (BY MR. TUTTLE) But yet you would agree that it's your money, the money that belonged to San Saba that went missing, correct?
A. It's money that belonged --
MR. BINNS: Objection. Argu -- objection.

Page 106

Argumentative, assumes facts not in evidence, and calls for speculation.
A. It's money that belonged to Jorge that went missing.
Q. (BY MR. TUTTLE) Right, but it's money that belongs to Jorge that didn't get sent to Jorge. You would agree to that, correct?
MR. BINNS: Objection. Assumes facts not in evidence, argumentative, and asked and answered.
A. We sent it --
MR. BINNS: And calls for speculation. Sorry.
A. We sent it to where he told us -- where we thought he told us to send it. I mean, based on e-mails we -- we received, we sent it to where he said to send it.
Q. (BY MR. TUTTLE) I understand, but you also agree that if Jorge didn't get that money, it's your money that's lost?
A. No, I don't agree.
MR. BINNS: Objection. Argumentative.
A. I don't agree to that.
Q. (BY MR. TUTTLE) Well, that money certainly didn't belong to Jude Okoh, did it?
A. I have no idea.
MR. BINNS: Objection. Argumentative.
Q. (BY MR. TUTTLE) Well, I mean, that's -- well,

Page 107

do you believe that San Saba owed money to Jude Okoh?
A. Based on what --
MR. BINNS: Objection. Argumentative. Assumes facts not in evidence.
A. Based on what I was told to do, we owed money to Jude Okoh.
Q. (BY MR. TUTTLE) Told to do by who?
A. The wire -- the e-mail that came in from Jorge.
Q. Well, but Jorge has testified and -- and I believe he's told you, even apart from testifying, that he didn't author that e-mail.
A. We didn't know that at the time.
Q. I understand that, but if he's not the one who sent that wire transfer, you would agree that Jorge is not the one who requested that wire transfer change?
MR. BINNS: Objection. Argumentative, assumes facts not in evidence, asked and answered, and calls for speculation.
A. We did not know that that e-mail did not come from Jorge.
Q. (BY MR. TUTTLE) That's not my question. My question is, if the e-mail didn't, in fact, come from Jorge, you would agree that Jorge didn't authorize a change in the payment instructions?
MR. BINNS: Objection. Asked and answered,

Page 108

argumentative, calls for speculation, assumes facts not in evidence.
A. If Jorge didn't send it, but we didn't know that.
Q. (BY MR. TUTTLE) I understand that, but so you would agree that if Jorge didn't send that, then he did not provide authorization for you to change the payment instructions?
MR. BINNS: Objection. Argumentative, assumes facts not in evidence, calls for speculation, and asked and answered.
A. If he didn't send the e-mail, then, no, he didn't authorize it.
Q. (BY MR. TUTTLE) Okay. And if he didn't authorize it, then the money went to somewhere without his permission. You would agree with that, correct?
A. Apparently it did, yeah.
Q. And -- and so independent of the authorization or not, San Saba didn't owe Jude Okoh any money, correct?
MR. BINNS: Objection. Argumentative, assumes facts not in evidence, calls for speculation, and asked and answered.
A. We had no purchase order with Jude Okoh, but we had instructions from Jorge to tend the money to Jude Okoh.

Page 109

MR. TUTTLE: Objection. Nonresponsive.
Q. (BY MR. TUTTLE) That's not my question. My question is, it is true that San Saba did not owe any money to Jude Okoh, correct?
MR. BINNS: Objection. Argumentative, calls for speculation, asked and answered.
A. We did not owe money to Jude Okoh.
Q. (BY MR. TUTTLE) And did you owe money to Asesores Comerciales Mundo, S.A. de C.V.?
MR. BINNS: Objection. Calls for a legal conclusion and asked and answered.
A. No.
Q. (BY MR. TUTTLE) Did you owe money -- or when I say "you," did San Saba owe money to Services Y Construccion, S.A. de C.V. Katat?
MR. BINNS: Objection. Calls for legal -- sorry. Objection. Argumentative and assumes facts not in evidence, calls for speculation.
A. No.
Q. (BY MR. TUTTLE) And so the only reason that that money was sent to those beneficiaries is because San Saba changed the payment information based on an e-mail that it thought came from Jorge Flores, correct?
MR. BINNS: Objection. Misstates testimony, asked and answered, assumes fact not in evidence,

Page 110

argumentative.
A. Yes.
Q. (BY MR. TUTTLE) And you would also agree that if, in fact, he was not the one who actually authored those e-mails, then San Saba should have never sent that money to any of those beneficiaries that were not J.F. Nut Company, correct?
MR. BINNS: Objection. Calls for specu -- speculation, calls for a legal conclusion, asked and answered.
A. If he did not author them, that's what you're saying?
Q. (BY MR. TUTTLE) Yes.
A. If he did not author them, no.
Q. But yet in spite of that, it's still your contention that San Saba bears no responsibility and no fault in any of this having occurred, correct?
MR. BINNS: Objection. Asked and answered.
A. That's our position, yes.
Q. (BY MR. TUTTLE) Is that your position?
A. That's my position, as the CFO, yes, which is the position of San Saba Pecan.
Q. Okay.
MR. TUTTLE: Let's take a quick break. I want to just make sure we're -- I'm done. I think we're done.

Page 111

(Recess from 7:15 p.m. to 7:26 p.m.)
Q. (BY MR. TUTTLE) Just real quick, I want you to take a look at Exhibit 146 one more time, and I'm going to show you -- I'm just going to re-mark these just for the sake of doing this here, Exhibit 157.
(Exhibit No. 157 marked)
Q. (BY MR. TUTTLE) And 157 is dated 2/18, and the payee on that one is Jude Okoh, and I think the date paid here -- Jude Okoh being account Number 345 -- 345, and then amount of --
A. 218.
Q. 218,625 when you --
A. Uh-huh.
Q. -- when you pull that out?
A. Yeah.
Q. Is that consistent with the Jude Okoh wire that we're talking about in Exhibit 126 [sic]?
A. The date -- excuse me. The date of February the 18th corresponds with the date paid on the spreadsheet, so it appears to me that this is the wire transfer relating to PO 1883.
Q. And the document that I'm going to mark as Exhibit 58 [sic] is a wire that was paid on 2/26.
(Exhibit No. 158 marked)
Q. (BY MR. TUTTLE) And there were two wires that

Page 112

were paid on 2/26, the same day, that totaled about approximately 240,000, 241 when you add them up. Is that the one that's -- 441. I'm sorry. I'm sorry. It's late in the day. 441 is -- does that appear that Exhibit 158 is the corresponding wire transfer for those two payments that was made to Asesores --
A. Yes.
Q. -- Comercialis Mundo?
A. Yes.
Q. Okay.
A. There was only one wire fee charged, so that tells me that the two were put together.
Q. And since they were on the same date and the amount for being 441, that would be consistent with that, correct?
A. It appears to be exactly the right amount, yes.
(Exhibit No. 159 marked)
Q. (BY MR. TUTTLE) And then Exhibit 159 is dated 2/29, and that shows a payee of Services Y Construccion de --
A. Uh-huh.
Q. -- S.A. de C.V. Katat.
A. Yes.
Q. And that's the one that appears to be reflected here on 2/29, which shows an amount of --

Page 113

A. 220,650, which is the 220,725 less the wire transfer fee.
Q. And so 159 would correspond to that summary, correct, for that one that we just talked about?
A. I believe that's correct, yes.
Q. And this last one is also to the same beneficiary, and it will be 160.
(Exhibit No. 160 marked)
Q. (BY MR. TUTTLE) 160 is dated 3/4, which is the second-to-the-last one that's on the list, correct?
A. Yes.
Q. And so what I want to do just for clarification's sake, if you would permit, if you can try to mark a -- like number these one through six. You don't need to do the seventh one because that one doesn't --
A. (Witness complies.)
Q. Okay. Next to number six, if -- if Exhibit 160 is the corresponding actual wire transfer, if you can do a dash, 160 next to that --
A. (Witness complies.)
Q. -- to show that Exhibit 160 is the one that corresponds to that page. Exhibit 159, which is the 2/29 wire --
A. Uh-huh.
Q. -- to Katat, if that's the corresponding wire

for number five, then if you can just write "Exhibit 159" as being the corresponding one. Does it -- because it does correspond, correct?
A. Yeah, I believe that's -- I believe that is the wire transfer sheet, yes.
Q. And for Exhibit 158, this actually corresponds to two wire transfers that -- that are dated 2/26, correct?
A. I believe that's correct, yes.
Q. So if you can write kind of a -- something to denote that Exhibit 158 corresponds to those two.
A. (Witness complies.)
Q. And Exhibit 157 is the one that corresponds to the February 18th wire to Jude Okoh; is that correct?
A. It appears to be, yes.
Q. Now, for some strange reason, I can't find in the paperwork that I have -- well, no, this is a different one. I have the 2/17 wire which is Bates stamped Number 482 --
A. Uh-huh.
Q. -- in the amount of 218,625 --
A. Uh-huh.
Q. -- with the beneficiary of Jude Okoh on 2/17. That's the last remaining one that we don't have a corresponding exhibit to, correct?



A. It appears to be, yes.
Q. But you would agree with me that the -- the document that's Bates stamped 482, I believe that's 482 unless I'm --
A. Yes.
Q. That would be the document that would correspond to that one, correct?
A. Yes.
Q. And so if you can kind of maybe put a little arrow and just maybe write "San Saba 482" since it's not really an exhibit number.
A. (Witness indicates.)
Q. Okay. So when you write "SS 482" on Exhibit -- the last page of Exhibit 146, you're telling the ladies and gentlemen of the jury that SS 482 means the document that's Bates stamped San Saba, underscore, 00000482?
A. Yes.
Q. Have you understood all my questions today, sir?
A. Pretty much, yes.
Q. Is there any answer that you want to go back and change at this time?
A. No.
Q. Have I been professional with you?
A. Yes.
MR. TUTTLE: I'll pass the witness.



CROSS-EXAMINATION

BY MR. BINNS:
Q. Mr. Shahan, how did San Saba Pecan, LP, correspond with J.F. Nut?
A. By e-mail.
Q. Did you personally have any control over J.F. Nut's e-mail?
A. No.
Q. Did you personally have any control over Jorge Flores' e-mail?
A. No.
Q. Did San Saba Pecan, LP, have any control over J.F. Nut's e-mail?
A. No.
Q. Did San Saba Pecan, LP, have any control over Jorge Flores' e-mail?
A. No.
Q. With respect to the e-mails that are at issue in this case, do you personally have any knowledge on whether or not any of those e-mails were authorized to be sent by Jorge Flores?
A. No.
Q. Do you know whether or not any of the e-mails sent were unauthorized?
A. No.



Q. If you knew -- if San Saba Pecan, LP, received an e-mail that it knew was not authorized and that e-mail contained different wiring instructions, would San Saba Pecan, LP, follow them?
A. No.
Q. Did you personally believe that each of the e-mails received from J.F. Nut that are at issue in this case that deal with changing wiring instructions were authorized to be sent to San Saba Pecan, LP?
A. Yes.
Q. Why is that?
A. The e-mails came from Jorge Flores or J.F. Nut's e-mail address. It was the exact same address every time.
Q. Based on the foregoing, is there anything, to your knowledge, that would give you any reason to believe that each of the wires that you've been discussing here today and that are listed on Exhibit -- where is that?
A. 146, 141.
Q. Let me start over. Based on the foregoing, is there anything -- any reason, to your knowledge, that each of the wires that are reflected on Exhibit 146 and that are at issue in the -- this case should not have been sent as directed?
A. Repeat the question.
Q. Is there any reason that you believe that the

Page 118

six wires on the last page of Exhibit 146 should not have been sent?
A. I have no reason to believe that they should not have been sent.
Q. If J.F. Nut is correct and the e-mails that they claim were unauthorized were, in fact, unauthorized, do you think that San Saba should have to pay for the pecans a second time?
A. No.
Q. Why not?
A. I've already paid for them once.
Q. Before, you were asking some -- answering some questions regarding whether or not the e-mails were authorized and whether or not San Saba Pecan, LP, should have sent wires in response to those e-mails.
Do you remember that line of questioning?
A. Yes.
Q. Okay. As you sit here today, is it correct and fair to say that if you knew an e-mail received from J.F. Nut was unauthorized and you sent money in response to it, that you believe you shouldn't have sent that money then, correct?
A. If I believed it was unauthorized, then I should not have sent the money.
Q. That's right. But at no time did anyone within

Page 119

San Saba, to your knowledge, including yourself, believe or have any reason to believe that any e-mail from J.F. Nut or Jorge Flores was unauthorized or not intended to be sent?
A. We had no reason to believe that those e-mails were unauthorized.
Q. Who do you believe should bear the loss associated with the wires that are -- the top six wires that are listed on Exhibit 146?
A. It's my opinion that J.F. Nut should bear the loss.
Q. And why is that?
A. Because it was not our e-mail that was supposedly hacked, but he -- his e-mail that was supposedly hacked. And we acted according to the instructions that we received that appeared to be bona fide from those e-mails.
Q. Is there any reason why San Saba Pecan, LP, did not communicate with J.F. Nut or Jorge Flores orally?
A. We were doing all of our transactions with him by e-mail. English is a second language for him. Spanish is a second language for us. I'm not sure who -- who even had his phone number. It was just all the business was done by e-mail.
Q. Is that the practice of San Saba Pecan, LP, when

Page 120

dealing with Mexican entities, to transact that business via e-mail and text as opposed to oral communications?
A. It's almost always that -- done that way with Mexican entities because of the language barrier.
MR. BINNS: Thank you. Pass the witness.

REDIRECT EXAMINATION

BY MR. TUTTLE:
Q. A couple of questions. A moment ago, you stated that you didn't have any control over Mr. Flores' e-mail, correct?
A. Correct.
Q. But you certainly had control over San Saba's payment systems, correct?
A. Correct.
Q. You certainly had control over deciding whether or not you were going to confirm the change of payment instructions through a second communication source, didn't you?
A. With Jorge Flores?
Q. Well, in other words, you had control whether or not someone from San Saba would try to communicate with Jorge Flores via secondary communication method to confirm the change in payment instructions, correct?
A. There was a certain amount of control on our end, yes.

Page 121

Q. And -- and you could have sent a text, correct?
A. Possibly.
Q. And it's -- and it's -- is it your testimony that under no circumstances could have anybody at San Saba called anybody in Mexico to try to figure out whether or not the -- the instructions should be -- should be changed?
A. I think if that was the only case where we had -- ever had a Mexican entity change wiring instructions, we might have probably done a little more investigation, but it happened all the time with the Mexican entities.
Q. And so in light of that fact, wouldn't it be incumbent upon San Saba even more to try to make sure that there's that additional layer of protection under those circumstances?
A. If we had never had an instance before where any of the Mexican entities had changed wiring instructions and didn't get their money, then maybe we might have been a little bit more diligent, but we had never had that happen in the past.
Q. Well, you -- you've already testified previously that you're aware of the risks posed by phishing, correct?
A. Everybody has risks from phishing.
Q. Sure. And because of everybody has risks for

phishing, then there should be measures within your own company to try to protect your own company from the hazards and the risks that are posed by a phishing scheme, correct?
A. Well, I think our company is protected from the hazards and risks of a phishing scheme through the IT department.
Q. Well --
A. But the phishing didn't happen with our e-mail or our -- our Internet account.
Q. Right, but knowing, as you just stated, that everyone knows about the risks associated by phishing, then you -- it's -- it's reasonable to conclude that San Saba needs to protect itself against a vendor that may have its accounts compromised, that may have its systems compromised through a phishing scheme, correct?
MR. BINNS: Objection. Misstates prior testimony, calls for speculation.
A. Are you asking me if we should protect their --
Q. (BY MR. TUTTLE) No.
A. -- integrity or our integrity?
Q. No. What -- what I -- what I suggest that you -- what should have been done is exactly what the FBI suggested that should have been done in August of 2017, that confirm requests for transfer of funds. When using



phone verification as part of the two-factor authentication, use previously known numbers, not the numbers provided in the e-mail request.
Do you agree with that?
A. Well, if someone had sent us that, we might have -- we might have investigated a little further and put some of those pro -- procedures in place, but we never received that general communication or whatever that is.
The IT department obviously didn't think it was important enough to send it to us. And we certainly don't go out and visit the FBI website all the time to get -- to get access to those kind of bulletins.
Q. And you -- but you would also agree that had you done so, according to the simple suggestion that the FBI is making, that would have eliminated or at least minimized the risk to your company as being exposed due to a -- some sort of phishing scheme?
MR. BINNS: Objection. Calls for speculation.
A. I don't know what we would have done.
Q. (BY MR. TUTTLE) In addition, it says, Verify changes in vendor payment location by adding additional two-factor authentication.
Do you -- do you even know what two-factor authentication is?
A. I'm sure I could figure it out. I -- I imagine



it -- you know, it's two methods of -- of getting confirmation from someone as far as wire transfer instructions.
Q. Exactly. And San Saba had nothing in place, no two-factor authentication with regard to confirming changes of payment instructions, correct?
A. Not at that time, no.
Q. In fact, it does now because it realizes and -- and it's -- it's aware of these risks, correct?
A. We have procedures in place to minimize those kind of -- those kind of instances happening, yes.
Q. And you could have very easily -- well, at the time this -- well, let me say this. At this time this happened, you knew that Jorge Flores was essentially Don's customer, correct?
MR. BINNS: Objection. Misstates prior testimony and assumes facts not in evidence.
A. He was a customer of San Saba Pecan.
Q. (BY MR. TUTTLE) Right, but did you know that he came -- he had come in through Don?
A. Well, all the purchases of those -- of that kind of product came in through Don.
Q. Okay. And so would it have been easy for you to just simply get Don on the phone and say, Hey, Don, can you confirm this with Jorge, if he wants the payment



instructions changed or not?
A. I think if we had thought it was out of the ordinary, we could have, yes, but --
Q. Okay.
A. -- again, we've got a lot of instances where Mexican entities change their wire instructions all the time. It's not uncommon. I mean, it was so common to us, it didn't raise a red flag.
Q. At the time that this happened, was it common?
A. Yes.
Q. Okay. And do you recall -- you were there in Pamela's deposition where she pulled out a stack of documents that showed instances where Mexican entities or other entities had requested payment instructions to be changed. You recall that, correct?
A. Yes, uh-huh.
Q. In fact, did you help her compile that list?
A. No, she did it on her own.
Q. Okay, but -- but you don't disagree with Don's testimony earlier where he testified that he asked her, he prompted her to do that, correct?
A. He asked her to, yes.
Q. Sure, and she did it, correct?
A. Yes.
Q. And do you believe that she was not thorough in

doing that search?
A. I think she was as thorough as she could be.
Q. Okay. And -- but do you also remember her testimony when she said in every single one of those instances where the payee was changed, where the information was changed, that someone from the company gave her the approval to do it?
A. I'm not sure if I remember her saying that.
Q. Okay. Would you be surprised if that's what she testified to?
A. Would I be surprised? Probably not.
Q. Okay. And so that someone had looked at that besides her and said, Hey, this is okay, go ahead and do it, correct?
A. Well, I -- I'm -- I'm -- if she said so, then I'm not going to question her word.
Q. Okay. And so in -- and in this particular case, it's your testimony that you approved the change in payee when she showed you the e-mail and -- and presented that to you, correct?
A. I looked at and said, It appears to be legitimate to me. It's his e-mail. He's telling us to send it somewhere else. He's got a reason. We need to follow his direction.
Q. And at no time did it occur to you to try to



confirm that through a secondary method of communication?
A. No.
MR. BINNS: Objection. Asked and answered.
A. No.
Q. (BY MR. TUTTLE) Is it your testimony today that you were unable to communicate with Mr. Flores?
A. It's my testimony I didn't try to communicate with him.
Q. You -- you were -- well, were you present for Mr. Flores' depo? I don't think you were, were you?
A. No.
Q. Okay. Were you present when he showed up at San Saba Pecan as part of the investigation immediately after all this stuff happened?
A. Yes.
Q. And when he was there, did you have a chance to communicate with him at all?
A. We were in the meeting together, yes.
Q. Well, did he speak primarily in English or in Spanish or kind of a combination of both?
A. A combination of both, if I recall.
Q. Okay. And so basically there was attempts at least to communicate, or at least whatever information was being communicated, you felt satisfied that -- that the information was, in fact, communicated, correct?



A. The information from?
Q. From the meeting, whatever information that --
A. Yeah, it was --
Q. -- Mr. Flores --
A. It was communicated to him because he had people there that interpreted for him. When he didn't understand something, he would ask them.
Q. I'm going to show a document that's marked San Saba 508. I'm not going to mark it as an exhibit, but I'm going to circle just two examples of calls going to Mexico. Who were those calls going from? Do you know from looking at that whose phone that was?
A. Going from? That's a fax number, I think. Are those at the bottom or the top of that list? That's the top -- bottom, so the calls above it were on that number, right, I think. Those could be made by Ruben Parra, our dock manager, to someone in -- I mean, we do business with more than just Jorge Flores in Mexico.
Q. Right, but, I mean, there's nothing that would have prevented anybody from picking up the phone and contacting someone in Mexico, correct?
A. I mean, the -- the phone calls go to Mexico just as well as they go to the United States.
Q. And even if Mr. Parra had to come and translate, I mean, you could have pulled him from the plant to go



help, correct?
A. You could have.
Q. Here's another example. Page 509, that's another page I just circled a couple of times where they showed calls to Mexico.
A. Oh, yeah. Well, it's not -- it's not uncommon for us to have a lot of calls to Mexico on our phone bill.
Q. So here's another one, Page 510, that I just circled a few that show --
A. Yeah.
Q. -- that they're from Mexico.
A. That's not unusual.
Q. Okay. So there's nothing that would have prevented anybody from picking up the phone and calling to Mexico, correct?
A. Correct.
Q. Also, a moment ago you testified that you didn't have Jorge's information or anything like that, but that's not really true, is it, because there's a packet of documentation that's provided to the company.
MR. TUTTLE: What's our last exhibit that we're on?
THE REPORTER: 160 was the last.
MR. TUTTLE: Okay. So 161.
THE REPORTER: It would be 161.

Page 130

(Exhibit No. 161 marked)
Q. (BY MR. TUTTLE) Which contains some excerpts of the type of information that --
A. 160.
Q. It's right here. The second page of 161 is information that is solicited by San Saba. I mean, is that -- do you -- don't you agree? The second page of Exhibit 161, I mean, that's -- that's information that's solicited by San Saba, correct?
MR. BINNS: Objection. Multiple and compound questions.
A. Yes.
Q. (BY MR. TUTTLE) In fact, on 161, if you take a look down toward the bottom, it says emergency contact. I think it says 24 hours, if I'm not mistaken. Doesn't it say that on the second page of 161?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And so when you -- when you just testified that, well, we don't even know -- have his number, we don't know how to get in contact with him, he provides you -- he provides San Saba with an emergency contact number, 24 hours, didn't he?
MR. BINNS: Objection. Misstates prior

Page 131

testimony.
A. Apparently, yeah.
Q. (BY MR. TUTTLE) I mean, that's San Saba's documentation, is it not?
A. It's -- it is documentation that is used in the food safety program, yes.
Q. Sure, but you have access to it, don't you?
A. I don't.
Q. Well, is it your testimony in front of the ladies and gentlemen of the jury that the documentation that's on San Saba's form, you don't have any access to that if you need it?
A. I didn't even know it was there. I mean, I'm not familiar with what SQF documents are. That's not my department.
Q. Well, there's no question whatsoever that you work for San Saba, correct?
A. I work for San Saba.
Q. And that information is given to San Saba, correct?
A. It is given to San Saba as part of the food safety program.
Q. Sure, but you still have access to that information if you need it, correct?
MR. BINNS: Objection. Asked and answered.

Page 132

A. If I know it's there, yes.
Q. (BY MR. TUTTLE) Well, is it your testimony in front of the ladies and gentlemen of the jury that you do not obtain that information for every single supplier that supplies product to San Saba?
A. The accounting department does not obtain this, no.
Q. That's not my question. Do you know whether or not San Saba is required to have that information for every single vendor?
A. For the food safety --
MR. BINNS: Objection. Asked and answered.
A. For the food safety program, they are, yes.
Q. (BY MR. TUTTLE) Yes. And so you understand that for every single vendor, as part of the food safety program, they provide information to San Saba, correct?
A. Yes.
MR. BINNS: Objection. Asked and answered.
Q. (BY MR. TUTTLE) And so -- and so if you need to be able to obtain that information, you can get it if you need it, correct?
MR. BINNS: Objection. Asked and answered.
A. Yeah, sure.
Q. (BY MR. TUTTLE) Okay. One of the things that San Saba's attorney keeps saying and asking questions

Page 133

about is that, Well, should -- they keep saying, Well, should San Saba have to pay twice. You -- you remember that question, correct?
A. Asked of me?
Q. Well, he -- he's asked that question, should -- should San Saba have to pay twice, and your answer was no, correct?
A. I don't think we should have to pay twice.
Q. Right, but should they at least have to pay Jorge Flores once, J.F. Nut Company once?
MR. BINNS: Objection. Calls for a legal conclusion.
A. We paid Jorge Flores once based on his instruction in those e-mails.
Q. (BY MR. TUTTLE) But you also agree that if he, in fact, did not authorize those e-mails, then you also agreed that San Saba shouldn't have paid those people that are listed in that summary on Exhibit 146, correct?
A. But we don't know whether he authorized those e-mails or not.
Q. That's not my question. If, in fact, it turns out and the jury believes that he didn't authorize that change of payment, you agree that San Saba should have to pay J.F. Nut Company, correct?
MR. BINNS: Objection. Calls for a legal

Page 134

conclusion.
A. No.
Q. (BY MR. TUTTLE) So why do you -- what is your -- what are you going to tell the jury and explain to the jury as to why they shouldn't -- you shouldn't -- or why J.F. Nut Company shouldn't have to be paid at least once for pecans?
A. Because --
MR. BINNS: Objection. Calls for a narrative answer and asked and answered.
A. I've already paid it once.
Q. (BY MR. TUTTLE) But you would agree with me if, in fact, he didn't receive that money, it doesn't matter that you paid, you would agree that he hasn't received that money?
MR. BINNS: Objection. Calls for speculation, assumes facts not in evidence, asked and answered. And I know you're getting frustrated and you're tired, but be respectful of the witness.
A. We get back to the same point. I don't know for a fact that he didn't get the money.
Q. (BY MR. TUTTLE) Fair enough.
MR. TUTTLE: Pass the witness.
RECROSS-EXAMINATION
BY MR. BINNS:

Page 135

Q. Mr. Shahan, are you aware of whether or not J.F. Nut was actually the subject of some phishing scheme?
A. No.
Q. Of all the people that would know whether or not J.F. Nut or Jorge Flores was the subject of a phishing scheme, who do you anticipate would know?
A. Jorge Flores.
Q. Okay. Do you know whether Jorge Flores has ever made any allegation in this case that he was subject to some phishing scheme?
A. Not to my knowledge.
Q. Do you know whether J.F. Nut has ever made any allegations in this lawsuit that it was subject to some phishing scheme?
A. Not to my knowledge.
Q. Are you aware of any allegation in this case that San Saba Pecan, LP, was subject to any phishing scheme?
A. Not to my knowledge.
Q. Can you think of any way in which San Saba Pecan, LP, could prevent J.F. Nut from falling victim to some phishing scheme with respect to its e-mails?
A. No.
Q. Who is the person that would be in the best position to ensure that J.F. Nut and Jorge Flores do not

Page 136

fall victim to some phishing scheme?
A. Jorge Flores.
Q. Can you explain to me the approval process with respect to change wiring instructions as it goes from Pam Mann to you?
A. At what point in time?
Q. During the December 2015 to February -- well, let me ask a different question. Did the approval process with respect to change wiring instructions differ at any time prior to March of 2016?
A. No.
Q. Okay. During that time, what was the process for the changes in wiring instructions that you would receive from Mexican entities who were selling product to San Saba Pecan, LP?
A. We normally took changed wiring instructions at face value from normally an e-mail.
Q. Who would receive that e-mail?
A. Normally Pam.
Q. And would she bring that e-mail to you?
A. In most cases, yes.
Q. Okay. And then you would look over that e-mail; is that right?
A. Yes.
Q. And what would you look for with respect to that

Page 137

e-mail, like to see if it was going to Mexico versus eastern Europe? What type of things would you look for?
A. Well, you would look for -- you would look for the changed instructions themselves, where was the money going, was it still going to someplace in Mexico, was the e-mail sufficient to explain why they changed the wiring instructions, did the e-mail appear to come from the person that we've been dealing with, were the e-mails the same. I mean, those sort of things is what you look at.
And here again, since we had changed wiring instructions for Mexican entities on several occasions and had no issues with it, we did not believe that there would be an issue with this one either.
Q. And all those different things you just discussed that you look at to determine whether or not there's any issues with the direction to change wiring instructions, did any of those things create any issues or red flags with respect to the six transactions that are the subject in this case?
A. No.
Q. Did -- did Jorge Flores or J.F. Nut advise San Saba Pecan, LP, that they only wanted to communicate with respect to wiring instructions in certain ways?
A. I don't know.
Q. You're not aware of any?

Page 138

A. I'm not aware of any.
Q. Did -- are you aware of whether or not J.F. Nut or Jorge Flore -- Flores told San Saba Pecan, LP, that as a result of whatever risks there are with J.F. Nut's e-mails, that they wanted to do some sort of two-factor authentication in case there was a wire instruction change?
A. No.
Q. Do you know of any reason that J.F. Nut or Jorge Flores could not have learned of the FBI alerts that are labeled Exhibit 147 and 148?
A. State that again.
Q. Are you aware of any reason that J.F. Nut or Jorge Flores could not have learned about the FBI alerts that are Exhibits 147 and 148?
A. No, I know of no reason.
Q. During -- at some point in time, it was determined that there was some sort of issue with these e-mails you had received from J.F. Nut and Jorge Flores, correct?
A. Yes.
Q. And that was during a period of, roughly, early March that this kind of came to a head; is that correct?
A. I believe that's correct, yes.
Q. And -- and it came to a head over the course of

Page 139

a few days, you know, three to seven days; is that right?
A. Probably, yes.
Q. At any time during that time, did Jorge Flores ever call San Saba Pecan, LP?
MR. TUTTLE: Objection. Leading.
A. I don't know.
Q. (BY BINNS) Are you aware of any such call?
A. No.
MR. TUTTLE: Objection. Leading.
Q. (BY MR. BINNS) Are you aware of whether or not anyone from J.F. Nut called San Saba Pecan, LP, during that time period?
MR. TUTTLE: Objection. Leading.
A. I don't know. I'm not aware of any.
Q. (BY MR. BINNS) Did anyone from J.F. Nut ever call you during that time period?
A. No.
MR. TUTTLE: Objection. Leading.
Q. (BY MR. BINNS) Did Jorge Flores ever call you during that period?
MR. TUTTLE: Objection. Leading.
A. Not that I remember, no.
Q. (BY MR. BINNS) Do you -- San Saba Pecan, LP, has a website, correct?
A. Yes.

Page 140

Q. Does that website contain San Saba Pecan, LP's phone number?
A. Yes.
Q. Is one of the phone numbers contained on your website a 1-800 number?
A. Yes.
Q. Can you think of any reason why other than -- are you aware of whether or not Jorge Flores with J.F. Nut was corresponding with Don Lindquist via text message?
MR. TUTTLE: Objection. Leading. Asked and answered.
A. At that -- at that time, I was not aware, no.
Q. (BY MR. BINNS) Okay. Are you aware of any reason that would prevent Jorge Flores or J.F. Nut from contacting via telephone and oral communication San Saba Pecan, LP?
A. No.
MR. TUTTLE: Objection. Leading.
MR. BINNS: Pass the witness.

REDIRECT EXAMINATION

BY MR. TUTTLE:
Q. Going back very quickly to the question that was asked with regard to the best position, it is true that you have no control over your vendors, their e-mail practices, or anything like that, correct?

Page 141

A. Correct.
Q. But you have full control over San Saba's practices, correct?
A. In regards to?
Q. Well, is it your testimony in front of the jury that --
A. No, I --
Q. -- you do not have control over San Saba's business practices?
A. Well, that's --
MR. BINNS: Objection. Argumentative.
A. Well, that's what I'm trying to find out. You're -- you're saying business practices?
Q. (BY MR. TUTTLE) Absolutely.
A. Well, sure, we have control over it.
Q. And -- and you had full control over whether you would have picked up the phone, tried to contact Jorge Flores, correct?
A. We would have had control over that, yes.
Q. You could have texted him, correct?
A. Yes.
Q. You could have sent a snail mail, correct?
A. Yes.
Q. You could have faxed him, correct?
A. If we had his fax number, yes.

Page 142

Q. Did he not --
A. I guess --
Q. -- provide the fax number as part of --
A. I guess he did. I don't know.
Q. Okay.
A. That's the first time I've ever seen that document.
Q. Okay. And so it is absolutely true that San Saba had total control over whether or not it actually paid that money or not, correct?
A. Sure, we did.
Q. And it had total control as to whether it was actually going to honor those e-mail instructions, correct?
A. Control, yes, we had control over it.
Q. It had total control over whatever policies and procedures that it had in place, whether written, informal, or otherwise, as to whether it was going to seek some sort of secondary confirmation to the change in payment instructions, correct?
A. Total control, sure, we did.
Q. And so from the standpoint of who's in a better position to prevent this type of thing from happening, you would have to agree that it would be San Saba who was in the best position to have prevented this type of thing

Page 143

from occurring?
A. I'm not sure I can agree to that one hundred percent, no.
Q. Would you agree to it some percentage?
A. Yeah, we had some percent of control, yes.
Q. How much? What would you say?
A. I -- I -- it looks to me like it's a 50/50 deal.
Q. And from the standpoint of what you testified earlier that counsel was saying, well, that when it's domestic companies, your understanding is that Pam picks up the phone and confirms the payment instruction change, correct?
A. In some cases, yes.
Q. And the reason you're trying to do that is to make sure that it is, in fact, a change that's actually authorized by the customer, correct?
A. But she can talk to domestic people in English.
Q. Absolutely. But is it your testimony that there's no one there at the plant who could have come and helped translate?
A. We have bilingual people, yes.
Q. And so you could have pulled a bilingual person to try to call and confirm and communicate, correct?
A. We could have.
Q. And in addition to that, you could have also

Page 144

tried to pick up the phone and see if you could have tried to communicate with Jorge the best you could, correct?
A. We could have.
Q. And -- but none of that was done either, was it?
A. No.
Q. And so from the standpoint of not picking up the phone and trying to confirm and talk to someone, it's your testimony for the jury there's actually less protection that you're providing your company to customers who are coming from Mexico where it's probably more likely that there might be fraud. You would agree, correct?
MR. BINNS: Objection. Calls for speculation, argumentative, assumes facts not evidence.
A. I don't know that I can say that there would be more likely to have -- to have something fraudulent out of Mexico than any more so out of the United States.
Q. (BY MR. TUTTLE) Okay.
MR. TUTTLE: Pass the witness.

RECROSS-EXAMINATION

BY MR. BINNS:
Q. You're aware generally of the facts of this case, correct?
A. Yes.
Q. Based upon the allegations that J.F. Nut is making, where is the first place that a problem started

Page 145

that ultimately led to this?
MR. TUTTLE: Objection. Speculation.
Q. (BY MR. BINNS) Okay. Wasn't it J.F. Nut's e-mail the first place where the problem started, and then it went from J.F. Nut's e-mail to e-mails purportedly being sent that were unauthorized and wires that went; is that correct?
MR. TUTTLE: Objection. Speculation, compound.
Q. (BY MR. BINNS) Okay. Let me back up, then. Based upon your understanding of the allegations in this case, where is the first place that there was a problem that arose that led to this lawsuit?
MR. TUTTLE: Objection. Speculation.
A. The fraudulent e-mail that we -- that we -- the sub -- the -- the supposedly fraudulent e-mail that we found out later was fraudulent, but not at the time.
Q. (BY MR. BINNS) Well, do you know as you sit here today that you know whether it's fraudulent or not?
A. As of today --
MR. TUTTLE: Objection. Speculation.
A. As of today, I think we know it's fraudulent.
Q. (BY MR. BINNS) Are you -- do you know it's fraudulent based upon anything other than Jorge Flores' claims?
A. No.

Q. Okay.
MR. TUTTLE: Objection. Speculation.
Q. (BY MR. BINNS) Okay. So the very first spot where the problem started was -- was Jorge Flores' e-mail, correct?
A. Yes.
MR. TUTTLE: Objection. Speculation.
Q. (BY MR. BINNS) Okay.
MR. TUTTLE: And asked and answered.
Q. (BY MR. BINNS) Let me back up. Let me rephrase actually. So -- so based upon the allegations in this case, it's your understanding that the very first place that something occurred was Jorge Flores' e-mail.
MR. TUTTLE: Objection.
Q. (BY MR. BINNS) Right?
MR. TUTTLE: Speculation, asked and answered.
MR. BINNS: Let me finish the question.
THE REPORTER: Thank you.
MR. BINNS: God.
MR. TUTTLE: It's the same question --
MR. BINNS: Come on.
MR. TUTTLE: -- that you keep asking over that he's already answered.
Q. (BY MR. BINNS) Based upon the allegations in this case, it's your understanding that the first place



where any issue arose was with respect to J.F. Nut and Jorge Flores' e-mail, correct?
MR. TUTTLE: Objection. Speculation, asked and answered.
A. Yes.
Q. (BY MR. BINNS) Okay. Who is responsible for that e-mail?
MR. TUTTLE: Objection. Speculation.
Q. (BY MR. BINNS) Well, let ask it differently. Who do you understand is responsible for that e-mail?
MR. TUTTLE: Objection. Speculation and calls for a legal conclusion.
A. All I can tell you about that e-mail is on the surface, it appeared to have come from Jorge Flores' e-mail.
Q. (BY MR. BINNS) I know it's late. Let me ask you differently.
A. Okay.
Q. Do you believe that Jorge Flores and J.F. Nut had control over that e-mail?
A. Yes.
MR. TUTTLE: Objection. Speculation.
Q. (BY MR. BINNS) Do you know --
MR. TUTTLE: Asked and answered actually, too.
Q. (BY MR. BINNS) Do you know whether San Saba



Pecan, LP, had any control over J.F. Nut and Jorge Flores' e-mail?
A. No.
Q. No, you don't know, or, no, they didn't?
A. No, they did not.
Q. Okay. So based upon that, if you were going to divide up responsibility in this case, how would you divide it up?
MR. TUTTLE: Objection. Calls for a legal conclusion and speculation and asked and answered. He's already testified 50/50.
A. Well, I think there's -- there's probably some blame to go around maybe with both parties, I mean. So I don't know. 50/50 gets pulled out of the air because that's equal responsibility for both parties.
Q. (BY MR. BINNS) So when you say 50/50, you're just speculating?
A. Yes.
MR. TUTTLE: Objection. Badgering the witness.
MR. BINNS: I'll pass the witness. Are you done?
MR. TUTTLE: Done.
MR. BINNS: All right. He'll review.
THE REPORTER: All right. Before I --
MR. BINNS: I've got to go. No, go ahead. He's



going to review.
THE REPORTER: Before I announce the deposition is complete, pursuant to the Federal Rules, are there any stipulations regarding custody of the transcript, exhibits, and/or any other pertinent matters?
MR. BINNS: He's going to review.
(Deposition concluded at 8:10 p.m.)

CORRECTIONS AND SIGNATURE

PAGE LINE CHANGE REASON

I, MR. JAMES K. SHAHAN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
MR. JAMES K. SHAHAN



CERTIFICATION PURSUANT TO FEDERAL RULES
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

J.F. NUT COMPANY, )
)
Plaintiff, )
)
VS. ) CAUSE ACTION
) NO. 1:17-CV-405-SS
SAN SABA PECAN EXPORTS )
CORPORATION AND SAN SABA )
PECAN, LP, )
)
Defendant )

REPORTER'S CERTIFICATION
DEPOSITION OF MR. DONALD K. LINDQUIST, III
MAY 1, 2018

I, Carol A. Curtis, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the witness, MR. JAMES K. SHAHAN, was sworn by the deposition officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as well as Rule 30(e)(2) that the signature of the deponent:

_X_ was requested by the deponent and/or a party before completion of the deposition and is to be returned



within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

___ was not requested by the deponent and/or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken; Further, I am not a relative nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 14th day of May, 2018.

Carol A. Curtis
______________________________
Carol A. Curtis, Texas CSR 3202
Expiration 12/31/19
Kim Tindall & Associates, LLC
16414 San Pedro, Suite 900
San Antonio, Texas 78232
Telephone: (210) 697-3400
Facsimile: (210) 697-3408
Registration No. 631

**Exhibits**

**Shahan, James K. Ex 15** 34:2 44:12,16 69:12 72:1

**Shahan, James K. Ex 136** 82:3

**Shahan, James K. Ex 140** 80:14

**Shahan, James K. Ex 141**

**Shahan, James K. Ex 142**

**Shahan, James K. Ex 143**

**Shahan, James K. Ex 144**

**Shahan, James K. Ex 145** 69:24, 25 70:10,24 73:12 74:12 76:23

**Shahan, James K. Ex 146** 61:3,4, 16 69:9,20 78:10 79:1,9,23 80:9 91:13 92:1 111:3 115:14 117:21 118:1 119:9 133:18

**Shahan, James K. Ex 147** 55:24 138:11

**Shahan, James K. Ex 148** 55:17, 18

**Shahan, James K. Ex 149**

**Shahan, James K. Ex 151** 85:2,4, 10

**Shahan, James K. Ex 152** 86:4,6, 12

**Shahan, James K. Ex 153** 86:21, 24,25

**Shahan, James K. Ex 154** 87:10, 12

**Shahan, James K. Ex 155** 87:18, 19,20

**Shahan, James K. Ex 156** 88:1,2 89:5 92:12 93:3,19,20,24 94:9

**Shahan, James K. Ex 157** 111:5, 6 114:13

**Shahan, James K. Ex 158** 111:24 112:4 114:6,11

**Shahan, James K. Ex 159** 112:17,18 113:22 114:1

**Shahan, James K. Ex 160** 113:8, 17,21

**Shahan, James K. Ex 161** 130:1, 8

**$**

**$10,000** 66:13

**$218,700** 89:8 92:16

**$220,725** 74:4

**$220.75** 74:4

**$5.45** 74:3

**$509,594.43** 84:1

**0**

**0** 73:1

**00000482** 115:16

**01** 92:4

**03** 19:21,22 20:7

**04/08/1950** 9:4

**05680136** 9:2

**1**

**1,350** 74:3

**1-800** 140:5

**10th** 89:17 93:8

**11th** 93:10

**12** 20:1

**126** 111:17

**13** 61:2

**130** 83:18

**136** 82:3

**137** 83:18

**140** 80:14,19

**141** 80:14 81:2 117:18

**142** 80:15 81:2

**143** 80:15 81:6

**144** 80:15 81:6,19

**145** 69:24,25 70:10,24 73:10,12 74:12 76:23

**146** 61:3,4,16 69:9,20 78:10 79:1,9, 23 80:9 91:13 92:1 111:3 115:14 117:18,21 118:1 119:9 133:18

**147** 55:24 138:11,15

**148** 55:17,18 138:11,15

**149** 55:17

**15** 20:6 34:2 44:12,16 69:12 72:1

**151** 85:2,4,10

**152** 86:4,6,12,16

**153** 86:21,23,25 87:9

**154** 87:10,12

**155** 87:18,19,20

**156** 88:1,2,7 89:5 92:12 93:3,20,24 94:9

**157** 111:5,6,7 114:13

**158** 111:24 112:4 114:6,11

**159** 112:17,18 113:3,22 114:1

**15th** 89:19

**160** 113:7,8,9,17,19,21 129:23 130:4

**161** 129:24,25 130:1,5,8,13,16

**16414** 7:11

**17th** 82:23

**1883** 88:9,20 90:12,13 92:13 94:10 111:21

**18th** 111:19 114:14

**1968** 12:22 13:1

**1970** 12:11

**1972** 13:1,19 14:9

**1973** 12:16 14:22

**1975** 13:20

**1976** 12:9,16

**1984** 9:14 12:9

**1988** 15:18,19

**1989** 15:24

**1990** 16:17

**1994** 16:21 17:14

**1995** 16:19,25 17:6,20 18:14,21 40:9 70:13

**19th** 83:2 93:8

**1:17-CV-405-SS** 7:9

**1st** 7:2 82:16 84:1

## 2

**2/17** 114:18,23
**2/18** 111:7
**2/26** 111:23 112:1 114:7
**2/29** 112:19,25 113:22
**20** 30:16
**20-some-odd** 42:10
**2003** 19:16,19 21:10,11 39:16
**201** 12:7
**2012** 22:21
**2015** 20:7,13,15 21:3,11 24:3 55:19, 25 67:23 136:7
**2016** 21:4 24:4 136:10
**2017** 122:24
**2018** 7:2
**218** 111:11
**218,625** 111:12 114:21
**218,700** 91:7
**220,650** 113:1
**220,725** 113:1
**22nd** 55:25 88:18
**24** 41:8 97:11,12 130:15,24
**240,000** 112:2
**241** 112:2
**2509** 9:3 12:4,5
**26th** 83:6
**27** 67:23
**27th** 55:19
**29th** 83:8

## 3

**3,000** 45:1
**3/4** 113:9
**30** 26:9,10,13 30:16
**345** 111:9

## 4

**4** 73:9
**40** 51:10,12
**40,200** 74:3
**40,500** 88:24,25
**409** 86:7
**41,916** 89:1,2
**416** 86:8
**417** 85:5
**424** 85:5
**441** 112:3,4,14
**453** 73:1,2,3,9 75:24 76:2
**454** 74:17
**455** 74:23
**456** 73:18 74:23
**457** 75:3
**458** 75:12
**459** 75:12
**48** 41:8 97:13
**482** 114:19 115:3,10,13,15
**4:22** 7:3
**4:48** 23:23
**4:53** 23:23

## 5

**5** 61:2
**50/50** 143:7 148:11,14,16
**508** 128:9
**509** 129:3
**510** 129:8
**58** 111:23

## 6

**60** 20:17 26:10,14
**6:19** 82:1
**6:26** 82:1

## 7

**7** 12:14
**72** 14:19
**73** 14:20 15:6
**76** 15:6,8,16
**76877** 9:3
**7:15** 111:1
**7:26** 111:1

## 8

**88** 15:15,17
**89** 15:15 16:16 17:11
**8:10** 149:7

## 9

**90** 17:16
**900** 7:12
**95** 17:12,17,18 18:2,20,21,22
**96** 18:14,20 19:12

## A

**A1008** 88:20 90:1 91:15 92:20
**ABA** 40:2,3
**absolutely** 104:8 141:14 142:8 143:18
**access** 123:12 131:7,11,23
**account** 42:13 69:14 83:20 99:1,9, 10,13 105:19,20 111:9 122:10
**accountable** 22:3
**accountant** 14:17 26:16 60:2
**accounting** 13:7,8 14:11 22:17 23:16,17 24:6,17,20,21 25:14 28:22, 24 29:3,24 30:23 52:21 53:1 58:15 132:6
**accounts** 99:1,3,19,22,24 122:15
**accumulated** 85:6

**accurate** 78:11

**accuse** 102:17

**acquired** 17:23 18:7,20 46:6

**acted** 119:15

**actual** 113:18

**Adams** 20:3 22:22 38:20

**add** 26:17 88:22 112:2

**adding** 123:21

**addition** 38:24,25 123:20 143:25

**additional** 121:15 123:21

**address** 9:3,7,8,13 12:13 28:13 30:13,14 65:17 117:13

**Administration** 13:8

**administrative** 38:23 39:1

**advice** 52:8

**advise** 137:21

**affirmative** 55:5

**affirmatively** 56:9 59:7

**affix** 74:9

**affixing** 72:15

**agent** 66:9 95:24 96:1

**agree** 11:23 35:23 48:11 50:3,15,18 71:25 92:21 95:8 96:19 98:17 99:6,17 101:5,21 102:2,19 103:7,17 105:21 106:7,16,18,20 107:14,23 108:6,16 110:3 115:2 123:4,13 130:7 133:15,23 134:12,14 142:24 143:2,4 144:11

**agreed** 39:13 68:24 133:17

**agreeing** 75:18

**agreement** 28:6

**agrees** 91:4,14

**ahead** 16:22 126:13 148:25

**AICPA's** 52:4

**air** 148:14

**Alaska** 101:7

**alerts** 138:10,14

**allegation** 36:7 135:9,16

**allegations** 135:13 144:24 145:10 146:11,24

**Alonso** 95:10

**Amanda** 31:14 37:20

**ambiguous** 26:24 43:12 44:1 52:22 66:20

**America** 100:2,7,11

**amount** 65:3,4 89:3,6,8,20,21,23 90:25 91:1,8,9,14,25 111:10 112:14,16,25 114:21 120:24

**and/or** 42:20 149:5

**Angelo** 13:1,2 14:7

**announce** 149:2

**announcement** 67:24

**announcements** 67:23

**answering** 19:6 118:12

**anticipate** 135:6

**Antonio** 7:12

**anymore** 53:9

**apologize** 80:19

**Apparently** 108:17 131:2

**appearances** 7:14

**appeared** 119:16 147:14

**appears** 80:17,21,23 82:13 89:25 103:5 111:20 112:16,24 114:15 115:1 126:21

**apply** 53:19

**appreciable** 38:18

**approval** 70:25 71:1,4 126:7 136:3,8

**approved** 68:22 126:18

**approving** 60:16,19

**approximately** 7:3 112:2

**April** 21:4 24:4

**area** 50:20 52:20,21

**arena** 50:21

**Argu** 105:25

**arguably** 50:24

**argumentative** 75:22 97:18 104:3 105:9 106:1,9,19,24 107:3,16 108:1,9,20 109:5,17 110:1 141:11 144:13

**arose** 145:12 147:1

**arrival** 19:12

**arrived** 40:12,13

**arrow** 115:10

**Arrowhead** 42:20 44:13 63:1,11,12,15 97:14 98:13,14,19 100:14

**Arrowhead's** 63:9

**Artesia** 58:15,17

**articles** 51:21,22,23 52:13 53:18 58:25 59:3

**Asesores** 109:9 112:6

**aspect** 29:11

**aspects** 53:1

**assets** 17:15

**assign** 30:12,24

**assigned** 27:23

**assistance** 62:14

**assistant** 38:23 39:1

**Associates** 7:11

**Association** 15:10

**assume** 21:7 26:17

**assumed** 21:8 43:8

**assumes** 62:15 88:16 97:18 102:23 103:21 104:4 106:1,8 107:3,16 108:1,9,20 109:17,25 124:17 134:17 144:13

**assuming** 46:10 99:14 102:25

**asterisk** 61:18

**attached** 61:15 77:14 89:5 94:11

**attachments** 54:16

**attempt** 68:17

**attempts** 127:22

**attended** 13:1

**attention** 59:4 95:2

**attorney** 132:25

**audit** 29:18

**August** 14:19 55:19 67:23 122:24

**Austin** 7:9 14:12

**authentication** 44:5,9 68:3 123:2, 22,24 124:5 138:6

**author** 107:11 110:11,14

**authored** 110:4

**authority** 21:18 99:8,18

**authorization** 36:2,15 47:11 108:7, 18

**authorize** 107:23 108:13,15 133:16, 22

**authorized** 36:9 116:20 117:2,9 118:14 133:19 143:16

**avoid** 50:25 51:5

**aware** 39:18 40:12 43:21,23 55:10 56:19 57:4,14,25 67:7 77:22,25 78:14,20,25 79:6 102:7 105:5 121:23 124:9 135:1,16 137:25 138:1,2,13 139:7,10,14 140:8,12,13 144:21

**awhile** 11:2 24:5 57:13

B

**Bachelor** 13:7

**bachelor's** 13:6,7

**back** 10:17 14:5 15:8 16:4 17:13,19, 20 18:1 34:3,9 39:8 42:11 45:23 54:20 59:13 64:14 95:25 97:16 103:25 115:20 134:20 140:22 145:9 146:10

**backs** 73:6

**bad** 103:3

**Badgering** 148:19

**bank** 16:1,2,3 17:9,11 34:18 40:24 41:2,12,16,25 42:13,20 43:10,14,15 44:4,10,13,24,25 45:9,16 60:1 63:1, 2,12,13 71:22 72:2,4,9,11 74:6 78:5 82:5 83:16,19,21 84:3 97:14 98:5,9, 13,14,19 99:8,18 100:14 103:4,24 104:5

**Bank's** 98:22

**bar** 13:22,24

**barrier** 120:4

**based** 71:5 106:13 107:2,5 109:22 117:14,19 133:13 144:24 145:10,23 146:11,24 148:6

**basically** 19:23 24:5 25:6 29:25 30:3 46:5 47:13 54:14 57:17 59:25 74:20 127:22

**basis** 22:5,6,7 31:1,10 51:9 58:12

**batch** 82:12

**Bates** 72:24 73:9 85:4 86:7 114:18 115:3,16

**bear** 119:7,10

**bears** 110:16

**BEC** 67:25

**begin** 30:18

**believed** 118:23

**believes** 133:22

**belong** 106:22

**belonged** 105:22,24 106:3

**belongs** 106:6

**beneficiaries** 109:21 110:6

**beneficiaries'** 99:22

**beneficiary** 61:21 69:14 79:2 94:16, 20 99:23 100:16 113:7 114:23

**benefit** 57:2

**big** 102:14

**bilingual** 143:21,22

**bill** 74:18 76:8 81:4,19 129:7

**Binns** 7:16 26:23 28:6 29:15 43:12, 17 44:1 49:10 50:14 52:22 62:2,15 66:19 67:5 75:22 79:18 80:1,11 86:12,18,24 88:12,16 96:16,25 97:7, 18,24 99:11,25 100:5 101:11,23 102:22 103:10,20 104:3,15,24 105:8,15,25 106:8,11,19,24 107:3, 16,25 108:9,20 109:5,10,16,24 110:8,18 116:2 120:5 122:17 123:18 124:16 127:3 130:10,25 131:25 132:12,18,22 133:11,25 134:9,16,25 139:7,10,15,19,23 140:13,19 141:11 144:12,20 145:3,9,17,22 146:3,8,10, 15,17,19,21,24 147:6,9,16,23,25 148:16,20,23,25 149:6

**birth** 9:4

**bit** 25:11 38:19 43:21 50:1 51:13 56:18 75:15 90:16 121:20

**black** 61:9

**blame** 148:13

**blank** 34:2

**blew** 80:24

**bona** 119:16

**books** 22:17

**border** 81:1,14

**bottom** 70:3,23 128:14,15 130:14

**bought** 18:21

**break** 23:21 27:13,16 81:25 110:24

**Brian** 8:14

**bring** 38:13 40:2 59:17 75:9 136:20

**broad** 51:24 52:14 53:4,5 54:12

**brought** 59:4,23,25 70:12

**Buddy** 20:3 22:22 23:7 38:20,23 39:3,4,7,8,9

**Building** 15:10 16:5

**bulletins** 123:12

**business** 13:7 15:15 20:9,10 23:16 24:16 29:11 30:25 31:3,17 51:18 52:18 55:1 56:3,6 95:3,5 119:23 120:1 128:17 141:9,13

**businesses** 55:11,12

**buyers** 39:2

**buying** 38:25

C

**C-E-N-T-E-X** 17:2

**C.V.** 65:21 96:4 109:9,15 112:22

**call** 20:18 26:25 35:4 37:10 40:8 44:16,21,22 45:10,20,25 47:15 54:21 58:8 66:9 76:1 139:4,7,16,19 143:23

**called** 14:13 15:25 18:5 24:20,22 37:9 38:22 44:18 46:19 51:17 52:3 56:3,16,20 76:2 83:12 95:12,15,16, 21 121:5 139:11

**calling** 45:15 129:14

**calls** 26:24 49:10 50:14 62:2 96:16, 25 97:7,19 99:11,25 100:5 101:11, 23 102:22 103:10,21 104:3,24 105:8 106:1,11 107:17 108:1,10,21 109:5, 10,16,18 110:8,9 122:18 123:18

128:10,11,15,22 129:5,7 133:11,25 134:9,16 144:12 147:11 148:9

**capital** 27:10

**card** 34:18

**care** 74:15,18,19,21 75:4,8,10 76:5,6,7,10,12 80:15 81:5

**cared** 81:1,4,7

**careful** 54:7,16

**Carol** 7:10

**carried** 44:24

**carriers** 67:19

**case** 31:12,19 36:7 37:7,13 40:25 41:2 42:21,24 46:21,23 59:21,23 61:12 67:10,15 68:17 77:21,23,25 82:12 87:1 116:19 117:8,22 121:8 126:17 135:9,16 137:19 138:6 144:22 145:11 146:12,25 148:7

**case-by-case** 31:10

**cases** 31:3 44:18,19 46:17 60:23 74:3 136:21 143:13

**Castleberry** 12:14

**cautious** 46:17 47:1

**ceased** 16:20 17:14

**Cen** 17:8

**Centex** 16:24 17:1,6,8,16

**CEO** 22:23 38:24,25 56:16

**certificates** 96:23

**certification** 29:19

**certified** 7:10

**CFO** 16:11,14,15 18:13 21:4,7 22:14 24:4,9 32:5,10,11 37:5 38:9,18 50:17,23 53:9,11 57:20 61:11 99:7 110:21

**chance** 97:13 127:16

**change** 20:12 25:5,6 34:24 36:1,9 37:16 38:18,21 46:1,7 47:4,6 48:5,8,20,25 49:12 50:9 59:10,15,19,22 60:9,16,17 68:19,22,23 69:6 97:11 107:15,24 108:7 115:21 120:16,23 121:9 125:6 126:18 133:23 136:4,9 137:16 138:7 142:19 143:11,15

**changed** 25:3 33:15 34:15,19 37:15 38:19 48:3,10 94:23 109:22 121:7,18 125:1,15 126:5,6 136:16 137:4,6,10

**changing** 36:4,14 45:24 46:13 47:10 50:5 117:8

**charge** 27:11 39:15

**charged** 36:22 58:1 112:11

**chart** 23:4,6

**charter** 17:13

**Chase** 19:16,17,24 20:17,20,24 21:9 25:8,23 26:2,14,15 66:22

**check** 30:15,24 31:2 32:19 33:20 37:17 69:25 71:2,7,15 76:17,22 77:8,12 83:20 88:10,18 89:9 94:14

**checks** 83:11

**children** 9:24

**choice** 45:5

**choose** 28:15 57:3

**circle** 128:10

**circled** 129:4,9

**circumstance** 40:11 41:14,21

**circumstances** 46:15 78:25 121:4,16

**cities** 10:8

**city** 10:8

**claim** 118:6

**claims** 67:7,9 145:24

**clarification** 52:25 91:12

**clarification's** 113:13

**clarify** 93:6

**Clay** 10:4

**clean** 75:14

**clear** 35:12 37:12 38:8 74:5,25 75:3

**cleared** 73:24 76:15 96:22,23

**clearer** 50:2

**click** 57:15

**closed** 21:9

**closely** 56:15

**closing** 19:21

**COA** 73:23,24 74:4,5,24 75:2

**COAS** 76:15 96:23

**code** 27:10

**cold** 76:1,2,3,4 77:16 78:6 85:14 89:17 90:13,18,20,22,25 91:1,3,4 93:7

**college** 14:1,6

**column** 92:5

**combination** 127:20,21

**Comerciales** 109:9

**Comercialis** 112:8

**commercially** 43:11,22,23

**common** 125:7,9

**communicate** 45:25 47:3,19,23 48:9,19 64:7 119:19 120:21 127:6,7,17,23 137:22 143:23 144:2

**communicated** 127:24,25 128:5

**communicates** 48:4

**communicating** 63:24

**communication** 35:5 48:25 49:7,8 50:9,12 62:25 68:18 120:17,22 123:8 127:1 140:15

**communications** 63:25 120:2

**companies** 25:9 27:13 143:10

**company** 7:6,19 14:7 16:23,24 18:5,12 19:11 20:12,23 22:10,20 26:25 32:7,16 36:24 42:25 49:3 52:21 54:12 61:10,22 62:5 65:11 67:9 77:22 78:15,21 79:3,24 80:7,23,24 81:12 94:16 95:22 96:1 99:4 104:1 110:7 122:2,5 123:16 126:6 129:20 133:10,24 134:6 144:9

**compare** 34:18 49:18

**compile** 125:17

**complete** 149:3

**completed** 70:16

**completely** 63:22 104:1

**completes** 73:6

**complied** 101:9

**complies** 113:16,20 114:12

**comply** 28:6

**compose** 96:11

**compound** 130:10 145:8

**comprise** 96:11

**compromise** 51:18 55:2 56:3,6

**compromised** 122:15,16

**computer** 37:6 57:17 60:15

**computers** 58:17,18

**conclude** 122:13

**concluded** 149:7

**conclus** 103:11

**conclusion** 97:1,8 101:24 103:11 109:11 110:9 133:12 134:1 147:12 148:10

**condition** 78:15 97:6

**conduct** 62:19

**conducting** 52:18

**confirm** 34:24 46:16 47:6 48:5,12, 16,20,25 50:4,8 68:1,7,17 104:13 120:16,22 122:25 124:25 127:1 143:23 144:7

**confirmation** 45:21 46:11 47:10 60:8,11,18 61:5 76:14 124:2 142:19

**confirmed** 49:8 93:15

**confirming** 124:5

**confirms** 143:11

**confusing** 11:25

**congratulations** 8:10

**Congress** 27:13

**conjunction** 35:9

**connection** 65:13 80:8 85:7 99:16, 23

**consistent** 91:17 111:16 112:14

**consists** 85:4

**Construccion** 65:22 96:3 109:15 112:19

**construction** 14:5

**consulting** 32:13

**contact** 42:19 48:12 52:17 59:5 63:21 95:18 130:14,22,23 141:17

**contacted** 63:11

**contacting** 128:21 140:15

**contained** 44:15 69:20 74:11 85:25 86:23 93:2,19 94:9 117:3 140:4

**contend** 93:25

**content** 88:12

**contention** 97:5 110:16

**context** 24:16

**continued** 95:2,5

**continuing** 51:9,12,13 52:6 56:13 58:24 59:4

**contract** 58:12

**contracted** 58:11

**contractual** 66:16

**control** 57:17 60:14 76:17 98:18,21 116:6,9,12,15 120:9,12,15,20,24 140:24 141:2,8,15,16,19 142:9,12, 15,16,21 143:5 147:20 148:1

**controls** 50:25

**conversations** 43:10,18 46:22 67:16

**converted** 24:21

**conveying** 62:9

**copies** 83:10,11

**copy** 75:9

**corporate** 100:20

**corporation** 7:7,17 16:25 17:1 26:22 27:7,9,12,17,24 28:3,5

**correct** 9:6 13:12 18:2 21:15 22:11, 12 23:15 24:11,13 25:17,18,24 27:19,20 32:5,6 33:12,13,21,22 34:7 35:1,15 36:10,15,19,20 38:1,4,5 41:17 42:7,21 43:1 45:21 47:5,14, 17,20,21 48:21 49:1,9 50:6,12,17,21 51:2,6 52:9 53:9,10,13 54:24 55:21, 22 56:11,12 57:5,18 58:12,24 59:11 61:6,16,19 62:1,6,7,10,14,20,23 63:2,6 65:24 68:7,13,19,20 69:6,15, 21,23 72:2,3,7,8,13,14 75:20,21,25 76:8,9,16 77:10,13 78:12,13 79:3,4, 13,17,24 80:9,16 82:8,12,13,23 84:5,8,12,21,25 85:1,15 86:1,3,13, 25 90:11 91:18 92:1,2,6,7,16,20 94:6,10,17,18,20,21,24,25 95:3,6,7 96:2,7,12,24 97:6,9,16,22 98:2,6,19, 20,23,24 99:1,2,4,5,19,20 100:9,16, 17,25 101:1,3,4,10,14,15,18,19 103:9,19 104:2,18,23 105:2,7,14,23 106:7 108:16,19 109:4,23 110:7,17 112:15 113:4,5,10 114:3,8,9,14,25 115:7 118:5,18,22 120:10,11,13,14, 23 121:1,23 122:4,16 124:6,9,15 125:15,21,23 126:14,20 127:25 128:21 129:1,15,16 130:9 131:17, 20,24 132:16,21 133:3,7,18,24 138:20,23,24 139:24 140:25 141:1, 3,18,20,22,24 142:10,14,20 143:12, 16,23 144:2,11,22 145:7 146:5 147:2

**corrected** 55:23 80:19

**correctly** 25:7 40:23 42:9 95:23

**correlate** 89:22,24

**correlates** 89:20,23

**correspond** 77:4 83:21 84:19 91:9 113:3 114:3 115:6 116:4

**corresponded** 37:6

**correspondence** 51:14,15,20

**corresponds** 62:5 83:24 88:20 92:13,20 111:19 113:22 114:6,11,13

**counsel** 7:13 143:9

**couple** 10:18 24:19 67:22 120:8 129:4

**courses** 56:14

**court** 7:8 11:7 78:9 103:2 104:7

**cover** 33:19 51:24 66:5

**coverage** 66:12,22 67:14,15

**CPA** 8:3,4,20 13:11,25 14:23 51:8 99:7

**CPAS** 8:5,17

**CPE** 52:3

**create** 137:17

**creates** 83:19

**credit** 51:23

**credits** 58:24

**crimes** 51:5 55:13

**CROSS-EXAMINATION** 116:1

**crucial** 75:14,17

**Cuevas** 70:5

**current** 25:15 32:5

**Curtis** 7:10
**custody** 149:4
**customer** 124:15,18 143:16
**customers** 29:20 144:9
**cut** 63:22
**cyber** 52:11 54:4

**D**

**d-e** 96:4
**D-E-B-R-A** 9:20
**D-I-S-C** 27:11
**Dallas** 7:4 8:19 17:20
**Dallas'** 14:25
**dash** 27:10 113:19
**date** 7:2 9:4 29:4,7 55:17,24 88:10 89:16,17,18 93:6,7 94:6,13 111:8, 18,19 112:13
**dated** 111:7 112:18 113:9 114:7
**dates** 13:16
**day** 21:8 25:1 39:3 84:3,5,7 98:17 112:1,4
**days** 28:7 39:19 41:6 84:25 93:9 139:1
**de** 65:21 109:9,15 112:20,22
**deadline** 41:9
**deaf** 43:6
**deal** 39:4,8 73:20 117:8 143:7
**dealing** 46:21 66:25 67:2 120:1 137:8
**dealt** 52:14
**debit** 83:12,14,19 84:4,8,10
**Debra** 9:18,19
**debts** 27:23
**December** 16:21 17:14 20:7,13,15 21:3,11 24:3 136:7
**decides** 31:8
**deciding** 120:15
**decision** 25:5,6 31:9,11,13,22
**default** 39:1
**define** 21:3 44:8
**degree** 13:6,8
**degrees** 13:3
**deleting** 54:18
**deliver** 101:7
**delivered** 44:24
**demand** 30:17 99:9 100:14
**demands** 99:19,22
**denote** 114:11
**denying** 92:11
**department** 28:22,24 29:3,24 30:4 53:2 54:4,7 56:24 58:6,10,13 63:14, 15 122:7 123:9 131:15 132:6
**department's** 105:18
**depending** 30:14
**depo** 127:10
**depose** 37:20
**deposit** 89:4
**deposited** 89:4
**deposition** 7:5 10:19,25 29:8 34:1 125:12 149:2,7
**desk** 73:15 74:9
**detailed** 95:17
**details** 39:6
**detected** 97:12
**determine** 137:15
**determined** 138:18
**differ** 136:9
**differently** 147:9,17
**digits** 40:3,4,5
**diligent** 121:20
**Direct** 7:22 52:3
**directed** 25:8 68:25 95:21 101:6 117:23
**direction** 25:3 126:24 137:16
**directly** 63:23
**director** 23:2,18
**disagree** 96:14 125:19
**discovery** 41:12 64:10
**discussed** 58:23 137:15
**discussing** 61:3 117:16
**discussion** 58:20 99:15
**dishonest** 102:6
**dismiss** 28:5
**dispute** 103:15
**District** 7:8
**divide** 148:7,8
**division** 7:9 18:13 52:4
**divisions** 18:12
**dock** 72:23 73:5,6 74:20 81:13,16 128:17
**document** 8:25 44:11 49:18 69:1 71:13,15 72:22,25 73:5,7 75:23 81:5 87:16,24 93:11,14 111:22 115:3,6, 15 128:8 142:7
**documentation** 32:19 71:20 72:16 74:8 75:13,17 77:12 80:16 85:6 88:14,21 89:5 92:12 93:23 129:20 131:4,5,10
**documenting** 32:18
**documents** 29:1 65:10 70:17 77:1, 18,24 81:8,24 85:5,11,13,17 86:1,6, 7,9,22 87:4,11,12,17,21,25 88:4,13 92:18,21 93:13 94:12 96:11 125:13 131:14
**dollar** 65:5,6 89:23 91:1,14
**dollars** 45:12
**domestic** 27:11 42:16,17 46:18 47:3,17 68:6 143:10,17
**Don** 11:6 22:19,22,25 23:1,3,18 28:20 38:24 46:24 47:19,24 58:21 59:5 60:8 61:3,4,8,17 80:14 96:11 98:12 102:9 104:12 124:20,22,24 140:9
**Don's** 46:23 124:14 125:19
**driver's** 8:22 9:2,5
**Dry** 9:3 12:4,5
**due** 30:16 123:16
**duly** 7:21

**dummy** 64:19,23 65:8,9 95:13

**dummying** 65:13,14

**duties** 21:23 22:1,14 24:8 37:2 38:19,24,25 50:18 51:7

**duty** 37:25

## E

**e-mail** 32:24 33:3 34:11,17 35:4 36:8 37:11 41:11 45:5 46:3,8,23 49:12 51:18 54:13,17,19 55:1 56:3,6 59:25 60:9,10,12,18,21,23,25 61:4 63:21 64:17 65:1,16,23 68:4 74:25 95:17,23 98:12 101:6 107:8,11,19, 22 108:12 109:22 116:5,7,10,13,16 117:2,13 118:19 119:2,13,14,21,24 120:2,9 122:9 123:3 126:19,22 136:17,18,20,22 137:1,6,7 140:24 142:13 145:4,5,14,15 146:4,13 147:2,7,10,13,15,20 148:2

**e-mails** 48:14 54:6,16 56:25 64:9,14 65:16 106:13 110:5 116:18,20,23 117:7,12 118:5,13,15 119:5,17 133:14,16,20 135:22 137:8 138:5,19 145:5

**earlier** 46:3 61:1 68:5 80:14 85:13 125:20 143:9

**early** 138:22

**earn** 13:3

**ears** 43:6

**easier** 42:17

**easily** 124:12

**eastern** 137:2

**easy** 124:23

**education** 12:23 51:9,12,13 52:6 56:14 58:24 59:5

**Edwards** 14:15

**effect** 17:12 34:17 70:15

**eliminated** 123:15

**Ellis** 23:13

**else's** 53:25

**embezzlement** 51:1

**emergency** 130:14,23

**employee** 15:3 18:14 21:12,14 32:16 100:21

**enable** 27:13

**end** 72:12 98:16 120:25

**Energy** 25:10 26:21 54:7 58:14,18

**English** 119:21 127:19 143:17

**ensure** 135:25

**entail** 52:11

**enter** 30:18,22 31:5,8

**entering** 30:20

**entire** 21:12

**entities** 120:1,4 121:12,18 125:6,13, 14 136:14 137:11

**entitled** 78:16 101:22 103:8

**entity** 19:18 66:5,15 121:9

**entry** 93:20

**equal** 23:4,8 148:15

**equals** 74:4

**essentially** 36:6 124:14

**Europe** 137:2

**evaluation** 52:18

**event** 36:17

**events** 21:20 29:5 32:8 35:13,25 39:17 51:16 53:11 56:4

**everyone's** 95:1

**evidence** 62:16 79:6,12,15,20,22 80:6,12 88:17 97:19 102:23 103:21 104:4 106:1,9 107:4,17 108:2,10,21 109:18,25 124:17 134:17 144:13

**evolved** 30:1

**Ewing** 14:25 15:1

**exact** 117:13

**exam** 13:13,19,23,25

**EXAMINATION** 7:22 120:6 140:20

**examples** 128:10

**exception** 61:17 69:19 78:12

**excerpts** 130:2

**excuse** 111:18

**execute** 44:6

**executed** 72:6

**executing** 45:17

**executive** 23:2,18

**exempt** 20:18

**exhibit** 34:2 44:12,16 55:17,18,24 61:3,4,16 69:9,12,20,24,25 70:10,24 72:1 73:9,12 74:12 76:23 78:10 79:1,9,23 80:9,14 82:3 83:18 85:2,4, 10 86:4,6,12,21,24 87:10,12,18,19, 20 88:1,2 89:5 91:13 92:1,12 93:3, 19,24 94:9 111:3,5,6,17,23,24 112:4,17,18 113:8,17,21,22 114:1,6, 11,13,25 115:11,13,14 117:17,21 118:1 119:9 128:9 129:21 130:1,8 133:18 138:11

**exhibits** 33:17 80:13 138:15 149:5

**exist** 16:20 17:14 51:6

**existing** 23:8 24:21

**exists** 20:25

**expect** 74:10 77:11 100:3 101:17

**expectation** 72:4 100:12

**expected** 72:17 73:24

**expecting** 73:21

**experience** 99:6

**expertise** 25:12

**explain** 134:4 136:3 137:6

**explained** 39:20

**export** 27:15

**exporting** 27:14

**Exports** 7:7,17 27:7,9,17,24 28:3,5

**exposed** 123:16

**extensive** 29:17 32:14

**extent** 37:4 85:10 92:3

**external** 76:17

## F

**face** 92:21 136:17

**fact** 33:9 39:12 54:15 56:25 61:9 62:19 67:17 68:15 70:12 71:15,16, 19 75:6,11 78:21 79:7,13,15 80:7,12 94:9,19 95:1 96:21 98:9 101:2 105:4 107:22 109:25 110:4 118:6 121:13

124:8 125:17 127:25 130:13 133:16, 21 134:13,21 143:15

**facts** 62:15 88:16 97:19 102:23 103:21 104:4 106:1,8 107:4,17 108:1,10,21 109:17 124:17 134:17 144:13,21

**failed** 15:19 97:5

**fair** 11:5 13:15,17 80:5 118:19 134:22

**fairly** 41:7

**fall** 23:17 54:1 136:1

**falling** 135:21

**falls** 53:2 94:14

**familiar** 54:17 55:1 65:4 70:1 85:8 131:14

**family** 8:21 19:16,17

**Farms** 20:17 26:2,14 66:22

**fashion** 57:3

**fault** 110:17

**fax** 33:4 34:9,16 35:4 44:23 45:3,5,7, 9,11,12 46:3,8 49:13,14 128:13 141:25 142:3

**faxed** 141:24

**FBI** 55:10,15 56:2 64:11,12,15 65:24 122:23 123:11,14 138:10,14

**February** 19:16,21 20:7 21:10,11 82:16,25 83:4,6,8 84:1 88:18 89:17, 19 111:18 114:14 136:7

**federal** 17:12,13 149:3

**fee** 112:11 113:2

**feel** 92:25

**fell** 43:6 53:24,25

**felt** 64:6 65:9 127:24

**fide** 119:17

**figure** 29:2 53:20 62:19 84:23 89:15 93:12 121:5 123:25

**file** 70:18 77:1,5

**filed** 77:11

**filled** 70:6,8 71:4 77:8

**finally** 13:19 63:20

**financial** 50:20 51:5 52:20,25 55:13 60:2

**find** 37:20 48:24 64:12 65:19 67:13 70:19 77:1 103:6,24 114:16 141:12

**fine** 9:9 11:3 33:3,4,6 45:14

**finish** 19:3,6 35:19 53:14 82:17 146:17

**finished** 22:6,7 37:8

**firm** 14:11,14

**flag** 125:8

**flags** 60:4 137:18

**flexible** 28:14

**Flore** 138:3

**Flores** 36:7 62:14 102:6 109:23 116:21 117:12 119:3,19 120:19,22 124:14 127:6 128:4,18 133:10,13 135:5,7,8,25 136:2 137:21 138:3,10, 14,19 139:3,19 140:8,14 141:18 147:19

**Flores'** 116:10,16 120:9 127:10 145:23 146:4,13 147:2,14 148:1

**folks** 24:19

**follow** 67:12 117:4 126:24

**follow-up** 44:20 46:11,16

**food** 29:10,17 131:6,21 132:11,13, 15

**foregoing** 117:14,19

**foreman** 81:16

**forgot** 19:4 67:18

**form** 33:17 34:3,4 46:9,11 57:2 69:4, 6,12 70:7,12,13,14,15 72:7,9,16 76:22 77:8,12,16 78:6 79:23 83:22 85:12 88:18 89:9 131:11

**formal** 12:23 48:23 53:22

**formed** 19:20 27:18

**forms** 69:10

**formulated** 35:13

**forward** 39:10

**found** 41:4 42:14 145:16

**Fox** 17:4

**frame** 18:20 20:13 21:19 35:7 41:5 94:15

**fraud** 51:25 52:8,11,12 56:6,15,16, 19 63:14,15 144:11

**fraudster** 64:18

**fraudsters** 64:16

**fraudulent** 144:15 145:14,15,16,18, 21,23

**freight** 80:21,22,23 81:2

**front** 72:21 103:1 131:9 132:3 141:5

**Frost** 42:20 63:1,12,13 97:14 98:22 100:14

**frustrated** 134:18

**full** 7:25 141:2,16

**function** 24:6,7

**funds** 22:18 68:1 122:25

## G

**G-A-B-A-L-D-O-N** 32:4

**G.L.** 25:8,9 66:21

**Gabaldon** 32:2,3

**Galbaldon** 31:15

**gave** 10:25 24:5 27:18 39:17 53:12 55:20 57:5 96:20,24 126:7

**general** 20:22 25:19,21 123:8

**generally** 53:24 105:10 144:21

**generated** 83:21

**generates** 84:3

**gentlemen** 103:2 104:7 115:15 131:10 132:3

**gist** 95:18

**give** 39:6 40:1 61:16 64:4 66:2 117:15

**giving** 21:2,20 29:5 32:8 33:14 35:13,25 36:17 41:23 50:2 51:16 52:7 56:4

**God** 146:19

**good** 51:13

**goods** 22:6,7 37:8

**Googling** 8:16

**Gotcha** 17:6

**graduate** 12:19
**graduated** 14:9
**Granbury** 10:16
**grandchildren** 20:19 26:6,7
**grandchildren's** 26:3,8,13
**Great** 24:23 28:9,13 32:14
**Greg** 7:16
**growers** 37:7
**guess** 15:3 16:9 30:1 48:6 55:4 72:18 99:12 142:2,4
**guys** 53:21

**H**

**hack** 49:13,14
**hacked** 101:6 119:14,15
**hacker** 64:18
**hackers** 64:16
**hacking** 56:19
**half** 93:9
**hand** 31:19 33:18 44:24,25 101:18
**handed** 17:13
**happen** 105:19 121:21 122:9
**happened** 35:24 41:10 42:9 47:24 60:6 61:25 62:20 97:10 105:19 121:11 124:14 125:9 127:14
**happening** 45:10 104:10 124:11 142:23
**happy** 28:4 67:5 75:8
**harder** 13:22
**Haynes** 31:15
**hazards** 122:3,6
**He'll** 148:23
**head** 20:21,22,25 25:16 26:15 53:17 54:6 138:23,25
**heard** 56:5 57:12 96:10
**Heart** 15:11
**Heath** 10:10
**held** 16:7
**helped** 143:20
**Hey** 69:2 101:9 124:24 126:13
**high** 12:19,20 29:18
**higher** 23:4
**highlight** 86:24
**highlighted** 61:8
**highlighting** 86:12 87:2
**hijacked** 49:6
**hired** 21:15 22:22,25 23:1
**hitch** 94:24
**hold** 19:3 74:22
**home** 55:11
**Homes** 17:4,5
**honor** 142:13
**hope** 12:7,13 36:13
**hours** 41:8 51:10,12 58:24 97:13 130:15,24
**house** 38:13
**HR** 27:4
**hundred** 20:23 26:17 92:25 143:2

**I**

**IC-DISC** 27:9
**ID** 30:12,19,21 31:6
**idea** 64:2,25 65:15 106:23
**identified** 56:3
**identify** 55:7 56:10
**II** 8:1
**III** 8:1
**imagine** 123:25
**immediately** 127:13
**imperative** 33:20
**implement** 58:1
**important** 123:10
**improve** 53:21
**in-house** 58:11
**in-shell** 22:5
**incident** 21:2 24:1 25:16 27:18 33:14 50:2 55:20 57:5 66:24 67:1
**include** 53:2
**included** 82:11 86:1
**including** 119:1
**incumbent** 121:14
**independent** 96:7 108:18
**indication** 48:15
**individual** 95:22
**individually** 25:24
**individuals** 19:25 95:11
**industry** 8:12
**informal** 142:18
**information** 9:5 33:1,7,9,11,18 34:4 36:23 37:20 44:6 45:24 46:13 47:5 49:5 57:1,2,16,18 62:9 63:18 64:1,4 66:3 72:7 74:11 77:4 79:6 92:14 93:2,19 94:8 96:8 109:22 126:6 127:23,25 128:1,2 129:18 130:3,6,8 131:19,24 132:4,9,16,20
**informed** 56:15
**initial** 69:1 71:1
**initially** 63:11,17
**initials** 70:3
**input** 28:10
**inspection** 75:7
**instance** 40:1,15,24 70:15 84:15 121:17
**instances** 54:9 124:11 125:5,13 126:5
**institute** 35:2 57:21
**instituting** 36:12
**instruct** 60:7
**instructed** 98:5
**instruction** 36:23 44:7,20 46:13,18 68:19 69:4,6,10 77:7 78:5 85:12 133:14 138:6 143:11
**instructions** 28:11,15,19 32:18,21, 23 33:5,20 34:15,19,20,21,25 35:11 36:1,9,15 37:7,15 44:15 45:3,17 46:1,4,7 47:7 48:3,8,10,20 49:1 50:6 59:10,16,20,23 60:23 69:3 71:22

72:1,5,6 74:6,10 75:19 76:21 77:3, 16 84:25 94:22 97:12 104:13 107:24 108:8,24 117:3,8 119:16 120:17,23 121:6,10,18 124:3,6 125:1,6,14 136:4,9,13,16 137:4,7,11,17,23 142:13,20

**insurance** 66:5,17

**insure** 66:16

**integrity** 122:21

**intended** 23:7 89:3,4 119:3

**intent** 36:16

**interceder** 39:2

**interest** 19:22 20:5 27:11 66:15

**interested** 80:18

**interests** 19:25

**intermediary** 63:12

**internal** 50:25 62:13 75:7

**internally** 74:20 83:21

**international** 27:12 42:18 48:2 63:13

**Internet** 52:11 58:17 122:10

**interpreted** 128:6

**investigated** 123:6

**investigation** 62:13,19,22 63:9,10 96:7 121:11 127:13

**invoice** 30:23 31:5 33:5,6 46:4 62:5 65:6 70:14 73:25 74:1 75:20 77:16 78:6 80:17,18,20,21 81:2,22,23 85:14 88:20,24 89:8,24,25 90:3,4,9 91:4,7,15 92:3,9,20 94:5

**invoices** 30:18,20 64:23,24 65:20 77:22 78:9 95:13 100:24

**involve** 51:4

**involved** 20:11 37:14 48:14 52:6 67:3

**involves** 42:25

**issue** 41:1 61:12 78:11 85:23 87:21 88:4,8 116:18 117:7,22 137:13 138:18 147:1

**issued** 71:8

**issues** 59:3 137:12,16,17

## J

**J.C.** 14:25

**J.F.** 7:6,18 22:10 24:13 31:19 41:19 42:25 59:22 61:10,21 62:5 65:12 67:9 69:14,16 77:21 78:15,20 79:2, 6,10,24 80:3,6 84:11,12,19,20 90:4 93:21 94:15,24 95:2,3,6 96:21 97:5 98:17 99:4,7,16,17,23 100:13,15,24 101:6,20,21 102:19,20 103:8,17 104:1 110:6 116:4,6,13 117:7,12 118:5,19 119:2,10,19 133:10,24 134:6 135:1,5,12,21,25 137:21 138:2,4,9,13,19 139:11,15 140:8,14 144:24 145:3,5 147:1,19 148:1

**Jacobs** 17:4

**James** 7:5,20,25 10:4

**January** 19:21 55:25

**Jason** 10:4,14,15,16

**Jimmy** 23:13

**job** 14:7 38:11,15,17,19 39:20,22,25 40:9

**jobs** 14:3 36:25

**joke** 29:12

**joking** 29:9

**Jorge** 36:7 47:8,20,23 48:12,16,19 61:6 62:14 68:24 102:6,10,14 106:3, 6,16 107:8,9,14,20,23 108:3,6,24 109:23 116:9,16,21 117:12 119:3,19 120:19,22 124:14,25 128:18 133:10, 13 135:5,7,8,25 136:2 137:21 138:3, 9,14,19 139:3,19 140:8,14 141:17 144:2 145:23 146:4,13 147:2,14,19 148:1

**Jorge's** 105:19 129:18

**Jude** 60:2 69:13 94:20 106:22 107:1,6 108:19,23,24 109:4,7 111:8, 9,16 114:14,23

**jumping** 16:4 18:5

**jury** 78:8 103:2 104:7 115:15 131:10 132:3 133:22 134:4,5 141:5 144:8

**justify** 92:15

## K

**K-A-T-A-T** 65:20,21 96:4

**Katat** 65:20 109:15 112:22 113:25

**keeping** 67:5

**Keith** 7:25 8:14

**Kevin** 8:14

**Kim** 7:11

**kind** 11:5,6 26:19 29:12 37:12 38:9 43:5,6 56:10 58:12 64:2,6 67:18 71:23 114:10 115:9 123:12 124:11, 21 127:20 138:23

**knew** 39:21 47:23 54:9 117:1,2 118:19 124:14

**knowing** 60:13,15 69:6 122:11

**knowledge** 27:21 28:2 32:14 46:5 48:13 61:19,20 102:8 105:3 116:19 117:15,20 119:1 135:11,15,19

## L

**label** 87:18 88:1

**labeled** 138:11

**lack** 22:18 30:1

**ladies** 103:1 104:7 115:14 131:10 132:3

**lading** 74:18 76:8 81:4,20

**lady** 63:15 98:12,13

**Lampasas** 12:14 14:22,23

**land** 43:7

**language** 119:21,22 120:4

**lapsed** 97:13

**large** 63:13

**late** 11:6 16:17 112:3 147:16

**lawsuit** 21:21 22:9 24:3 27:18 29:6 32:8 33:15,16 35:16 36:18 39:17 55:21 56:5 67:20 135:13 145:12

**lawsuits** 67:4,7

**layer** 121:15

**lead** 91:7

**Leading** 139:5,9,13,18,21 140:10, 18

**learned** 138:10,14

**leave** 16:18

**led** 145:1,12

**Lee** 8:14

**left** 16:19,23 17:15,16 38:20 103:4

**legal** 96:25 97:7 101:23 103:10 109:10,16 110:9 133:11,25 147:12 148:9

**legitimate** 65:11 68:24 126:22

**letter** 33:19

**liabilities** 27:23

**liability** 20:23

**liar** 102:14

**license** 8:22 9:2,6 13:18,20

**licensed** 13:11

**lied** 102:7

**light** 121:13

**likelihood** 36:3

**limited** 20:10,23 25:17,23 26:2,3

**limits** 66:12

**Lindquist** 22:19 57:25 96:11 140:9

**link** 55:10

**list** 69:20 113:10 125:17 128:14

**listed** 44:12 89:11 91:13 94:16 117:17 119:9 133:18

**listing** 61:16 81:20

**live** 9:15 12:12 78:15

**lived** 12:13,17 14:7

**lives** 10:16

**living** 9:12

**LLANO** 98:14

**LLC** 20:9,21,22,25 26:15

**loads** 75:2

**loan** 15:10,14,19,21,25 16:5

**located** 7:3 104:2

**location** 123:21

**log** 76:10

**long** 11:1 12:8,15 15:5 40:19

**longer** 15:13 16:20 104:2

**looked** 23:6 47:22 65:1,2 68:24 90:9 126:12,21

**loss** 66:6 119:7,11

**lost** 106:17

**lot** 13:22 45:5 63:19,25 81:15 125:5 129:7

**LP** 7:7,16 19:20 20:8 21:5,8 25:15 26:22 27:22,23 66:4,7,16,17 69:25 116:3,12,15 117:1,4,9 118:14 119:18,25 135:17,21 136:15 137:22 138:3 139:4,11,23 140:16 148:1

**LP's** 140:1

**luck** 103:3

**lucky** 8:6

**lying** 102:10

## M

**M-C-W-H-I-R-T-E-R** 14:15

**M-O-R-V-E-N** 17:23 18:6,7

**Mack** 25:9 26:21 54:7 58:13,18

**mad** 35:20,21 53:16 82:19,22

**made** 25:5 28:7 29:16 31:10,22 36:7 39:8 40:13 42:23 50:10 51:16 71:18,19 103:13 112:6 128:16 135:9,12

**mail** 9:11 33:25 34:9 49:15 141:22

**mailing** 9:8

**Main** 22:16

**maintained** 37:5

**maintaining** 36:22

**major** 13:8

**make** 17:25 25:13 28:4 39:4 44:22 48:3 52:19 63:21 65:10 99:18,21 110:25 121:14 143:15

**makes** 31:10,13 42:16

**making** 47:4 67:9 98:7 123:15 144:25

**man** 74:19 95:16

**manage** 22:18

**manager** 15:9 73:5 128:17

**managing** 16:6

**Mann** 21:12 29:8 36:21 37:17 136:5

**Mann's** 34:1 69:12

**manner** 22:10

**manual** 28:23,25

**manufactured** 14:8

**March** 18:21 21:4 24:3 136:10 138:23

**Maria** 63:1,5

**Maribel** 70:5,17 77:9,10

**Marisa** 63:3,4,6,15,20 64:1,15 65:23

**Marisa's** 63:9

**mark** 111:22 113:14 128:9

**marked** 55:16 82:3 85:2 86:4,6,21 87:10,19 88:2 111:6,24 112:17 113:8 128:8 130:1

**married** 14:6

**marry** 12:10

**match** 74:1 90:14 93:20

**matched** 65:6

**matches** 65:5

**Matt** 20:19

**matter** 7:6 54:3 94:1 134:13

**matters** 149:5

**MC** 70:4

**Mcwhirter** 14:14,15

**means** 34:16 44:3 60:18 115:15

**meant** 43:8

**measures** 43:11 122:1

**meats** 22:8

**meet** 75:3

**meeting** 127:18 128:2

**mentioned** 31:25

**mere** 35:4

**merged** 16:23 17:5,15

**message** 140:9

**met** 64:15

**met all** 96:22

**method** 35:3,5 48:5,25 49:6,7,11,12 50:9,11,12 60:8,9 68:7,8,11,18 120:22 127:1

**methods** 124:1

**Mexican** 80:22,23 120:1,4 121:9,12, 18 125:6,13 136:14 137:11

**Mexico** 58:16 95:19 100:1 121:5 128:11,18,21,22 129:5,7,11,15 137:1,5 144:10,16

**Microsoft** 24:23,24

**mid** 16:17

**middle** 15:24

**Mike** 7:18

**mind** 60:4

**mine** 87:3

**minimize** 36:13,14 51:1 57:22 58:2 124:10

**minimized** 123:16

**minute** 41:23 64:17

**minutes** 45:2

**missing** 86:16 105:23 106:4

**Misstates** 29:15 79:18 80:1 88:12 109:24 122:17 124:16 130:25

**mistaken** 130:15

**moment** 22:14 31:25 120:8 129:17

**money** 45:8 60:2 68:25 95:8 97:15 98:25 99:9 100:18,22,23 103:4,5,6, 7,8,16,18,24 104:1 105:22,24 106:3, 5,16,21 107:1,5 108:15,19,24 109:4, 7,8,13,14,21 110:6 118:20,21,24 121:19 134:13,15,21 137:4 142:10

**monies** 80:7

**month** 18:22

**months** 17:21 18:4

**Mor** 18:6

**Morgan** 18:5

**Morven** 17:22 18:6,19 19:15

**moved** 10:17 14:22 15:8

**mud** 38:8

**multiple** 84:7 130:10

**Mundo** 109:9 112:8

## N

**NAFTA** 81:3

**named** 79:2

**names** 8:13 10:3

**narrative** 96:16,17 104:4 134:9

**Nathan** 10:4,8,10

**nature** 51:19 52:12 56:14 64:19 67:8

**nearest** 16:11

**necessarily** 84:19

**needed** 33:7 39:13,24 40:10 78:21

**net** 30:16

**never-never** 43:7

**nice** 28:7

**nodding** 53:17

**Nonresponsive** 109:1

**normal** 28:12 50:22

**North** 12:7

**notebook** 39:5

**notice** 67:20

**notification** 34:16

**notified** 64:11

**November** 14:20

**nuclear** 17:3

**number** 9:2 12:14 40:2 41:6 42:13 45:12 73:1 74:23 84:4 88:9 89:24,25 90:2,3,4,8,9,10 91:5,15 92:4,10,20 93:20 94:7,9 111:9 113:14,17 114:1, 19 115:11 119:23 128:13,15 130:21, 23 140:2,5 141:25 142:3

**numbers** 8:21 40:4 68:3,4 91:23 92:15 94:2 123:2,3 140:4

**Nut** 7:6,19 20:21,22,25 22:10 24:13 25:16 26:15 31:19 41:19 42:25 59:22 61:10,21 62:5 65:12 67:9 69:14 77:21 78:15,21 79:2,7,10,24 80:7 84:11,12,20 90:4 93:21 94:15, 24 95:2,3,6 96:21 97:5 98:17 99:4,7, 16,17,23 100:13,15,24 101:7,20,21 102:19,20 103:8,17 104:1 110:6 116:4 117:7 118:5,20 119:3,10,19 133:10,24 134:6 135:2,5,12,21,25 137:21 138:2,9,13,19 139:11,15 140:8,14 144:24 147:1,19 148:1

**Nut's** 69:16 116:7,13 117:12 138:4 145:3,5

**nuts** 101:21,22

## O

**O-L-N-E-Y** 15:23

**oath** 11:17

**Object** 26:23

**objection** 26:23 29:15 43:12,17 44:1 49:10 50:14 52:22 62:2,15 66:19 75:22 79:18 80:1,11 88:12,16 96:16,25 97:7,18,24 99:11,25 100:5 101:11,23 102:22 103:10,20 104:3, 15,24 105:8,15,25 106:8,19,24 107:3,16,25 108:9,20 109:1,5,10,16, 17,24 110:8,18 122:17 123:18 124:16 127:3 130:10,25 131:25 132:12,18,22 133:11,25 134:9,16 139:5,9,13,18,21 140:10,18 141:11 144:12 145:2,8,13,20 146:2,7,14 147:3,8,11,22 148:9,19

**obligation** 66:16 93:22 96:21,24

**obtain** 13:17 33:1,11 51:9 132:4,6, 20

**obtained** 95:12

**obvious** 103:12

**occasional** 31:1

**occasions** 137:11

**occur** 126:25

**occurred** 19:21 82:15 110:17 146:13

**occurring** 104:23 143:1

**office** 17:13 81:16,21,22

**officer** 15:9 16:6

**officers** 23:9,10

**Okoh** 60:3 69:13 94:20 106:22 107:1,6 108:19,23,25 109:4,7 111:8, 9,16 114:14,23

**Olney** 15:20 16:8,9

**open** 18:1 54:8

**opened** 17:20

**opening** 54:16

**opinion** 119:10

**opportunity** 52:16

**opposed** 120:2

**oral** 7:5 120:2 140:15

**orally** 119:19

**order** 31:5 71:24 72:18,19,21 73:16 74:2 76:12 85:14 87:21 108:23

**ordered** 31:16

**ordinary** 125:3

**org** 23:4,6

**organization** 36:22 50:19 52:8 54:23 55:6,8 105:6,11,13

**original** 86:13,25

**originally** 32:12

**Ortega** 95:10

**overheard** 102:9

**oversaw** 37:4 39:11,12

**overseas** 27:14

**oversee** 22:16 24:6 37:16

**owe** 108:19 109:3,7,8,13,14

**owed** 46:6 100:24 107:1,5

**owned** 16:24 17:8 20:20,21,23 26:7, 8

**owner** 95:24

**ownership** 19:13,22 20:5 21:9 66:15

P

**P-A-D-D-I-E** 23:14

**P-H** 57:11

**p.m.** 7:3 23:23 82:1 111:1 149:7

**packet** 74:10 77:15 81:9 86:2,10 88:7 91:16 129:19

**Paddie** 23:10,14

**paid** 33:10 39:13 58:12 70:15 74:5 75:11 80:22 95:9 103:4,14 111:8,19, 23 112:1 118:11 133:13,17 134:6, 11,14 142:10

**Pam** 37:10,11 39:1,6,10 46:17,25 47:1,2 63:17,18,19,22 73:14 74:4,24 136:4,19 143:10

**Pamela** 21:12 28:20 29:8 34:1 36:21 37:3,17 38:9 44:17,21 47:23 48:24 50:4,8 59:11 60:17 68:6 69:11

**Pamela's** 44:12 125:12

**papers** 81:11,17

**paperwork** 114:17

**Parra** 128:16,24

**part** 14:20 15:20,24 28:16 34:23 37:25 45:17 46:12 51:7,15 56:13 58:13 62:22 66:10 68:2 77:12 81:4,8 86:2,9 100:13 123:1 127:13 131:21 132:15 142:3

**part-time** 14:7

**participation** 65:13

**parties** 63:1 148:13,15

**partner** 20:22 25:17,19,21,23 26:2

**partners** 17:22,23 18:7,19 19:15 20:1,4,11,15 26:4

**partnership** 19:23,25 20:11

**partnerships** 20:14

**party** 38:14 64:5

**pass** 13:14 115:25 120:5 134:23 140:19 144:18 148:20

**passed** 91:23

**past** 41:5,9 52:14 121:21

**pay** 27:5 30:24 31:2 73:22,25 74:7 93:22 96:21,24 100:23,24 101:10 118:7 133:2,6,8,9,24

**payables** 30:23

**payee** 42:8,12 61:21 99:13 111:8 112:19 126:5,18

**payees** 64:25 79:24,25 80:4 99:17

**payment** 22:4 28:10,13 31:6 32:18 34:25 36:1,9,14,23 37:15 40:13 46:1,13 48:2,20 49:1 59:10,16,22 60:16 70:25 71:4,18,19 78:16,22 87:13,21 88:4 91:25 92:15 94:22 97:6,12 99:1 101:10,16,21,22 102:20 104:13 107:24 108:7 109:22 120:13,16,23 123:21 124:6,25 125:14 133:23 142:20 143:11

**payments** 79:7 112:5

**pays** 13:21

**pecan** 7:6,7,16,17 17:24 18:8,13,15, 20 19:15,20 21:5,8 22:8 25:15 26:22 27:6,9,17,22,23,24 28:3,5 53:20 66:4,7,16,17 69:25 70:13 82:5 94:24 95:4,5 110:22 116:3,12,15 117:1,4,9 118:14 119:18,25 124:18 127:13 135:17,21 136:15 137:22 138:3 139:4,11,23 140:1,16 148:1

**pecans** 22:5,10 39:12 78:17 91:23 92:15 93:22,23 96:22 101:2,7,14,17 102:20 103:4,12,14,18 118:7 134:7

**Pedro** 7:11

**pen** 61:9

**people** 19:10 25:11 30:3 45:1 56:25 74:21 95:18 128:5 133:17 135:4 143:17,21

**percent** 20:6,17,20,21,23 25:21 26:7,9,10,13,14,15 92:25 143:3,5

**percentage** 26:5 143:4

**period** 21:12 41:7 94:15 138:22 139:12,16,20

**permission** 108:16

**permit** 113:13

**Persistence** 13:21

**person** 19:23 31:16 36:21 39:15 40:14,17,20 41:15 42:7 48:4 50:5 59:9,10 60:22 63:21 70:6 135:24 137:8 143:22

**personally** 116:6,9,19 117:6

**pertinent** 149:5

**phishing** 51:18 56:20,22,23 57:6, 15,23 58:3,21,23 60:14 105:6,10,14, 18 121:23,24 122:1,3,6,9,12,16 123:17 135:2,5,10,14,17,22 136:1

**phone** 35:3 44:16 45:15 46:19 47:2 66:8 68:2,7,9 119:23 123:1 124:24 128:12,20,22 129:7,14 140:2,4 141:17 143:11 144:1,7

**physical** 9:7,9

**pick** 44:16 47:2 66:8 144:1

**picked** 46:19 141:17

**picking** 45:15 128:20 129:14 144:6

**picks** 143:10

**place** 17:3 20:9 24:2 30:5 36:19 70:24 105:13 123:7 124:4,10 142:17 144:25 145:4,11 146:12,25

**places** 28:14

**Plains** 24:23 28:9,13 32:14

**Plaintiff** 7:18 93:14

**Plaintiff's** 44:15 71:25

**plant** 128:25 143:19

**platform** 24:23,25 25:14 28:9,18 32:15,20

**PO** 62:4 77:17 78:6 88:6,7,9,25 89:2 90:10,13,14,23 92:13 94:7,9,11 111:21

**point** 19:22 20:1 34:14 39:10 60:20 64:6 105:4 134:20 136:6 138:17

**pointers** 40:1

**policies** 28:21,24 29:10,23,25 35:2 57:21 58:2 66:9 142:16

**policy** 29:2 32:25 33:2 35:24 48:23 49:4 66:11,17,21 67:13

**Ponce** 95:10

**population** 45:1

**portion** 23:25

**pos** 78:9 104:17

**posed** 57:22 58:3,21,23 105:6,14 121:23 122:3

**poses** 105:10

**position** 14:16 15:2,9 16:5,8,10 18:9 22:25 23:3 32:13 93:21 110:19,20,21,22 135:25 140:23 142:23,25

**possibility** 49:6 97:20,25

**possibly** 84:11 104:16,18 121:2

**pound** 74:3

**pounds** 73:21 74:3 88:22,24,25 89:1,2 91:5

**power** 99:21

**practice** 17:21 18:1 119:25

**practices** 8:11 52:19 53:21 140:25 141:3,9,13

**practitioner** 14:23

**precaution** 48:7,18

**precautions** 51:5

**present** 7:13 127:9,12

**presented** 31:5 72:17 76:20 126:19

**pretty** 13:25 38:23 39:10,14 115:19

**prevent** 35:25 45:10 47:4,10 49:4 50:5 54:4 57:22 58:2 59:7 135:21 140:14 142:23

**prevented** 104:9,22 128:20 129:14 142:25

**previously** 55:16 68:3 121:22 123:2

**price** 73:22,23 91:3

**primarily** 127:19

**primary** 36:25

**printed** 87:2

**prior** 36:17 51:15 56:4 72:15 79:18 80:1 89:19 97:12 122:17 124:16 130:25 136:10

**privy** 51:16

**pro** 123:7

**problem** 40:5 60:20 61:5 95:2 103:6 144:25 145:4,11 146:4

**proced** 30:10

**procedure** 28:19 29:2 30:11 32:17 33:7,8 34:14 35:9,10,12,13,24 36:12,18 46:13 48:24

**procedures** 28:22,24 29:23,25 30:2,3,4,10 36:4 43:24 45:23 53:21 57:21 58:2 123:7 124:10 142:17

**proceeding** 11:20

**process** 45:17 46:12 65:14 71:21 98:18,22 105:5 136:3,8,12

**processes** 91:24

**produced** 85:5 91:16 93:13

**product** 24:23,24 25:14 27:14 46:6 72:23 75:7,11 76:4,17 124:22 132:5 136:14

**professional** 115:23

**program** 131:6,22 132:13,16

**project** 25:7

**promise** 9:9

**promote** 27:15

**prompt** 11:13

**prompted** 125:21

**pronounce** 43:22

**proper** 72:18

**protect** 50:19 52:7,8 54:23 105:13 122:2,14,19

**protected** 122:5

**protection** 47:13 67:25 121:15 144:8

**protections** 105:13

**protocol** 44:5,9

**provide** 33:3,4 44:6 67:14 78:22 93:21 108:7 132:16 142:3

**provided** 33:23 64:10 68:4 78:17 96:15,21 102:21 123:3 129:20

**providing** 144:9

**PSAS** 56:2

**public** 14:11 67:23,24

**publication** 51:21 52:1,4

**publicly** 8:11

**pull** 97:15 103:25 111:14

**pulled** 78:8 125:12 128:25 143:22 148:14

**Pulte** 17:5

**purchase** 73:16 74:2 76:12 85:14 108:23

**purchases** 124:21

**purportedly** 145:5

**purpose** 34:22 35:23 47:9 50:3 54:23 70:9 83:14 100:22

**purposes** 11:20 22:9 37:13

**pursuant** 149:3

**put** 28:15 30:5 34:13 37:23 49:15 50:25 57:16 61:8,17 62:12 67:20 69:3 70:14,18 72:18 75:18 105:12 112:12 115:9 123:7

**puts** 73:15

**putting** 103:25

## Q

**quality** 76:17

**quarterly** 51:21,25 52:2

**question** 11:24 13:17 19:3,6 23:24 35:20 43:13 44:2 48:6 50:1 53:14 66:19 91:21 93:5 107:21,22 109:2,3 117:24 126:16 131:16 132:8 133:3, 5,21 136:8 140:22 146:17,20

**questioning** 118:16

**questions** 51:22 67:22 115:18 118:13 120:8 130:11 132:25

**quick** 23:20 81:25 110:24 111:2

**quickly** 140:22

**quote** 65:13

## R

**raise** 60:4 125:8

**ran** 93:9

**range** 52:14

**ranges** 51:24

**rapport** 37:8

**re-call** 40:22,24 41:2,5,8,17,25 42:15,17,20 97:15 98:10

**re-mark** 111:4

**read** 23:25 39:7 51:21 59:25

**reading** 53:18 59:3

**ready** 74:5 76:4

**real** 111:2

**realized** 40:20

**realizes** 124:8

**reask** 50:1

**reason** 8:15 11:23,24 29:13,22 42:6 47:1,2 50:15 71:11 109:20 114:16 117:15,20,25 118:3 119:2,5,18 126:23 138:9,13,16 140:7,14 143:14

**reasonable** 43:11,23 46:9,11 122:13

**recall** 23:6 25:7 40:23 42:8 54:2 61:6 95:23 125:11,15 127:21

**receipt** 39:11 72:22

**receive** 45:12 76:22 78:16 79:7,17 80:7 101:3,13,22 102:20 134:13 136:14,18

**received** 22:5 36:24 39:12 44:14 54:3 64:23,24 73:24 75:3,20,25 89:16,18 91:5,21,22 92:14 93:6,7,8 94:3,6 101:20 103:12,18 106:14 117:1,7 118:19 119:16 123:8 134:14 138:19

**receives** 72:5

**receiving** 44:11 88:25 97:6

**recent** 67:17

**recess** 23:23 82:1 111:1

**recognize** 82:3 86:9

**reconfirming** 49:7

**record** 7:24 9:1 29:9,16 34:13 37:23 72:24 73:8

**records** 22:17

**RECROSS-EXAMINATION** 134:24 144:19

**red** 60:4 125:8 137:18

**redacted** 82:7,9,10

**redactions** 82:15

**REDIRECT** 120:6 140:20

**reduce** 36:3

**reduced** 30:2,5

**referred** 24:15 78:10

**referring** 72:24 74:16 93:2

**reflect** 82:10 84:10

**reflected** 93:23 112:24 117:21

**regard** 68:16 69:8 96:7 124:5 140:23

**regular** 30:25 51:8

**relate** 55:12 58:5 99:19

**related** 26:25 27:1 52:20 54:5 56:16 66:5,14,24 70:19 81:19 82:11,12 84:11 98:22

**relates** 41:1 43:15,24 59:22 77:21 100:15

**relating** 111:21

**relevant** 24:2 39:16 66:11

**remaining** 114:24

**remember** 18:22 40:19 42:14 64:16 66:23 67:3 118:16 126:3,8 133:2 139:22

**remind** 35:18

**repeat** 31:3 117:24

**rephrase** 12:1 146:10

**replied** 47:7

**report** 21:17 22:2 90:5,7

**reportedly** 29:16

**reporter** 7:2,10 11:7 19:2 129:23,25 146:18 148:24 149:2

**represent** 7:14 56:1 85:3

**representative** 100:19,20

**representing** 7:10

**represents** 72:22

**request** 32:22 33:1 42:22 50:9 68:4 70:1,25 71:2,4 76:22 77:8,12 88:18 89:9 123:3

**requested** 23:25 32:21 54:3 70:4 88:11 94:14 107:15 125:14

**requesting** 84:5 98:15

**requests** 49:12 68:1 122:25

**require** 29:20 35:3,6,9 44:5,10 45:19 46:15 77:14

**required** 29:12,14 30:8 48:24 51:8 81:14 87:13 132:9

**requires** 49:11

**requiring** 45:16

**research** 55:7 56:10

**researched** 66:9

**reside** 10:9

**resided** 12:4

**resides** 10:10

**resources** 55:11

**respect** 116:18 135:22 136:4,9,25 137:18,23 147:1

**respectful** 134:19

**respectfully** 35:19

**response** 41:13 43:8 59:2 118:15, 20

**responses** 11:11

**responsibilities** 21:23 22:1,15,16 23:17 24:4,9 37:2 50:19,24

**responsibility** 37:16,25 50:22 53:3 105:17,18 110:16 148:7,15

**responsible** 147:6,10

**restroom** 23:20

**result** 72:12 89:4 138:4

**return** 34:6

**reverse** 71:23 72:19

**review** 148:23 149:1,6

**Richard** 19:24 20:20,24 25:8,23 26:14

**Richard's** 26:10

**rise** 21:2,20 27:18 29:6 32:8 33:14 35:14,25 36:17 39:17 50:2 51:16 53:12 55:20 56:4 57:5 91:2 96:20,24

**risk** 36:14 51:1 57:14,22 58:3 60:13, 15 105:6,10 123:16

**risks** 59:7 105:14 121:23,24,25 122:3,6,12 124:9 138:4

**road** 14:5

**Rockwall** 10:12

**role** 21:7 22:13 98:22

**root** 102:15

**roughly** 138:22

**Ruben** 128:16

**rules** 11:6 149:3

**run** 8:21 75:7

**S**

**S-A-G-E** 24:22

**S.A.** 65:21 96:4 109:9,15 112:22

**Saba** 7:6,7,16,17 8:17,18 9:3 10:17 12:7,20 14:5 15:8,9 16:5 17:19,20, 23 18:1,7,15,20,25 19:15,20 21:4,8 25:15 26:22 27:6,9,17,22,23,24 28:3,5,10 44:5,25 45:25 46:12 53:19 54:2 57:20 59:6 62:5,13,18 66:4,7, 16,17 69:25 70:13 71:21 75:24 78:17,22 82:5 84:4 85:5 89:3 91:16, 22 92:13,14 93:13,18 95:4,5 98:13, 19 100:21,25 101:2 102:18,21 103:19 104:9 105:22 107:1 108:19 109:3,14,22 110:5,16,22 115:10,16 116:3,12,15 117:1,3,9 118:7,14 119:1,18,25 120:21 121:4,14 122:14 124:4,18 127:13 128:9 130:6,9,23 131:17,18,19,21 132:5,9,16 133:2,6, 17,23 135:17,20 136:15 137:22 138:3 139:4,11,23 140:1,15 142:9, 24 147:25

**Saba's** 32:17 45:23 97:4 99:1,19 101:6,8 120:12 131:3,11 132:25 141:2,8

**safety** 29:11,17 131:6,22 132:11,13, 15

**Sage** 24:22 25:14 28:18

**sake** 99:15 111:5 113:13

**sales** 27:12,15

**San** 7:6,7,11,12,16,17 8:17,18 9:3 10:17 12:7,20 13:2 14:5,7 15:8,9 16:5 17:19,20,23 18:1,7,15,20,25 19:15,19 21:4,8 25:15 26:22 27:6,8, 17,22,23,24 28:3,5,10 32:17 44:5,25 45:23,25 46:12 53:19 54:2 57:20 59:6 62:4,13,18 66:4,7,15,17 69:25 70:13 71:21 75:24 78:17,22 82:5 84:4 85:5 89:3 91:16,22 92:13,14 93:13,18 95:3,4,5 97:4 98:13,19 99:1,19 100:21,25 101:2,6,8 102:18, 21 103:18 104:9 105:22 107:1 108:19 109:3,14,21 110:5,16,22 115:10,16 116:3,12,15 117:1,3,9 118:7,14 119:1,18,25 120:12,21 121:4,14 122:13 124:4,18 127:12 128:8 130:6,9,23 131:3,11,17,18,19, 21 132:5,9,16,25 133:2,6,17,23 135:17,20 136:15 137:21 138:3 139:4,11,23 140:1,15 141:2,8 142:8, 24 147:25

**sat** 39:18

**satisfied** 127:24

**savings** 15:11,14,19,20,25 16:1,2,3 17:9,11

**scam** 67:25

**scan** 34:11

**scandal** 15:14

**scenario** 77:6

**scheme** 56:3,6 102:15 122:3,6,16 123:17 135:2,6,10,14,18,22 136:1

**school** 12:19,20

**schooling** 13:9

**scope** 37:2 53:3,24 54:1

**score** 29:18

**Scott** 10:5,6

**search** 126:1

**Seaton** 63:1,6

**second-to-the-last** 113:10

**secondary** 35:3,9 48:25 120:22 127:1 142:19

**secondhand** 63:18

**security** 43:11,23 50:11

**seek** 142:18

**self-employed** 17:21 18:4

**selling** 136:14

**seminar** 38:9

**send** 33:5 34:2,3,9,16 38:9 45:6,13 46:3 49:11 54:11,13 56:25 60:2 68:25 72:9 83:15 106:13,14 108:3,6, 12 123:10 126:23

**sending** 61:4

**sends** 98:14

**senior** 15:4

**separate** 65:6,7

**Sept** 18:24

**September** 19:1

**servers** 58:14,15,18

**service** 67:23,24 96:3

**services** 27:2,4,5 65:22 96:3 109:14 112:19

**set** 25:12 27:13,14 30:15 31:2,4,7, 18,19,22 86:6 87:17,25

**setting** 24:11 28:8,12 30:7,8,9

**setup** 28:16

**seventh** 113:15

**Shahan** 7:5,20,25 8:21 9:21 10:4,5 116:3 135:1

**Shahans** 8:17

**she'll** 37:22 82:22

**sheet** 33:23 70:8,9,11 75:7 76:1,3, 10,25 77:3,7 83:15 88:25 89:17 93:7 114:5

**shell** 22:8

**ship** 89:1

**short** 41:7

**shorthand** 7:10

**show** 38:14 55:16 82:2 86:5 87:11, 17,25 90:22 93:18 94:9 102:13 111:4 113:21 128:8 129:9

**showed** 125:13 126:19 127:12 129:5

**showing** 55:23

**shows** 61:23,25 75:24 88:18 90:24 92:4,14 93:8 94:19 112:19,25

**shut** 37:13

**sic** 18:5 111:17,23

**side** 29:17

**sign** 33:24 34:8,17,23 59:15,24 69:1 71:1,3,8,11 74:6 76:21 77:7 85:12, 20

**signature** 33:22 34:6,8,14,18,19,24 71:12 72:15 74:9

**signatures** 49:18

**signed** 34:7 49:11,18 68:22 69:4,5 71:10 78:4

**signing** 77:24

**signs** 14:8

**similar** 56:23 67:8,9,11 69:22 75:24

**simple** 104:12 123:14

**simply** 124:24

**single** 126:4 132:4,10,15

**singular** 35:5

**sir** 12:6 19:2,14 115:18

**sister** 8:19 16:24

**sit** 59:2 68:15 78:14,20,24 79:5,16 80:6 91:20 92:23 96:10 97:3 102:5 103:16 118:18 145:17

**sitting** 41:15 74:8 78:3

**situation** 39:14 66:12 77:22 102:2

**slash** 52:25

**slip** 83:19 84:4,8

**slips** 83:12,14 84:10

**small** 66:10

**snail** 141:22

**software** 24:22 25:12 58:15 71:6

**sold** 19:15,24

**sole** 14:23

**solicited** 130:6,9

**someone's** 60:14

**someplace** 137:5

**son** 8:3,4

**Sonny** 23:10

**sons** 8:4 9:23

**sort** 27:25 66:15 67:14 76:14 123:17 137:9 138:5,18 142:19

**sounds** 26:19 65:24

**source** 120:17

**Spanish** 119:21 127:20

**speak** 127:19

**specific** 19:18 32:25 39:18 54:10

**specifically** 27:12 41:18 58:22

**specifications** 96:22

**specs** 75:3

**specu** 110:8

**speculating** 148:17

**speculation** 26:24 49:10 50:14 62:2 97:19 99:11,25 100:6 101:11,24 102:22 103:11,21 104:24 105:8 106:2,11 107:18 108:1,10,21 109:6, 18 110:9 122:18 123:18 134:16 144:12 145:2,8,13,20 146:2,7,16 147:3,8,11,22 148:10

**spell** 9:19 15:22 32:3

**spelled** 23:14

**spite** 110:15

**split** 26:12

**spoken** 65:24

**spot** 146:3

**spreadsheet** 61:15 62:9,12 89:18, 21 90:1,2 111:20

**SQF** 131:14

**SS** 115:13,15

**stack** 125:12

**staff** 14:17 15:3

**stalk** 9:10

**stamped** 72:25 73:9 85:4 86:7 114:18 115:3,16

**stand** 55:23 80:19

**standpoint** 22:18 27:8 52:25 53:23 86:19 96:9 100:21 101:25 142:22 143:8 144:6

**stands** 27:11

**stapled** 77:4

**star** 61:9

**start** 14:9 22:19 40:5 72:19,21 93:16 117:19

**started** 10:19 13:19 53:17 59:12 63:24 72:19 144:25 145:4 146:4

**state** 7:13,24 13:1 138:12

**stated** 120:8 122:11

**statement** 82:5

**statements** 29:15

**States** 7:8 128:23 144:16

**stay** 81:13

**stayed** 15:24 16:25

**Steve** 31:15 32:1 74:25

**Steven** 10:4,16

**stipulations** 7:14 149:4

**stopped** 53:11

**storage** 76:1,3,4 77:16 78:6 85:14 89:17 90:14,19,20,22 91:1,2,3,4 93:7

**straight** 17:25

**Straley** 25:9 66:21 67:13

**strange** 114:16

**Street** 9:3 12:4,5,7,13

**structure** 20:8,9,10,14 25:15

**stuff** 19:10 127:14

**subject** 135:2,5,9,13,17 137:19

**subjects** 51:24,25 52:15

**submitted** 100:25

**subsequent** 34:24

**subsequently** 15:10 16:14 19:24

**subsidiaries** 17:16

**sufficient** 91:23 92:14 137:6

**suggest** 122:22

**suggested** 122:24

**suggestion** 123:14

**suggestions** 67:24

**suggests** 68:1

**suit** 21:3 35:25 50:3 51:16 57:5

**Suite** 7:12

**summarized** 69:9 78:25 79:8 80:9

**summary** 79:23 89:10,12,21 91:13 94:5 113:3 133:18

**summers** 14:5

**Supervision** 17:14

**supplier** 24:16,17,22 46:20,22,23 48:9 132:4

**suppliers** 24:11,13 37:8

**supplies** 132:5

**supply** 22:4

**supplying** 22:10

**support** 27:2

**supposed** 60:22 81:20 87:6

**supposedly** 95:22 119:14,15 145:15

**supposition** 98:7

**surface** 147:14

**surprised** 126:9,11

**swallow** 85:1

**swear** 7:15

**sworn** 7:21

**system** 24:11,20,22 30:9,18,23 31:9,20,23 40:22

**systems** 120:13 122:15

## T

**table** 75:8

**tables** 93:10

**taking** 13:19 89:10

**talk** 12:3 18:18 22:13 30:8 56:2 63:16 69:24 95:24 143:17 144:7

**talked** 13:22 56:18,24 113:4

**talking** 24:3 42:24,25 59:13 63:9,17 64:15 66:6 73:8 80:14 91:22 96:1 100:19 111:17

**talks** 67:24

**taught** 39:19

**tax** 27:10,13,16

**telephone** 46:22 140:15

**telling** 63:19,20 64:13 75:2 115:14 126:22

**tells** 75:1,4 112:12

**templates** 37:6

**ten** 11:3 20:20 26:7 30:16

**tend** 108:24

**tenders** 8:25 87:16,24

**term** 43:19 44:3 55:1,3 64:22,23 65:8 78:15 82:6

**terms** 20:8 21:17 28:13 30:15 58:25 71:5 74:2

**testified** 7:21 24:19 28:21 41:16 48:17 52:6 68:5 77:20 85:13 107:9 121:22 125:20 126:10 129:17 130:20 143:8 148:11

**testify** 68:21 104:11

**testifying** 107:10

**testimony** 11:20 47:16 78:19,24 79:19 80:2 96:10,15 103:1 104:8 109:24 121:3 122:18 124:17 125:20 126:4,18 127:5,7 131:1,9 132:2 141:5 143:18 144:8

**Texas** 7:4,8,12 9:2,3 10:11 12:14,17 13:2 14:12 15:11,23,25 16:2,3,12, 13,18,19 17:8,11

**text** 35:4 46:24 47:20,24 48:5,12,14, 16,19 104:12 120:2 121:1 140:9

**texted** 141:20

**texting** 46:24

**thereof** 22:18

**thing** 16:11 19:4 27:3 54:5 58:5 93:4 142:23,25

**things** 10:18 25:13 28:20 40:1,7 49:3 50:25 51:17,18 52:12 56:14 64:8,19 66:8 67:25 132:24 137:2,9, 14,17

**thinking** 65:4

**thought** 65:2,3 66:11 67:13 106:13 109:23 125:2

**thousand** 19:19 21:10

**threat** 56:2 58:21

**threats** 50:20 51:17 54:4 55:7 56:11 58:23

**throw** 19:10

**ticket** 85:15

**time** 7:3 10:24 11:1 17:22 18:16,20 19:22 20:2,6,13 21:2,19,20 22:22 23:3 24:1,2 25:16 27:4 29:5 32:7,10, 11,16 33:13 35:7 38:8 39:2,16,17, 18,25 41:4,5,7 45:19 49:20,21 50:2, 4 53:7,8 54:6 59:13,17 60:5,13 64:7 70:12 73:15 76:7,20 77:11 94:15 105:5 107:12 111:3 115:21 117:13 118:8,25 121:11 123:11 124:7,13 125:7,9 126:25 136:6,10,12 138:17 139:3,12,16 140:12 142:6 145:16

**times** 10:22 11:13 45:6 74:3 81:15 129:4

**Tindall** 7:11

**tired** 134:18

**title** 16:7,11 23:1

**today** 11:8,17 15:12 27:4 39:3 41:16 59:2 68:15 78:14,20,24 79:5,16 80:6 91:20 92:23 96:10 97:4 102:5 103:17 115:18 117:17 118:18 127:5 145:18,19,21

**Today's** 7:2

**told** 43:3,4,5 49:14 106:12,13 107:5, 7,10 138:3

**top** 69:25 70:8,9,14 76:22,25 119:8 128:14,15

**total** 26:5,8 61:13 142:9,12,16,21

**totaled** 112:1

**touch** 54:19,20

**tough** 13:25

**town** 15:23

**train** 48:1

**training** 38:10 40:8,10 52:5,7 54:2, 21 56:13

**tran** 89:11 98:11

**trans** 65:15

**transact** 120:1

**transaction** 72:13 81:9 84:11 89:11 96:12,20

**transactions** 37:15 78:11 82:11 84:12 119:20 137:18

**transcript** 149:4

**transfer** 32:20,21,22 33:17 34:15 40:2,16,22 41:8 44:14,19 45:11,24 46:18 48:2 50:4 60:21 68:1 69:10 71:3,12 72:1,5 75:18 76:21 77:3,7, 15,19 78:5 83:15,22 85:7 93:1 98:12,18 107:14,15 111:21 112:5 113:2,18 114:5 122:25 124:2

**transferred** 27:22

**transfers** 39:15 43:16,24 44:23 47:17 63:13 65:10,11 68:6,16 79:2 98:10,15 114:7

**transitions** 18:19

**translate** 128:24 143:20

**transmitted** 44:20

**treasurer** 16:13

**treasury** 24:7

**treat** 23:7

**trial** 93:18 102:13

**trigger** 101:16

**triggered** 91:25

**triggering** 92:15

**trouble** 60:1

**truck** 73:6,7 81:21,23

**trucking** 81:12

**true** 9:6 28:22 42:19 47:19 48:18 49:2 65:18 84:13 103:1 109:3 129:19 140:23 142:8

**trust** 16:1,2,3,12,13,18,19,20 17:9, 11 26:7

**trusts** 20:18,19 26:3,6,8,13

**Ts** 10:6

**turn** 29:1 51:22

**turned** 64:10

**turns** 133:21

**Tuttle** 7:18,23 19:4 23:20,24 24:1 27:1 28:4,8 29:22 43:15,20 44:4 49:16 50:17 52:24 62:4,18 75:23 79:22 80:5,13 81:25 82:2 85:3 86:5, 14,15,22 87:1,5,11,20 88:3,14,19 96:19 97:3,10,21 98:1 99:14 100:2,8 101:13 102:1,25 103:13,23 104:6,17 105:1,12,21 106:5,15,21,25 107:7, 21 108:5,14 109:1,2,8,13,20 110:3, 13,20,24 111:2,7,25 112:18 113:9 115:25 120:7 122:20 123:20 124:19 127:5 129:21,24 130:2,13 131:3 132:2,14,19,24 133:15 134:3,12,22, 23 139:5,9,13,18,21 140:10,18,21 141:14 144:17,18 145:2,8,13,20 146:2,7,9,14,16,20,22 147:3,8,11, 22,24 148:9,19,22

**twin** 9:23

**twins** 8:7

**two-factor** 68:2 123:1,22,23 124:5 138:5

**type** 14:3 16:11 32:13 51:5 56:15,19 58:2 130:3 137:2 142:23,25

**types** 55:13

**typical** 90:3

**typically** 51:11 81:8,10

**typo** 90:6 92:5 94:5,7

## U

**uh-huh** 10:7 11:14 17:2 61:7 68:8, 12 111:13 112:21 113:24 114:20,22 125:16 130:17

**ultimately** 43:3 145:1

**umbrella** 25:10 26:21

**unable** 127:6

**unauthorized** 47:4 49:5 50:5 56:25 97:11 116:24 118:6,20,23 119:3,6 145:6

**unchanged** 20:11

**uncommon** 125:7 129:6

**underscore** 115:16

**understand** 11:7,10,15,17,19,25 47:21 53:8 56:22,23 57:19 61:24 63:19 71:20 106:15 107:13 108:5 128:6 132:14 147:10

**understanding** 13:11 20:14 27:6,8 36:10,11 47:22 61:10,13,22,25 62:8 63:8 64:20 65:12 78:4 83:13 143:10 145:10 146:12,25

**understood** 30:3 39:7 100:22 115:18

**undertaken** 25:7

**unfortunate** 102:3

**United** 7:7 128:23 144:16

**University** 13:2

**unload** 73:7

**unquote** 65:14

**unusual** 129:12

**updating** 36:22

## V

**vague** 26:23 43:12 44:1 52:22 66:19

**valid** 92:9

**variation** 30:12

**variations** 18:15,18

**vendor** 24:18 28:8,12,16 30:7,8,9, 12,19,21,23 31:2,4,6,7 32:18 33:18, 24 36:5 48:9 71:8 74:1 75:20,25 81:10 122:14 123:21 132:10,15

**vendors** 29:20 36:24 37:9 84:20 140:24

**verbal** 11:10 69:2 74:24 76:15

**verification** 35:3 68:2 123:1

**verify** 33:21 34:23 44:17 123:20

**verifying** 35:11

**vernacular** 24:18

**versa** 101:20

**versus** 137:1

**vice** 101:20

**victim** 135:21 136:1

**virus** 54:8,10,15

**visit** 123:11

### W

**w-i-r-e** 84:2

**wait** 19:5 35:19 53:14

**wanted** 15:4 33:3,4,5 37:10 45:4 46:7 137:22 138:5

**warehouses** 101:8

**warned** 56:24

**warnings** 54:21,22 58:9

**wasting** 64:7

**watch** 24:10

**ways** 42:11 137:23

**website** 55:15 123:11 139:24 140:1, 5

**week** 93:9

**West** 9:3 12:4,5

**Western** 7:8

**whatsoever** 99:8 100:12 131:16

**wife** 9:16 12:10

**window** 42:5

**wire** 28:10,18 32:20,21,22 33:10,16, 25 34:15,19 35:11 37:7 39:15 40:2, 16,22,24 41:6,8 42:1,16,17,18 43:16,24 44:14,19 45:3,6,11,24 46:4,17,18 47:7,17 48:2,8,10 50:4 59:19 60:21 61:9 63:13 65:10,11,15 68:16,19 69:3,4,5,10 71:2,12,21,22 72:1,5 74:6,9 75:18,19 76:21,24 77:3,7,15,19 78:5 79:1 82:15 83:15, 22,25 84:2,24 85:7,12 91:12,17 92:1 93:1 94:13,14,16,19 98:10,11,12,14, 18,21 103:25 107:8,14,15 111:16, 20,23 112:5,11 113:1,18,23,25 114:5,7,14,18 124:2 125:6 138:6

**wired** 80:8 89:6

**wires** 41:1,3 42:21 61:5,11,13,16,20 65:7 69:8,18 80:8 84:4,7,15,17,18, 24 85:22 94:23 96:2 97:10,15 100:15 111:25 117:16,21 118:1,15 119:8 145:6

**wiring** 28:15 44:6 117:3,8 121:9,18 136:4,9,13,16 137:6,10,16,23

**word** 27:15 30:1 57:6,10,12 58:9 64:16 75:5 126:16

**words** 38:3 76:3 91:1 98:4 100:20 101:16 120:20

**work** 14:1,11,22 15:25 16:16 17:22 18:23 131:17,18

**worked** 14:4 37:5 39:3,14

**working** 14:10 17:19 22:19 32:7

**wow** 10:25

**write** 30:24 31:1 70:18 114:1,10 115:10,13

**writing** 30:2,6 76:15

**written** 28:21,23,25 29:10,23 34:16 39:5,7 48:23 49:17 68:13,14 142:17

**wrong** 40:13,17,20 41:15 42:7,8,12, 13

### Y

**year** 12:10,21 14:6,18 16:15 22:19 51:10

**yearly** 51:9

**years** 9:12 11:3 14:4 40:15 42:10 52:14

**yelling** 45:8